# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA        . CRIMINAL NO. 11-10331-RGS
                                .
          V.                    . BOSTON, MASSACHUSETTS
                                . NOVEMBER 4, 2011
 REZWAN FERDAUS                 .
     Defendant                  .
. . . . . . . . . . . . . . . . . . .
```

### TRANSCRIPT OF DETENTION HEARING
#### BEFORE THE HONORABLE TIMOTHY S. HILLMAN
#### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the government:    UNITED STATES ATTORNEY'S OFFICE
                       BY: B. Stephanie Siegmann, Esq.
                       One Courthouse Way, Suite 9200
                       Boston, MA  02210
                       617-748-3100


For the defendant:     Federal Defender Office
                       BY:  Miriam Conrad, Esq.
                       Catherine Byrne, Esq.
                       51 Sleeper Street, Fifth Floor
                       Boston, MA  02210
                       617-223-8061
                       miriam_conrad@fd.org
                       catherine_byrne@fd.org


Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

***MARYANN V. YOUNG***
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1                         **I N D E X**

2  **WITNESSES**        **DIRECT**    **CROSS**      **REDIRECT**      **RECROSS**

3  **Government's:**

4  Bradley Davis      4          49

5

6  **EXHIBITS**              **DESCRIPTION**                    **IN EVIDENCE**

7  **Government's:**

8       1           Complaint Affidavit                    13

9       2           CD of Consensual Recordings            15

10      3           Indictment                             24

11      4           Attack Plan provided 5/5/11            27

12      5           Attack Plan provided 6/9/11            27

13      6           Email from Defendant's Gmail

14      7           Email from Defendant's Gmail

15      8           CD - Training Video                    41

16      9           Photo of Inside of Framingham Storage  46

17      10          Photo of Inside of Framingham Storage  46

18      11          Photo of Inside of Framingham Storage  46

19

20

21

22

23

24

25

3

1    CASE CALLED INTO SESSION

2    (2:13:40)

3            THE CLERK:  Timothy S. Hillman presiding.  Today's

4    date is November 4, 2011 in the case of USA v. Rezwan Ferdaus,

5    Criminal Action No. 11-10331.  Counsel; please identify

6    yourself for the record.

7            MR. CABELL:  Good afternoon, Your Honor, Donald

8    Cabell for the government.

9            MS. SIEGMANN:  Good afternoon, Your Honor, Stephanie

10   Siegmann for the United States.

11           THE COURT:  Good afternoon.

12           MS. CONRAD:  Good afternoon, Your Honor, Miriam

13   Conrad for Mr. Ferdaus.  With me is Ms. Byrne, Catherine Byrne

14   form the Federal Defender Office and with Your Honor's

15   permission Michael Gibbons who is a paralegal in our office.  I

16   was going to say and is also a member of the Bar but he hasn't

17   been sworn in yet so.

18           THE COURT:  Know him well and he's very welcome.

19           Okay, you may proceed.

20           MS. SIEGMANN:  Your Honor, the government calls

21   Special Agent Bradley Davis to the witness stand.

22      GOVERNMENT WITNESS, BRADLEY DAVIS, SWORN

23           THE CLERK:  Please be seated.  Could you state your

24   name and spell your last name for the record.

25           MR. DAVIS:  Yes.  My full name is Bradley Davis,

4

1   D-A-V-I-S.

2                          DIRECT EXAMINATION

3   BY MS. SIEGMANN:

4   Q.   Could you please state your occupation for the record?

5   A.   Yes.  I'm a supervisory special agent for the FBI in

6   Boston.

7   Q.   How long have you worked for the FBI?

8   A.   Over 16 years.

9   Q    What is your present assignment?

10  A.   I'm a supervisory special agent of a domestic terrorism

11  squad in the JTTF.

12  Q.   You just mentioned JTTF.  What is the – and that stands

13  for what?

14  A.   Joint Terrorism Task Force.

15  Q.   Can you explain what the Joint Terrorism Task Force is to

16  the Judge, please?

17  A.   Yes.  Your Honor, the Joint Terrorism Task Force is a

18  group of, a multiagency group who investigate terrorism

19  matters.

20  Q.   Who sits on the JTTF?

21  A.   Multiple law enforcement agencies.  Both or state,

22  federal, local agencies are all on the Joint Terrorism Task

23  Force.

24  Q.   What is your responsibilities as a supervisory special

25  agent of a squad assigned to the JTTF?

5

1  A.   I'm responsible for the supervision of investigative

2  activities of special agents and task force officers regarding

3  terrorism investigations.

4  Q.   Are there any specific units that fall under your

5  supervision?

6  A.   Yes, I also supervise the special agent bomb tech program

7  and the evidence response team program in the FBI Boston

8  office.

9  Q.   Now before becoming a - well how long have you served as a

10  supervisor of the Joint Terrorism Task Force, one of the

11  squads of the Joint Terrorism Task Force?

12  A.   Mmm-hmm.  I've been in, serving in that capacity for two

13  years now.

14  Q.   And before becoming a supervisor involved in the JTTF did

15  you actually investigate terrorism cases?

16  A.   Yes, I did.

17  Q.   For how long have you done that?

18  A.   Approximately 11 years.

19  Q.   Have you received training on how to conduct terrorism

20  investigations?

21  A.   Yes, I have.

22  Q.   Have you received training on the use of undercover agents

23  and employees to investigate terrorism targets?

24  A.   Yes, I have.

25  Q.   Have you been involved in the investigation of the

6

1  defendant Rezwan Ferdaus?

2  A.   Yes, I was.

3  Q.   When did you first become involved in this investigation?

4  A.   Approximately February of 2011 I was first provided

5  information regarding this case.

6  Q.   And since February of 2011 have you been consulted in this

7  investigation and briefed upon its developments?

8  A.   I have, yes.

9  Q.   During the pendency – well you mentioned a few minutes ago

10  two squads, I'm sorry, two units that you supervise.  Can you

11  mention those again?

12  A.   Yes, the special agent bomb tech program, bomb technician

13  program which is akin to bomb squads that state and local

14  agencies have.  They investigate actual or suspected devices,

15  explosive devices.  And the other unit is the evidence response

16  team which is a team who, that collect evidence from crime

17  scenes.

18  Q.   Were those two units involved at all in this

19  investigation?

20  A.   They were, yes.

21  Q.   Could you explain how they were involved?

22  A.   Sure.  The special agent bomb techs were involved in the

23  production of explosive material and grenades for production on

24  the date of arrest of the defendant.  And the evidence response

25  team was also involved on the date of the arrest in the

7

1  collection of evidence from both the Framingham stores

2  location and the residence.

3  Q.   Now with regards to there was some detonation devices.

4  Can you explain with regards to the defendant what if at all

5  involvement the bomb techs had in that aspect of the

6  investigation?

7  A.   They--

8         THE COURT:  Agent Davis, can you just move back from

9  the microphone--

10         THE WITNESS:  Oh, I'm sorry.

11         THE COURT:  --just a minute.

12         THE WITNESS:  Sure.

13         THE COURT:  Thank you.

14  A.   After learning of the potential use of cellular telephones

15  as detonation device or a component of a detonation device--

16  BY MS. SIEGMANN:

17  Q.   Well stopping you there.

18  A.   Sure.

19  Q.   What at all do you know about the construction or the

20  development of cell phone detonation devices?  I mean what role

21  did that play in this investigation?

22  A.   Cellular telephone was introduced by the defendant in this

23  investigation as using it as a detonation device.

24  Q.   Did he in fact construct such devices?

25  A.   Yes, he did.

8

1   Q.   How many?

2   A.   Approximately 12.

3   Q.   And what happened to those devices after he constructed

4   them?

5   A.   They were provided to undercover employees.

6   Q.   And with regards to the bomb techs what did they do with

7   them?

8   A.   They looked at the possible capability of such a device

9   and in doing so they actually put together a similar device.

10  They used a similar practice and when they constructed it they

11  came to the conclusion that it could actually be used--

12          MS. CONRAD:   Objection.

13          THE COURT:   Sustained.   Let's not have a narrative.

14          MS. SIEGMANN:   I'm sorry?

15          THE COURT:   Let's not have a narrative.   Let's--

16          MS. SIEGMANN:   Okay.

17  BY MS. SIEGMANN:

18  Q.   So, I'm sorry, so the bomb techs were able to – with

19  regards to--

20          THE COURT:   Let's have a question, please.

21          MS. SIEGMANN:   Yes, Your Honor.

22  BY MS. SIEGMANN:

23  Q.   With regards to the devices that Mr. Ferdaus built were

24  the bomb techs able to ascertain whether those devices would

25  work?

9

1          MS. CONRAD:  Objection.

2          THE COURT:  What's your objection in a word?

3          MS. CONRAD:  Could it be five words?  One is

4   foundation.  Basically that's his expert opinion being offered

5   through another witness.  Second, and it may just be that I

6   haven't managed to look at every single piece of paper that

7   we've received so far, but I don't think we've received any

8   discovery on this so for this witness who hasn't been qualified

9   as an expert in this area to be offering secondhand expert

10  opinion on capability I would object to.

11         MS. SIEGMANN:  Your Honor, it's actually--

12         THE COURT:  Wait, wait--

13         MS. SIEGMANN:  I'm sorry.

14         THE COURT:  Wait.  Let's – I want to do this one at a

15  time please.  So what I'm going to ask you to do is I'm going

16  to sustain the objection and I'm going to ask you to lay a

17  foundation as to what his source of information is and then

18  we'll revisit the objection if you are not satisfied and then

19  we can parse through this on a question by question basis.

20  BY MS. SIEGMANN:

21  Q.   Special Agent Davis, you indicated a few minutes ago that

22  you supervise the bomb tech squad at the FBI?

23  A.   Correct.

24  Q.   As part of your supervision do you have conversations with

25  those bomb techs that were involved in the, in this

1    investigation?

2    A.    I did.

3    Q.    And during those conversations did they relay to you some

4    of the research and the analysis they had performed--

5    A.    Yes.

6    Q.    --in this investigation?

7    A.    Yes, they did.

8    Q.    Was information also provided to the agents that put

9    together the affidavit, the complaint affidavit in this case?

10   A.    Yes, it was.

11   Q.    And is it part of the complaint affidavit in this case?

12   A.    Yes.

13   Q.    Now, and now turning to my question with regards to the

14   cell phone detonation devices that the defendant built and

15   provided to the undercover agents was any analysis done to see

16   whether those would in fact work as he intended?

17   A.    Yes, there was.

18   Q.    And what was the determination of the bomb techs?

19            MS. CONRAD:  Objection.

20            THE COURT:  Overruled.  You may answer.

21   A.    The determination of the bomb techs in Boston were that

22   the device would function to provide an electrical impetus to

23   and improvise an explosive device.

24   BY MS. SIEGMANN:

25   Q.    Now you indicated also that you supervise the evidence

1  recovery team?

2  A.   Evidence response team, yes.

3         THE COURT:  I'm sorry, the what?

4  BY MS. SIEGMANN:

5  Q.   Evidence response team.  And again what was the role that

6  they played in this case?

7  A.   They were present on September 28 following the arrest of

8  Mr. Ferdaus.  They collected evidence at both the Framingham

9  storage location and also the residence of Mr. Ferdaus.

10 Q.   Were you involved in the arrest and criminal searches

11 conducted on the date of his arrest on September 28, 2011?

12 A.   Yes.  I was on scene in Framing - actually both locations

13 for a period of time both mostly in the Framingham location as

14 an on-scene commander, if you will, for that operation to

15 oversee logistics of the bomb techs and also the evidence

16 response team response to the arrest and search.

17 Q.   At this time I'm going to show you Government Exhibit No.

18 1.

19         THE COURT:  Do you all - just so that I can stay on

20 top of this have you, do you all have correspondingly numbered

21 exhibits?

22         MS. SIEGMANN:  I provided a complete copy of all the

23 exhibits I'm going to use.

24         THE COURT:  That you intend to offer?

25         MS. SIEGMANN:  Yes.  Yes.

1          THE COURT:  Okay.

2          MS. SIEGMANN:  To the defense prior to the hearing.

3          THE COURT:  You have those?

4          MS. CONRAD:  I do.

5          THE COURT:  Okay.  Thank you.

6   BY MS. SIEGMANN:

7   Q.   Special Agent Davis, do you recognize what I just handed

8   you which has been marked Government Exhibit 1?

9   A.   I do.

10  Q.   What is it?

11  A.   It is the complaint affidavit.

12  Q.   Who signed this affidavit?

13  A.   Supervisory Special Agent Gary Cacase (ph).

14  Q.   And do you know who that is?

15  A.   I do.  He's the supervisor of the FBI Boston's Worcester

16  Resident Agency Office.

17  Q.   How often do you interact with Special Agent Cacase?

18  A.   Weekly.

19  Q.   Have you read this affidavit?

20  A.   I have.

21  Q.   Are you familiar with the facts described in the

22  affidavit?

23  A.   I am.

24  Q.   Have you personally reviewed all the recordings that are

25  referenced in this affidavit?

13

1   A.    I have.

2   Q.    And more specifically have you reviewed the recording of

3   each telephonic and face to face meeting between the defendant

4   and the cooperating witness and the undercover employees that

5   are summarized in that affidavit?

6   A.    I have, yes.

7   Q.    Have you reviewed the defendant's attack plans that are

8   referenced in the affidavit?

9   A.    I have.

10  Q.    In preparation for testifying today have you spoken to the

11  agents, other agents involved in the investigation and read

12  reports?

13  A.    I have, yes.

14  Q.    And based upon your preparation for testifying today and

15  your involvement in this investigation do you believe the facts

16  contained in that complaint affidavit are true and correct?

17  A.    I do.

18          MS. SIEGMANN:  Your Honor, at this time the

19  government offers Government Exhibit 1 as evidence.

20          THE COURT:  Any objection?

21          MS. CONRAD:  No.

22          THE COURT:  So marked.

23      GOVERNMENT EXHIBIT NO. 1, ADMITTED

24          MS. SIEGMANN:  I'm handing the witness another copy

25  of the complaint affidavit and I'm handing the original to Ms.

1  Belpedio.

2          THE COURT:  You can hold that, Lisa, you can hold

3  that.

4  BY MS. SIEGMANN:

5  Q.   Now directing your attention to January 7, 2011, did the

6  defendant meet with a cooperating witness on that day?

7  A.   He does, yes.

8  Q.   Was that the first recorded meeting between the

9  cooperating witness and the defendant?

10  A.   It was.

11  Q.   Have you reviewed that recording?

12  A.   I have.

13  Q.   Now I'm handing you what has been marked Government

14  Exhibit No. 2.  Do you recognize that, Special Agent Davis?

15  A.   Yes, I do.

16  Q.   What is it?

17  A.   It's the, it's a CD containing the consensual recorded

18  meeting on January 7, 2011 between the CW and Mr. Ferdaus.

19          MS. SIEGMANN:  Now with the Court's--

20          THE COURT:  I'm sorry, the date one more time, Agent

21  Davis?

22          THE WITNESS:  It's January 7, 2011.

23          THE COURT:  Thank you.

24          MS. SIEGMANN:  With the Court's permission I'd like

25  to play an excerpt from that – well first I offer into evidence

1    Government Exhibit No. 2.

2            THE COURT:  Any objection?

3            MS. CONRAD:  No.

4            THE COURT:  So marked.

5        GOVERNMENT EXHIBIT NO. 2, ADMITTED

6            MS. SIEGMANN:  And with the Court's permission I'd

7    like to play an excerpt from that meeting.

8            MS. CONRAD:  May I just ask whether what's been

9    introduced is the complete recording or is it just an excerpt?

10           MS. SIEGMANN:  It's a complete recording.

11           MS. CONRAD:  Thank you.

12           THE COURT:  You may.

13           Hold on one minute, Ms. Siegmann.

14       PAUSE

15           MS. CONRAD:  May I inquire, Ms. Siegmann, what page

16   of the transcript the excerpt starts on?

17           MS. SIEGMANN:  I don't know the answer to that

18   question.

19       PAUSE

20           THE COURT:  How is it indexed?

21           MS. SIEGMANN:  It's the recording, Your Honor.  On

22   the recording it starts at 13:55:16.

23           THE COURT:  Does that help?

24           MS. CONRAD:  No.  I'll catch up.  I might have to ask

25   you to pause so I can line myself up to where we are.  Thank

1    you.

2           MS. SIEGMANN:  I was introducing the transcript, Your

3    Honor.

4           THE COURT:  Actually I had a more mundane matter.

5    Let's shut those drapes so I can actually see this thing.

6        PAUSE

7           THE COURT:  That's great.  Thank you, Lisa?

8           MS. SIEGMANN:  Is that set?

9           THE COURT:  Yeah that's good.  Go ahead.

10   (TAPE PLAYED FOR THE COURT)

11          MS. SIEGMANN:  The volume needs to be turned up.

12   Where's the--

13       PAUSE

14          MS. SIEGMANN:  It's not coming on the--

15       PAUSE

16          MS. SIEGMANN:  Sorry, Your Honor, we had this all set

17   up and somehow--

18       PAUSE

19          MS. SIEGMANN:  Let me back up, Your Honor, for--

20          THE COURT:  If you would please.  Thank you.

21          MS. SIEGMANN:  Sorry about that.

22       PAUSE

23          THE COURT:  So just so I understand, Exhibit 2 – can

24   you just pause that for one minute.  Exhibit 2 is only the

25   events of January 7th or are there going to be other dates?

1    MS. SIEGMANN:  No, Your Honor, Exhibit 2, Government

2  Exhibit 2 is just the DVD from the one meet--

3    THE COURT:  January 7th.

4    MS. SIEGMANN:  --on January 7th of 2011--

5    THE COURT:  Thank you.

6    MS. SIEGMANN:  --Which Special Agent Davis testified

7  was the first recorded meeting between--

8    THE COURT:  Okay.  And that, I'm sorry, the hour and

9  minute on that again is what?

10    MS. SIEGMANN:  Is, I'm playing from 13:55:20 to

11  14:04:59--

12    THE COURT:  Thank you.

13    MS. SIEGMANN:  --is what the – let me back it up a

14  little more.

15  (TAPE PLAYED FOR THE COURT)

16  BY MS. SIEGMANN:

17  Q.   Was this the first time the defendant had met the

18  cooperating witness?

19  A.   No.

20  Q.   When did the cooperating witness first meet the defendant?

21  A.   December 17, 2010.

22  Q.   Was that meeting recorded?

23  A.   It was not recorded.

24  Q.   Why wasn't it recorded?

25  A.   The FBI's common practice is to use the least intrusive

18

1    methods as they develop an investigation and in addition

2    trying to get an introduction between a cooperating witness and

3    a subject isn't guaranteed so on a first meeting like that

4    they're often not recorded.

5    Q.   Was the cooperating witness debriefed by FBI agents after

6    the conclusion of this meeting?

7    A.   Yes, he was.

8            THE COURT:  By this meeting you mean 12/17?

9            MS. SIEGMANN:  Yes, Your Honor.

10           THE COURT:  Mmm-hmm.

11   BY MS. SIEGMANN:

12   Q.   And according to the cooperating witness where did the

13   cooperating witness meet the defendant on December 17, 2010?

14   A.   Where did they meet?

15   Q.   Yes.

16   A.   In a Mosque.

17   Q.   And was there a conversation that took place outside the

18   Mosque?

19   A.   Yes.

20   Q.   According to the cooperating witness who initiated that

21   conversation?

22   A.   Mr. Ferdaus.

23   Q.   And can you tell us how that conversation came about?

24   A.   Yes.  The cooperating witness was in a discussion with a

25   third individual where they were discussing the cooperating

1  witness' former criminal history regarding weapons charges and

2  Mr. Ferdaus overheard that conversation and thus approached the

3  cooperating witness to discuss that further with him.

4  Q.   And can you tell us what the cooperating witness said that

5  he discussed with the defendant at that time?

6  A.   He discussed with him if there was an opportunity for the

7  cooperating witness to obtain guns or explosives for Mr.

8  Ferdaus.

9  Q.   Did Mr. Ferdaus tell the cooperating witness at that point

10 in time why it was that he wanted guns?

11 A.   Yeah, he had - wanted to get a movement going with regard

12 to some sort of a plan.

13 Q.   Now as a result of the, that meeting on December 17, 2010

14 was this the next meeting with the, between the cooperating

15 witness and the defendant?

16 A.   Yes, it was.

17 Q.   And in the video I was having trouble pausing it because

18 of the technical issues but the conversation began with someone

19 saying I have the guns and the bombs.

20 A.   Correct.

21 Q.   Who was that speaking?

22 A.   That was the cooperating witness.

23 Q.   Okay.   Now what is the defendant's educational background?

24 A.   The defendant?

25 Q.   Yes.

1  A.    The defendant's educational background is he's a graduate

2  of Northeastern University in physics.

3  Q.    In comparison to the defendant what is the cooperating

4  witness' educational background?

5  A.    He did not graduate high school.

6  Q.    Now as indicated in the complaint affidavit – well, the

7  cooperating witness has a criminal record; is that right?

8  A.    That's correct.

9  Q.    And could you briefly describe to the Court what his

10 criminal background entails?

11 A.    The criminal background of the cooperating witness is

12 principally guns and gang activity and he has been charged and

13 prosecuted for weapons, for home invasion or larceny with

14 weapons.  He also has a drug history as well.  That's basically

15 it.

16 Q.    Okay.  And during the investigation of the defendant did

17 the cooperating witness commit any misconduct?

18 A.    He did.

19 Q.    And can you briefly describe that to the Court, please?

20 A.    The cooperating witness took an item from a Radio Shack

21 store, actually stole an item from a Radio Shack Store during

22 this operation.

23 Q.    Okay.  And did that occur on February 11, 2011?

24 A.    It did.

25 Q.    Was that during a recorded meeting with the defendant?

1  A.   Yes, it was.

2  Q.   And at the conclusion of that meeting what did the

3  cooperating witness tell the agents happened with regards to

4  that item that he stole?

5  A.   Right, the cooperating witness told the handling agents

6  that Mr. Ferdaus had purchased the item and had given it to him

7  and that he was in custody of that particular item.

8  Q.   How did the FBI agents learn that that version of the

9  story wasn't actually correct?

10 A.   Part intuitiveness plus they had the recorded, the

11 consensually recorded meeting which they could sort of see that

12 something wasn't quite as the cooperating witness had

13 described.  So they further addressed it with the cooperating

14 witness.  They asked him questions when he finally then

15 admitted to the fact that he had taken the item from the store.

16 Q.   Before allowing the cooperating witness to conduct any

17 further meetings with the defendant did the FBI agents do

18 anything?

19 A.   Yeah, they admonished, they admonished the cooperating

20 witness not to conduct any illegal activity again.

21       MS. CONRAD:  I'm sorry, I couldn't hear that.

22 A.   The agents admonished the cooperating witness to not

23 conduct any illegal activity while in the, you know, assisting

24 in this investigation.

25 Q.   Was the cooperating witness provided immunity from

1   prosecution as a result of this shoplifting incident?

2   A.    No.

3   Q.    And how long after the shoplifting incident were the FBI

4   undercover employees introduced to Mr. Ferdaus?

5   A.    A few weeks afterward.

6   Q.    After the undercover employees were introduced how if at

7   all did the cooperating witness' role in the investigation

8   change?

9   A.    The cooperating was, had limited interaction following

10  that.  There were probably five meetings with, between the

11  cooperating, in which the cooperating witness was still

12  involved in meeting with the defendant one of which was also

13  attended by the undercover employees as well.  So his, the

14  cooperating witness', you know, participation started to be

15  minimized at that point.

16  Q.    And when was the last meeting that the cooperating witness

17  had with the defendant?

18  A.    April 6th.

19  Q.    After that was the, who took the primary role in the

20  investigation?

21  A.    After April 6th in which the cooperating witness was no

22  longer involved in the investigation, it was all undercover

23  employees.

24  Q.    As is customary with a cooperating witness were the

25  meetings between the cooperating witness and the target

23

1   recorded?

2   A.   Yes.

3   Q.   And with the exception of the first meeting that we were

4   disgusting a few minutes ago, the December 2010, were there any

5   other meetings that were unrecorded?

6   A.   Yes, there was one on I think February 4th, 4th that was not

7   recorded.

8   Q.   Why wasn't that recorded?

9   A.   Because of a malfunction in the recording device.

10  Q.   Were there meetings between the cooperating witness and

11  the defendant also surveilled?

12  A.   Yes, they were.

13  Q.   And was the cooperating witness provided instructions

14  prior to each meeting with the defendant and debriefed after

15  each meeting?

16  A.   Yes, he was.

17  Q.   I'm going to hand you Government Exhibit No. 3.  Special

18  Agent Davis, do you recognize that document?

19  A.   I do.

20  Q.   And what is it?

21  A.   It's the indictment of Mr. Ferdaus.

22          MS. SIEGMANN:  All right, the government offers the

23  indictment for your consideration.

24          MS. CONRAD:  Your Honor, I object.  I mean the

25  standard boiler plate law that an indictment is not evidence of

24

1   anything.  Certainly the Court has the indictment.  The fact

2   that there's an indictment is a fact.  I don't see how it's--

3          THE COURT:  You know what, I'm going to take it but I

4   agree with you.  I mean it's on the record.  I did the

5   arraignment.  I signed the complaint so I agree with you but I

6   am going to take it.

7        GOVERNMENT EXHIBIT NO. 3, ADMITTED

8          MS. SIEGMANN:  I do have a few questions pertaining

9   to that indictment.

10          THE COURT:  Go ahead.

11          MS. SIEGMAN:  I actually think that it is relevant.

12          THE COURT:  Go ahead.

13  BY MS. SIEGMANN:

14  Q.   Special Agent Davis, looking at the charges in the

15  indictment, the charged conduct relates to activities and

16  statements by the defendant beginning in March 2011 after the

17  undercover employees begin meeting with him?

18  A.   Could you rephrase or repeat the question please.

19  Q.   Sure.

20  A.   I didn't hear it.

21  Q.   Do the charges in this indictment relate to the conduct

22  that occurred after the introduction of the undercover

23  employees in March 2011?

24          MS. CONRAD:  Your Honor, I object.  First of all it's

25  leading.  Second of all, the indictment speaks for itself.  And

25

1   third of all the first sentence is beginning in or about 2010.

2           THE COURT:  Sustained.

3   BY MS. SIEGMANN:

4   Q.   Is the cooperating witness at all mentioned in the

5   indictment?

6           MS. CONRAD:  Objection, Your Honor, same issue.  It's

7   not evidence that it--

8           THE COURT:  Sustained.  I'm going to let you do this,

9   I'm going to let you point me to that document whenever we get

10  to closings on this but I can read the document myself.  It's

11  part of the record and I don't need him to tell me that stuff.

12          MS. SIEGMANN:  Yes, Your Honor.

13          THE COURT:  Ms. Conrad, when you make an objection

14  can you wait for me to ask you for one word rather than the

15  soliloquy from the banquet.

16          MS. CONRAD:  I apologize.

17          THE COURT:  Thank you. Next?

18  BY MS. SIEGMANN:

19  Q.   Based upon your view of the recorded meetings, Special

20  Agent Davis, who did the defendant believe the undercover

21  employees were?

22  A.   He believed they were members of Al-Qaida.

23  Q.   How soon after meeting with the FBI undercover employees

24  did the defendant tell them about his plan to attack the

25  Pentagon?

1   A.   He mentioned it in the very first meeting that he had

2   with him.

3   Q.   And how many times over the course of this investigation

4   did the defendant talk to the undercover employees about this

5   plan?

6   A.   In every meeting thereafter.

7   Q.   In addition to discussing this plan with the undercover

8   employees did the defendant ever provide a written description

9   of his plan to the undercover employees?

10  A.   Yes, he did.

11        MS. SIEGMANN:  At this time I'm handing the witness

12  Government Exhibits No. 4 and 5.

13  BY MS. SIEGMANN:

14  Q.   Special Agent Davis, those two documents I just handed

15  you, do you recognize them?

16  A.   I do.

17  Q.   What are they?

18  A.   They are both attack plans provided by Mr. Ferdaus to the

19  undercover employees.

20        THE COURT:  Can you identify them by number, please.

21        THE WITNESS:  The – Exhibit No. 4 is an attack plan

22  provided by Mr. Ferdaus to the undercover employees on May 5,

23  2011.  And Exhibit No. 5 is an attack plan provided to the

24  undercover employees by Mr. Ferdaus on June 9, 2011.

25        THE COURT:  Thank you.

27

1       MS. SIEGMANN:  And before asking you any questions

2  about them I'm going to actually hand you another set of copies

3  and give the original to the Court--

4       THE WITNESS:  Okay.

5       MS. SIEGMANN:  --so the Judge can follow along with

6  copies.

7       THE COURT:  Are you moving them?

8       MS. SIEGMANN:  Yes, Your Honor.  The government moves

9  in the, Government Exhibit Nos. 4 and 5.

10       THE COURT:  Any objection?

11       MS. CONRAD:  No objection.

12       THE COURT:  So marked.

13     GOVERNMENT EXHIBIT NOS. 4 and 5, ADMITTED

14       THE COURT:  All right, so hold on one minute.  I may

15  want to follow along with this.

16     PAUSE

17       THE COURT:  Go ahead, Ms. Siegmann.

18       MS. SIEGMANN:  Thank you, Your Honor.

19  BY MS. SIEGMANN:

20  Q.   Special Agent--

21       THE COURT:  Are these Bates numbered?

22       MS. SIEGMANN:  Sorry, Your Honor?

23       THE COURT:  Are these Bates numbered?

24       MS. SIEGMANN:  They are not Bates numbered.

25       THE COURT:  Okay.  Thank you.

28

1          MS. SIEGMANN:  Sorry.

2    BY MS. SIEGMANN:

3    Q.    Special Agent Davis, could you please briefly describe

4    the May 5th plan to the Court, please?

5    A.    Yes, it's a detailed plan regarding, it'd be basically a

6    summary entitled abstract of the plan.  It's the attack plan on

7    both the Pentagon and the Capital building which are referred

8    to as the P building and the C building in the document in

9    which it's broken down in a very organized manner to discuss

10   the aircraft type to include specs on the aircraft and also

11   pricing autopilot hardware that would need to be obtained in

12   order for the aircraft to function as the plan describes and

13   hardware and aircraft configurations as well as software.  In

14   addition there are pages in here which have detailed maps with

15   additions made to the maps by Mr. Ferdaus showing both launch

16   site locations and also the target locations of the U.S.

17   Capital and the Pentagon to include some flight plan, flight

18   route descriptions in here and then there are other photographs

19   which appear to have been either photocopied out of a book of

20   the Capital Building with an arrow that was added to the

21   photograph showing the impact point into the Capital Building

22   which also has a description below the photograph.  Others

23   similar, very similar of the Pentagon which include two arrows

24   pointing to the Pentagon for impact points as described in the

25   plan.  Then there are other pictures obtained apparently off of

1  the internet of the launch location which is sort of a golf

2  course in the D.C. area.  And then included toward the back of

3  this entire package then are hardware and software printouts

4  off of the, printouts off of the internet regarding hardware

5  and software that might be required to construct the aircraft

6  for the attack.

7  Q.   Was there, in that May 5, 2011 plan were there any

8  pictures or research done regarding grenades?

9  A.   Yes, there are also a page in here with pictures with also

10  description paragraphs of each of the, of different types of

11  grenades that could be used.

12  Q.   And Special Agent Davis, just can you, just – these

13  materials were they produced in hard copy to the undercover

14  employees?

15  A.   No.  It was produced in a thumb drive.

16  Q.   Okay.  And was that with respect to both plans, the May 5th

17  and May 6th, and the June 6th--

18  A.   Correct.

19  Q.   June 9th, excuse me.

20  A.   The June 9th, correct.  Both, both plans were presented to

21  the undercover employees via a thumb drive.

22  Q.   Now did the undercover employees instruct the defendant to

23  produce such plans?

24  A.   They did not.

25  Q.   You just described in detail the May 5, 2011 plan.  Have

1   you also reviewed the June 9th plan?

2   A.    I have, yes.

3   Q.    And can you tell us, briefly describe it and highlight the

4   differences between the two plans for the Court.

5   A.    Mmm-hmm.   It's basically the same plan, the same two

6   targets are described with similar photos and arrows and other

7   amendments made by Mr. Ferdaus to the photos regarding his plan

8   to attack those two sites, but the addition on the June 9th plan

9   he added a ground attack, a ground assault in addition to his

10  original plan which was merely aircraft flying with explosives

11  into those buildings.   In the June 9th plan the ground assault

12  portion of his new plan included descriptions that the aircraft

13  flying into the Pentagon would essentially require that

14  Pentagon employees would evacuate the building and be corralled

15  into certain locations at which time the other individuals who

16  would be enlisted in this attack would gun them down with

17  automatic weapons and grenades.   So basically the difference

18  between the first plan and the second plan was the ground

19  assault version of the plan.

20  Q.    Between the time the May 5, 2011 plan and the June 9, 2011

21  plan were created by the defendant had he conducted any

22  surveillance?

23  A.    He had.

24  Q.    Okay.   Where did he conduct surveillance?

25  A.    He conducted surveillance at the Pentagon and the Capital

1  Building, all of the locations basically described in his

2  plan.

3  Q.   And were pictures that he had taken during the

4  surveillance included in the June 9th plan that he provided to

5  the undercover employees?

6  A.   They were.

7  Q.   Now did the undercover employees ever try to discourage

8  the defendant from following through with this attack plan?

9  A.   They did, yes.

10  Q.   Can you please describe that to the Court?

11  A.   They, on at least over 30 times during the meetings that

12  they had had with Mr. Ferdaus had addressed with him his,

13  whether he desired to continue on with his plan.  They just,

14  they wanted to make sure that he was, you know, committed,

15  committed to this plan.  And each time that they asked if he

16  was continuing to do this he indicated, yes, this was all he

17  wanted to do, that was his mission, that's what he was here

18  for.

19  Q.   And did they at all, did they at any point tell him that

20  he did not have to go through with this?

21  A.   Yes, they did.

22  Q.   How many times did they tell him that?

23  A.   Ahh, many occasions throughout the meetings that they had

24  had with him.  They had 18 meetings with him, consensual

25  meetings with him and practically every meeting they had they

32

1    had indicated that to him.

2    Q.   And how did the defendant respond again?

3    A.   He responded saying that this was his plan and he was

4    going to continue with it, he was committed to doing this.

5    Q.   Did undercover employees ever question the defendant's

6    motives as to why he wanted to do this?

7    A.   They did, yes.

8    Q.   And what did the defendant say?

9    A.   He basically – the reference I can recall from all of the

10   monitorings that I viewed was that he wanted to cut the head

11   and the heart and the tail out of the snake which he referred

12   to the United States as the snake.

13   Q.   Now during the meetings did the undercover employees ever

14   inquire as to the defendant's ability to kill individuals and

15   whether he was willing to do so?

16   A.   Yes, they did.  And he indicated he was willing to do so,

17   yes.

18   Q.   When was the last time that the undercover employees told

19   the defendant, you don't have to go through with this, there's

20   no shame in backing out?

21   A.   On September 20, 2011.

22   Q.   And he was arrested on September 28th; is that right?

23   A.   September 28th he was arrested, yes.

24   Q.   During the defendant's meetings with the undercover

25   employees did the defendant ask them for any assistance in his

33

1   plans?

2   A.   Yes.

3   Q.   And what types of assistance did he request from the

4   undercover employees?

5   A.   He requested material, resources and funding to complete

6   the plan, the attack plan.

7   Q.   During this investigation did the defendant ever mention

8   the possibility of making homemade explosives to the

9   cooperating witness?

10  A.   Yes, he did.

11  Q.   Similarly did the defendant mention the possibility of

12  making his own homemade explosives to the undercover employees?

13  A.   Yes, he did.

14  Q.   And how did that subject come up in conversation, do you

15  recall?

16  A.   The one I recall is that they were discussing whether the

17  grenades would be an appropriate explosive to use and he

18  indicated that perhaps a homemade explosive would be better and

19  provide more explosive power than the grenades would.

20  Q.   How did the undercover employees react to the defendant's

21  suggestion that he make homemade explosives?

22  A.   They told him they didn't want him to do that because it

23  was a, they didn't want him to injure himself or any others but

24  obviously also as undercover employees there was a public

25  safety issue, a real world public safety issue that they were

34

1    concerned with that if he had started to experiment with

2    making his own explosives that somebody would get hurt.  For

3    public safety reasons they advised him not to do that.

4    Q.   During the defendant's, I'm sorry, and during the

5    defendant's meetings with the undercover employees did the

6    defendant ever reveal when he first began planning this attack

7    against the United States?

8    A.   Yes.  He said long before he'd ever met them, at least a

9    year before he'd met the undercover employees he'd been

10   planning this.

11   Q.   Did he describe any instances as to – strike that.

12        In those discussions with the undercover employees, did he

13   mention who he discussed this plan with originally?

14   A.   Yes, he had mentioned an individual from Dorchester, which

15   is an area in Boston, who he'd discussed this plan with and he

16   also indicated that the individual with whom he'd discussed the

17   plan had suggested that perhaps they just conduct an attack on

18   a recruiting center, a military recruiting station at which

19   time Mr. Ferdaus said yes, that's a viable plan but he would

20   prefer to do something bigger than that.

21   Q.   During the defendant's meetings with the cooperating

22   witness and the undercover employees did the defendant mention

23   the possibility of attacking any other targets in addition to

24   the Capital and the Pentagon?

25   A.   Yes.  On at least one of the meetings he had mentioned the

35

1  possibility of attacking a subway and also a military base in

2  Colorado.

3  Q.   Did the defendant ever explain why he felt it was

4  necessary to attack the United States?

5  A.   It was an evil land, the United States is evil, and an

6  enemy to Islam.

7  Q.   Now during the course of the investigation were emails

8  obtained from the defendant's Gmail account pursuant to a

9  search warrant?

10  A.   Yes.

11  Q.   I'm now showing you Government Exhibits No. 6 and 7.

12          THE COURT:  Did you say 6 and 7?

13          MS. SIEGMANN:  Six and 7, Your Honor.

14  BY MS. SIEGMANN:

15  Q.   Do you recognize those emails, Special Agent Davis?

16  A.   Yes, I do.

17  Q.   I'm actually going to – and are those the emails from the

18  defendant's Gmail account?

19  A.   Yes, they are.

20          MS. SIEGMANN:  The Government moves to admit

21  Government Exhibit Nos. 6 and 7.

22          MS. CONRAD:  Objection.

23          THE COURT:  What's your objection?

24          MS. CONRAD:  Relevance.

25          THE COURT:  Can you give me an offer of proof,

1   please?

2          MS. SIEGMANN:  Your Honor, it establishes that long

3   before, well before he met the cooperating witness that he felt

4   that the United States Army was a – (unintelligible - #3:02:42)

5   - army, a non-believer army and that he thought al-Qaida was

6   the defender of innocence and that they should do, Muslims need

7   to do whatever they could and sacrifice to ensure Sharia law.

8          THE COURT:  How does that help me on the issue of

9   detention?

10         MS. SIEGMANN:  I was actually anticipating that the

11  defense, and I can wait until redirect for this, defense is

12  going to inquire as to or try to establish that there's some

13  entrapment here and that he did not have the intention to

14  actually attack the United States but for the actions of the

15  cooperating witness and undercover employees.

16         THE COURT:  Sustained.

17  BY MS. SIEGMANN:

18  Q.   When did the defendant first mention the possibility of

19  constructing a cell phone detonator?

20  A.    He first mentioned it in, frankly the videotape we just

21  watched on January 7th he had mentioned using a cellular

22  telephone as a means to detonate an explosive but he didn't

23  call it a detonator in that video.

24  Q.    He said it was easy to make detonators, do you recall

25  hearing that?

37

1   A.   Say that, I'm sorry, say that again?

2   Q.   Did he use the words it's easy to make detonators?

3   A.   Yes, he did.

4   Q.   And during the course of the investigation how many times

5   did the defendant mention detonators during the conversations

6   with the cooperating witness and the undercover employees?

7   A.   Virtually every, every meeting.

8   Q.   How did the defendant describe how he intended – strike

9   that.

10       At some point the defendant started building detonators;

11  is that right?

12  A.   Correct.

13  Q.   And how did the defendant describe how he intended that

14  those detonators be used?

15  A.   He intended that they be used in the creation of an IED,

16  an improvised explosive device.  He also indicated that they

17  could be used in the aircraft, at one point that they could be

18  used in the aircraft as well.

19  Q.   Was there a specific target that he wanted the detonators

20  to be used against?

21  A.   Yes, United States soldiers, forces overseas.

22  Q.   Now directing your attention to the meet that occurred on

23  June 27, 2011, do you recall that meeting?

24  A.   June 27th?

25  Q.   Yes.

38

1   A.   Yes.

2   Q.   Did the defendant meet with the FBI undercover employees

3   on that date?

4   A.   Yes, he did.

5   Q.   And during that meeting did the defendant provide the

6   undercover employees a cellular phone detonation device?

7   A.   He did.

8   Q.   After giving the undercover employees this detonation

9   device was there any discussion about any--

10  A.   I'm sorry, let me correct - did you say June 7th or June

11  9th?

12  Q.   June 27th.

13  A.   Oh, June 27th.  Yes, June 27th, yes.

14  Q.   On June 27th--

15  A.   Yes.

16  Q.   --okay, just to make sure - so--

17  A.   Right.

18  Q.   There's a lot of meetings, a lot of recordings--

19  A.   Yes.

20  Q.   --in this case.  So if you at all are confused about dates

21  please stop me again.  So on June 27, 2011 you indicate, just

22  testified that the defendant provided a detonation device to

23  the undercover employees?

24  A.   That's correct.

25  Q.   After providing this device to them was there any

39

1  discussion regarding a prior device that was provided,

2  supplied to the undercover employees?

3  A.    Yes, there was.

4  Q.    And can you describe that to the Court?

5  A.    Yes, the undercover employees indicated that the previous

6  devices that or device that was provided by Mr. Ferdaus was in

7  fact successful in killing U.S. soldiers abroad.

8  Q.    Do you recall how many he, they indic--

9  A.    I think he said three killed and five wounded, something

10  like that, in Afghanistan or Iraq, Iraq.

11  Q.    What was the defendant's reaction to this news?

12  A.    He was excited about the news.

13  Q.    And turning now to page 34 of Government Exhibit No. 1--

14        THE COURT:  Hold on one second.

15        PAUSE

16        THE COURT:  What page?

17        MS. SIEGMANN:  Thirty-four, Your Honor.

18        THE COURT:  Thank you.

19  BY MS. SIEGMANN:

20  Q.    Paragraph 64.  And then at that same meeting did Mr.

21  Ferdaus state this is exactly what I wanted and I feel so

22  blessed to feel that I'm seeing the fruits of my labor?

23        MS. CONRAD:  Objection to leading, Your Honor.

24        THE COURT:  Yeah.  Stop leading please.

25  BY MS. SIEGMANN:

40

1   Q.   Special Agent Davis, can you read that first sentence,

2   that'd be the last sentence of paragraph 64, Ferdaus stated?

3   A.   Yes.  "This is exactly what I wanted and I feel so

4   blessed.  I feel that I'm seeing the fruits of my labor.  I

5   want to work with you guys and I want to hit the snake on the

6   tail and I want to choke it right in the head.  The world will

7   never be the same."

8   Q.   Special Agent Davis, was that in relation to the

9   detonation devices that he was building and providing to people

10  he believes to be al-Qaida?

11  A.   Yes, it was.

12  Q.   Directing your attention to September 20, 2011, on that

13  date did the defendant meet with one of the FBI undercover

14  employees?

15  A.   He did.

16  Q.   During that meeting did the defendant make a training

17  video on how to make cell phone detonators for the brothers

18  overseas?

19  A.   Yes, he did.

20  Q.   Have you watched that video?

21  A.   I have.

22  Q.   How long is the video?

23  A.   It's about 20 minutes long.

24  Q.   And what does the defendant do on this video?

25  A.   He disassembled, he takes the back off of a cellular

1   telephone with a screwdriver then he proceeds to connect wires

2   via soldering from the speaker of the cell phone such that

3   those wires could then be used to connect to other components

4   of an IED.  And then he – while doing that he is speaking as if

5   he was giving a lecture or training on how, what he was doing

6   throughout the process so that others could view it and learn

7   from it.

8   Q.   Who filmed the defendant while he was constructing this

9   cell phone detonation device?

10  A.   One of the undercover employees.

11       MS. SIEGMANN:  I'm sorry; I'm having some technical

12  difficulties.

13  BY MS. SIEGMANN:

14  Q.   Okay, I'm handing the witness what has been marked

15  Government Exhibit No. 8.  Special Agent Davis, do you

16  recognize what that is?

17  A.   Yes, I do.

18  Q.   What is it?

19  A.   It is a CD containing the video we just discussed that the

20  undercover employee took of Mr. Ferdaus constructing the cell

21  phone detonator, the training video.

22       MS. SIEGMANN:  At this time the government moves to

23  admit Government Exhibit No. 8, Your Honor.

24       MS. CONRAD:  No objection.

25       GOVERNMENT EXHIBIT NO. 8, ADMITTED

42

1      THE COURT:  Is this the type of information you want

2  on the public record?

3      MS. SIEGMANN:  We're not actually going to, we're

4  only going to play two excerpts from it for you and this is for

5  your inspection.

6      THE COURT:  We're not about to have a tutorial on the

7  public record.

8      MS. SIEGMANN:  No, Your Honor.

9      THE COURT:  Thank you.

10      MS. SIEGMANN:  We're just going to have the first

11  minute and then a few of the last--

12      THE COURT:  And again do you have the minute, hour

13  minute on that for me, please?

14      MS. SIEGMANN:  Well what we're going to play is the

15  001, the first file on the CD.

16      THE COURT:  Okay.  Thank you.

17      MS. SIEGMANN:  And it'll be the first minute of that

18  and then we'll play the last segment which is 006.

19      THE COURT:  Thank you.

20      PAUSE

21  (TAPE PLAYED FOR COURT)

22  BY MS. SIEGMANN:

23  Q.  Special Agent Davis, you've watched this before, the first

24  words that you just heard Mr. Ferdaus say can you tell the

25  Court what he just said?

43

1  A.    I actually can't.

2  Q.    You couldn't hear it?

3  A.    No.

4  Q.    Okay.

5        MS. SIEGMANN:  Well, Your Honor, you'll have it in

6  chambers so you can actually play it.

7  (TAPE PLAYED FOR COURT)

8        MS. SIEGMANN:  And at this point we're going to stop

9  it so that we don't have any - and we'll turn it to the last--

10        THE COURT:  And this is file which number?

11        MS. SIEGMANN:  This is file 006, Your Honor.

12        THE COURT:  Thank you.  So the files are 001 and 006?

13        MS. SIEGMANN:  Yes, that we're showing.

14  (TAPE PLAYED FOR COURT)

15  BY MS. SIEGMANN:

16  Q.    And Special Agent Davis, this portion right here is,

17  you've watched the last segment.  What does he do in this last

18  segment?

19  A.    In this segment here?

20  Q.    Yeah.

21  A.    He's showing that the, once he's configured the cell phone

22  with the wires that are sticking out of the phone that dialing

23  the number of the phone or setting off the ring tone would in

24  fact induce a current through those wires.

25  Q.    So he's not revealing any of his, the step by step.  He's

44

1  just showing, demonstrating that it would work?

2  A.    Correct.

3          MS. SIEGMANN:  So with that caveat we're going to

4  play this.

5  (TAPE PLAYED FOR COURT)

6  BY MS. SIEGMANN:

7  Q.    Special Agent Davis, we've been referring to the

8  undercover employees as undercover employees and that's how

9  they're referred to the complaint affidavit.  Are they're

10  special agents of the FBI?

11  A.    No, they are not.

12  Q.    Can you describe how they're employed?

13  A.    Mmm-hmm.  They're long term law enforcement task force

14  officers of the joint terrorism task force who have been

15  specially certified as undercover employees for the FBI.

16  Q.    Now turning back to the video for a second.  Are you

17  familiar with improvised explosive devices?

18  A.    Yes.

19  Q.    And how common is it that cell phones are used to

20  construct such devices?

21  A.    It's very common.

22  Q.    Now turning to September 28, 2011.  Was that the date the

23  defendant was arrested?

24          THE COURT:  I'm sorry, say--

25          MS. SIEGMANN:  September 28, 2011.

45

1   A.   Yes, that's the date he was arrested.

2   BY MS. SIEGMANN:

3   Q.   Prior to his arrest did the defendant meet with the

4   undercover employees?

5   A.   Yes, he did.

6   Q.   What happened during that meeting?

7   A.   Well when the, the undercover employees' vehicle they had

8   with them the plastic C4 explosives, grenades, six automatic

9   Ak47 assault rifles.  It was at that time in the van that they

10  pulled over and they showed Mr. Ferdaus what was in the bags or

11  the containers in which they had those devices and weapons.

12  Q.   Were these the items that the defendant had requested from

13  the undercover employees?

14  A.   Yes, they were.  In fact during that meeting they again

15  asked him what his shopping list I suppose was and he

16  reiterated before they showed him what they had with them that

17  he was looking for 24, five pounds of C4 explosives, six

18  grenades, I guess or nine grenades and six AK47 assault rifles.

19  Q.   Were any photographs taken during this meeting?

20  A.   While in the van or during the day?

21  Q.   During the meeting?

22  A.   During – yes, there were.

23       MS. SIEGMANN:  I'm handing the witness what has been

24  marked Government Exhibits No. 9, 10 and 11.

25  BY MS. SIEGMANN:

1  Q.   Special Agent Davis do you recognize those photographs?

2  A.   Yes, I do.

3  Q.   And were those the photographs that you were just

4  referring to a few minutes ago that were taken on the day of

5  the defendant's arrest?

6  A.   Yes, they are.

7        MS. SIEGMANN:  Your Honor, the government moves to

8  admit those photographs into evidence.

9        THE COURT:  Ms. Conrad?

10        MS. CONRAD:  No objection.

11        THE COURT:  So marked.

12     GOVERNMENT EXHIBIT Nos. 9, 10 AND 11, ADMITTED

13        MS. SIEGMANN:  In a moment Ms. Belpedio is going to

14  switch us so we can actually show them on the screen.

15     PAUSE

16        THE COURT:  Do you have a second set?

17        MS. SIEGMANN:  I do, Your Honor.

18        THE COURT:  Oh great.  Thank you.  And they are

19  marked?

20        MS. SIEGMANN:  Yes, Your Honor.

21        THE COURT:  Thank you.

22  BY MS. SIEGMANN:

23  Q.   I'm showing you what has been admitted as Government No.

24  9, Special Agent Davis.

25  A.   Yes.

                    *MARYANN V. YOUNG*
                *Certified Court Transcriber*
                      *(508) 384-2003*

47

1    Q.    Do you see that on the screen there?

2    A.    I do, yeah.

3    Q.    Can you tell us what we're looking at?

4    A.    Yes, it's a photograph inside the Framingham storage

5    facility, a room that was rented by Mr. Ferdaus, and he is

6    standing next to one of the undercover employees holding, each

7    of them holding AK47 assault rifles which were delivered to him

8    by the undercover employees.

9    Q.    Now you mentioned a storage unit in Framingham.  Who

10   rented that?

11   A.    Mr. Ferdaus rented that.

12   Q.    Did he rent it under his real name?

13   A.    He did not.

14   Q.    What name, do you remember what name he rented it under?

15   A.    Mr. Ramos I believe.

16   Q.    Now I'm showing you Government Exhibit No. 10.  Could you

17   tell us what we're looking at here?

18   A.    Photograph taken by one of the undercover employees again

19   in the same location.  This time both Mr. Ferdaus and the

20   undercover, other undercover employee are, you know,

21   shouldering the automatic rifles.

22   Q.    And lastly, Government Exhibit No. 11.  Can you tell us

23   what we're looking at hear?

24   A.    Yes.  It's a photograph again taken in the same, on the

25   same date, September 28th, in the storage facility in Framingham

48

1   and it shows, it was taken by one of the undercover employees

2   and it's a photograph of Mr. Ferdaus placing what he believes

3   to be plastic C4 explosives within the F86 RC aircraft, radio

4   controlled aircraft.

5   Q.   Now you mentioned what he believed to be C4 explosives.

6   Of the 25 pounds how much was actually actual C4 explosives as

7   opposed to inert?

8   A.   There was 1.25 pounds of actual C4 explosives within the

9   whole delivery.

10   Q.   Now during the defendant's meetings with the undercover

11   employees did he ever indicate where he planned to go after he

12   successfully launched his attacks on the Capital and the

13   Pentagon?

14   A.   Yes.  His desire was to travel to Afghanistan.

15   Q.   For what reason?

16   A.   To train, participate or be a trainer, train with or be a

17   trainer of individuals in training camps in Afghanistan.

18   Q.   Now Special Agent Davis, during the investigation did the

19   undercover employees question the defendant about the

20   feasibility of his plan?

21   A.   Yes, they did.

22   Q.   And what was his response to the undercover employees?

23   A.   His response was that he feels, felt that that was the

24   plan he devised and he felt that it was very, within his power

25   it was very feasible.

49

1   Q.   And based upon your experience do you believe Mr.

2   Ferdaus' idea was feasible?

3   A.   I do.  I do believe he could've accomplished what he was

4   setting out to do.

5   Q.   Do you believe this plan would've cause loss of life and

6   destruction of property?

7   A.   Yes, I do.

8          MS. SIEGMANN:  Your Honor, if I could just have a

9   moment?

10          THE COURT:  Mmm-hmm.

11      PAUSE

12          MS. SIEGMANN:  Your Honor, the government has no

13   further questions.

14          THE COURT:  Ms. Conrad?

15          MS. CONRAD:  Thank you, Your Honor.

16                          CROSS EXAMINATION

17   BY MS. CONRAD:

18   Q.   Good afternoon, Agent Davis.

19          MS. CONRAD:  May I inquire from here, Your Honor, or

20   do you prefer me at the podium?

21          THE COURT:  No, I think wherever you're comfortable.

22   Just, Ms. Belpedio's got to make sure we're picking you up,

23   that's all.

24          MS. CONRAD:  Okay.

25          THE CLERK:  Just bring the--

50

1      THE COURT:  There you go.  We can catch it.  We're

2  good.  We're good.

3      MS. CONRAD:  Thank you.

4  BY MS. CONRAD:

5  Q.   Agent Davis, my name is Miriam Conrad and along with Ms.

6  Byrne I represent Mr. Ferdaus.  Before these pictures, Exhibits

7  9 and 10 were taken, do you have any evidence that, or are you

8  aware whether Mr. Ferdaus ever held a gun in his hands?

9  A.   Was there any evidence that he had done so?

10  Q.   Yes.

11  A.   No.

12  Q.   In fact he on several occasions told the informant that he

13  didn't know anything about guns, right?

14  A.   That is correct.

15  Q.   And he told him he needed to practice, right?

16  A.   That's correct.

17  Q.   And in fact the way he's holding the gun in Exhibit 9

18  isn't really the way somebody would normally hold a gun.  He's

19  holding it tucked under his arm?

20  A.   People can carry guns in that fashion.  In Exhibit 10 he

21  is holding it in a, fashion.

22  Q.   So the only gun he ever touched to your knowledge--

23  A.   Mmm-hmm.

24  Q.   --during the entire time he was under the government's

25  scrutiny was the guns that the government gave him?

1    A.    To my knowledge.

2    Q.    And the only explosives he ever had in his possession were

3    the explosives that the government gave him?

4    A.    To my knowledge that's correct.

5    Q.    And those explosives and those guns and that storage

6    locker were all acquired with government funds, right?

7    A.    The guns and other, and the explosives were in the

8    possession of the government so they weren't--

9    Q.    Okay.

10   A.    --purchased.

11   Q.    They were all provided by the government?

12   A.    That is correct.

13   Q.    So Mr.--

14          THE COURT:  Ms. Conrad by storage locker--

15          MS. CONRAD:  I'll explain that.  Sorry.

16          THE COURT:  Okay.  Thank you.  Go ahead.

17   BY MS. CONRAD:

18   Q.    So these pictures, 9, 10 and 11 were taken at a storage

19   locker in Framingham, correct?

20   A.    That's correct.

21   Q.    And that was a storage locker that was as you've mentioned

22   or alluded to rented by Mr. Ferdaus, correct?

23   A.    That's correct.

24   Q.    And the money for that rental was provided by the

25   government?

52

1   A.   That's correct.

2   Q.   Of course he didn't know it was provided by the

3   government, right?

4   A.   That's correct.

5   Q.   And the trip he took to Washington D.C. that was funded by

6   the government?

7   A.   That is correct.

8   Q.   The government bought him the plane ticket, right?

9   A.   That's correct.

10  Q.   And as far as you were aware and certainly from everything

11  that you've reviewed Mr. Ferdaus didn't have any funds of his

12  own during this whole time; is that right?

13  A.   He did.  He had had a job during that time which he quit.

14  So he did have some of his own money.

15  Q.   Did he tell the informant that when the informant at one

16  point asked him if he had any money he said just change?

17  A.   He did at one point say that, yes.

18  Q.   And didn't he also say that he couldn't drive his car

19  because he owed $100 in parking tickets and he hadn't paid, or

20  some kind of fines and he hadn't paid those off?

21  A.   He did allude to that but the vehicle was also broken

22  down.  It wouldn't run.

23  Q.   So he didn't have a car, right?  Is that right?

24  A.   That's correct.

25  Q.   He didn't have any money; is that right?  Or he didn't

53

1  have much money?

2  A.  Correct.

3  Q.  And he certainly didn't have the kind of money that one

4  would need to buy this kind of explosive fire power, right?

5  A.  He did not.

6  Q.  And he didn't have a cell phone during part of this

7  investigation; is that correct?

8  A.  During the initial part he did not have a cell phone.

9  Q.  And he at certain times didn't even have access to a

10  laptop; is that right?

11  A.  At certain times, that's correct.

12  Q.  And isn't it true that before this investigation even

13  started there were indications that Mr. Ferdaus had psychiatric

14  problems?

15  A.  I am not aware of that.

16  Q.  You're not aware of that?

17  A.  Before this investigation, no, I'm not aware of that.

18  Q.  So are you aware for example of an Ashland police report

19  dated April 3, 2010 that described Mr. Ferdaus as being

20  disoriented?

21  A.  I am aware of that.

22  Q.  Okay.  So disoriented to you wouldn't be an indication of

23  psychiatric problems?

24  A.  Not necessarily, no.

25  Q.  Well, I understand not necessarily but these reports were

54

1   reviewed before the government ever made contact with Mr.

2   Ferdaus, correct?

3   A.   That's correct.

4   Q.   The federal government had access to that April 3, 2010

5   report, correct?

6   A.   That's correct.

7   Q.   And I apologize, that actually I think referred to an

8   event that occurred on March 31, 2010, correct?

9   A.   If, I – correct.  Yes, as I recall.

10  Q.   And on a later occasion the FBI actually interviewed Mr.

11  Ferdaus, right?

12  A.   That's correct.

13  Q.   And that was before he met the informant, right?

14  A.   That's correct.

15  Q.   And he met him, excuse me, he was interviewed in his home

16  in the presence of his father on October 12, 2010, right?

17  Excuse me, 21st.

18  A.   Correct.

19  Q.   And at that time he was described as agitated, correct?

20  A.   Correct.

21  Q.   And very nervous, correct?

22  A.   Correct.

23  Q.   And visibly shaken, correct?

24  A.   Correct.

25  Q.   And it was less than two months later that the FBI sent

55

1   the informant to the Worcester Mosque in an effort to make

2   contact with Mr. Ferdaus, correct?

3   A.   Yes.

4   Q.   And you said that that meeting – and in fact when the

5   informant went to the mosque – he was shown a photograph of Mr.

6   Ferdaus before he went, right?

7   A.   That's correct.

8   Q.   So he was targeting Mr. Ferdaus, correct?

9   A.   He was going in to attempt to identify, he had never seen

10  him before, so based on the photograph he was going in to see

11  if he could identify him and meet with him, yes.

12  Q.   And you told us that that meeting was not recorded, right?

13  A.   That's correct.

14  Q.   It could've been recorded?

15  A.   It could have been.

16  Q.   But it wasn't?

17  A.   It was not.

18  Q.   And that was a decision that the FBI made not to record

19  that meeting, right?

20  A.   Yes.  It's standard.

21  Q.   I'm sorry?

22  A.   It's standard for their practice.

23  Q.   Well, and do you know what the reason for that is?

24  A.   Yes, as I indicated it's FBI procedure, not hard and fast

25  procedure but basically start with a least intrusive method of,

56

1    using least intrusive tools and then ramping up the

2    sophistication of the tools used in an investigation.

3    Q.   I don't understand that because there were occasions when

4    the informant wore a wire inside, as it were, inside the

5    mosque, right?

6    A.   Correct.

7    Q.   So how would that be intrusive?  It's not showing.  No one

8    knows he's making a recording, right?

9    A.   That's correct.  It's just the terminology used in the FBI

10   for using sophisticated techniques while conducting an

11   investigation.

12   Q.   Well it wouldn't interfere with the informant's ability to

13   speak to anyone.

14   A.   No, that's correct.

15   Q.   So it very well could have been recorded, right?

16   A.   It could have been, yeah.

17   Q.   So what instead because the FBI chose not to record that

18   meeting the only way that you know or the only basis for your

19   testimony that Mr. Ferdaus approached the informant was the

20   fact that the informant told you that?

21   A.   Told the handling agents that, yes, that's correct.

22   Q.   Right.  I'm sorry; you were not even involved in the

23   investigation at that time, right?

24   A.   Not at that time, no.

25   Q.   Okay.  And at the time that the informant told the FBI

57

1   agents that that was in December of 2010, correct?

2   A.   Correct.

3   Q.   Now the informant had previously been terminated as an FBI

4   informant; isn't that right?

5   A.   Yes, he's not been used an informant for quite some time.

6   Q.   Well, not only had he not been used, he had been

7   terminated in May of 2010?

8   A.   I'm not sure of the exact date.

9   Q.   Well--

10  A.   But, yes, he--

11  Q.   --are you aware of the fact that during the previous time

12  when he was working as an FBI informant he was seen by his

13  handler, Agent Wotenberg (ph), walking down the street in

14  Worcester and was asked what he was doing and he admitted that

15  he was actually, while working as an FBI informant, selling

16  drugs?

17  A.   I am aware of that incident.

18  Q.   And so that would be committing a crime while he's an

19  informant, right?

20  A.   That's correct.

21  Q.   So this Radio Shack shoplifting incident that you told us

22  about that wasn't the first time he was caught committing a

23  crime while he was on the FBI's payroll, right?

24  A.   That's correct.

25  Q.   And it also certainly wasn't the first time he was

1  admonished not to commit crimes while on the FBI payroll?

2  A.    That's correct.

3  Q.    So apparently the first time, actually the May 2010 time

4  wasn't even the first time he was admonished not to commit

5  crimes while on the FBI payroll; is that right?

6  A.    That's correct, and that's a standard procedure for any,

7  any cooperating witness as well.

8  Q.    Well I'm sorry; maybe I'm not making myself clear.  It

9  wasn't the first time he committed a crime while on the FBI

10  payroll, was it?

11  A.    I can't recall.

12  Q.    Are you aware that in June of 2009 Mr., excuse me, strike

13  that, the informant was arrested by Worcester police?

14  A.    Yes.

15  Q.    And are you aware that that time he was on the FBI

16  payroll?

17  A.    I was aware that he was on the FBI payroll.  I don't

18  recall if it was during that exact time.

19  Q.    And he was charged with possession of heroin, correct?

20  A.    Correct.

21  Q.    And trespassing, correct?

22  A.    Correct.

23  Q.    And those charges were dismissed?

24  A.    They were.

25  Q.    And in fact the informant is not just someone with a

1  criminal record.  He's a drug addict, right?

2  A.    He has substance abuse issues, yes, he does.

3  Q.    Well substance abuse issues or he's a drug addict?  Heroin

4  addict?

5  A.    He does--

6            MS. SIEGMANN:  Objection, Your Honor.  This is not an

7  expert on what an addict versus--

8            THE COURT:  Sustained.

9            MS. SIEGMANN:  --a substance abuse--

10            THE COURT:  Sustained.

11            MS. SIEGMANN:  --problem.

12  BY MS. CONRAD:

13  Q.    Has he told the FBI that he's a heroin addict?

14  A.    Umm, I believe so.  Yes.

15  Q.    So, okay.

16  A.    I mean I believe he's told them he has a problem with

17  heroin.  The FBI is aware of his heroin problem.

18  Q.    And have you worked with witnesses before with drug abuse

19  problems?

20  A.    Yes.

21  Q.    And are you aware of people who use heroin occasionally or

22  would you say it's more common for someone who uses heroin to

23  use heroin consistently?

24  A.    It's more common they use it consistently.

25  Q.    And so this informant in June of 2009 admitted to using

1   heroin and he was placed at the behest I take it of the FBI in

2   a detox program, correct?

3   A.   Correct.

4   Q.   And after a week he came out and he went right back to

5   work for the FBI, correct?

6   A.   I'm not sure about that fact.

7   Q.   And, but Agent Wotenberg would be clear on that, right?

8   A.   Other agents would, yes, would be.

9   Q.   Well Agent Wotenberg was his handler, right?

10  A.   Correct.

11  Q.   And the FBI later discovered that from the time, from at

12  least September of 2009 through at least September of 2010 the

13  informant was using heroin?

14          THE COURT:  I'm sorry; give me those dates again

15  please.

16          MS. CONRAD:  Sure, September of 2009 until September

17  2010 the informant was using heroin.

18          THE COURT:  Thank you.

19  A.   Well based on the information he was during that time

20  using heroin.  I don't know if during the entire time he was

21  using heroin.

22  BY MS. CONRAD:

23  Q.   Was he ever drug tested by the FBI?

24  A.   No, not to my knowledge.

25  Q.   So even though he had this history of drug use and drug

61

1  sales and committing crimes while on the FBI payroll when he

2  was enlisted in I take it shortly before December 17, 2010 to

3  conduct Mr. Ferdaus he wasn't drug tested?

4  A.   No, he was not, not to my knowledge.

5  Q.   And during this entire investigation he wasn't drug

6  tested?

7  A.   Not to my knowledge.

8  Q.   And in fact there's some indication that he was using

9  heroin during the course of this investigation, isn't there?

10  A.   Umm, I'm not aware of it.

11  Q.   Well isn't it true that on one of the recordings he said

12  I'm sick, I need a gram?

13  A.   I recall he was sick, he said he was sick on one of the

14  recordings, yes.

15  Q.   And he said I need a gram?

16        MS. SIEGMANN:  Objection.

17        THE COURT:  Overruled.

18  A.   I--

19        THE COURT:  Overruled, that means you may answer.

20  BY MS. CONRAD:

21  Q.   I want a gram of dope.  I feel real sick.  Isn't that on

22  one of the recordings?

23  A.   I do recall him mentioning being sick.  I don't recall

24  those exact words.

25  Q.   So the FBI didn't, no one in the FBI said, gee, why are

62

1  you saying I need a gram of dope when you're supposed to be

2  working as an FBI informant in a supposedly terrorism

3  investigation?  No one's concerned that this guy's dope sick?

4          MS. SIEGMANN:  Objection.  The witness said he did

5  not recall--

6          THE COURT:  Wait.  Stop.  Stop.  Stop.

7          Sustained.  Let's move, let's keep moving.

8  BY MS. CONRAD:

9  Q.    During the course of this investigation was there ever any

10  effort made to test the informant to determine whether he was

11  using illegal drugs?

12  A.    Not that I'm aware of.

13  Q.    And was his conduct, apart from the surveillance of

14  certain scheduled meetings, was his conduct monitored in any

15  way?

16  A.    We were aware of telephonic communications he was making

17  and we were monitoring methods of communication, electronic

18  methods of communication that he may be undertaking but his

19  physical activities, I'm unaware of whether they were monitored

20  more closely.

21  Q.    So when you told Ms. Siegmann on direct examination that

22  there were no meetings that were not recorded you don't know if

23  that's true, do you?

24  A.    Physical meetings, no, I'm not aware of those.

25  Q.    I understand you're not aware of them but you wouldn't be

63

1  aware of them unless the informant told you?

2  A.   That's correct.

3  Q.   In other words you didn't follow him 24-7?

4  A.   That's correct.

5  Q.   So he could have been meeting with Mr. Ferdaus without

6  being recorded and you wouldn't know that, right?

7  A.   That would be possible.

8  Q.   And in fact there were many phone calls that were not

9  recorded; is that correct?

10  A.   Between the--

11  Q.   Between Mr. Ferdaus and the informant?

12  A.   Umm, I'm not aware.  I didn't review anything, any of the

13  reports that were not recorded.

14  Q.   I'm sorry?

15  A.   I didn't review any, except for the two reports we already

16  addressed I didn't review any other reports that the handlers

17  may have drafted regarding meetings with the CW.

18  Q.   Oh, I'm sorry.  I thought you reviewed all the reports in

19  this case?

20  A.   That were addressed in this, in the indictment and in the

21  complaint.

22  Q.   Oh.  So you haven't reviewed all of the reports regarding

23  all of the contacts between the informant and Mr. Ferdaus; is

24  that correct?

25  A.   Apart from the other, the meeting in December and the

64

1  meeting in, the unrecorded meeting on February 4th, I've

2  reviewed all of those.

3  Q.    So the one I was asking you about with respect to I want a

4  gram of dope, I feel real sick, that was January 20th, a

5  recording made on January 20th.  You haven't reviewed that?

6  A.    Yes, I did review that.

7  Q.    You did review that?

8  A.    I did, yes.

9  Q.    So do you know why it was decided – at the time – strike

10  that.

11       As of September 2010 this informant was not on the FBI

12  payroll; is that correct?

13  A.    September 2010.  I don't know the exact dates of when he

14  was being handled or not.

15  Q.    Do you know when he was reinstated?

16  A.    I don't know that.

17  Q.    Do you know whether he was reinstated for this

18  investigation?

19  A.    As a result of this investigation?

20  Q.    For the purpose of this investigation?

21  A.    Umm, I believe he was, I believe so.  I believe so.

22  Q.    And do you know how or why it was decided that despite his

23  previous misconduct and the fact that he was selling I think it

24  was crack cocaine while on the government's payroll and buying

25  drugs for himself from targets of FBI investigations he would

1    be a reliable person to conduct a terrorism investigation?

2    A.   Well he was considered actually a very productive source

3    because of all the work he had accomplished in those drug

4    investigations and his ability to perform well during those

5    investigations.

6    Q.   So as long as he was productive the FBI wasn't terribly

7    concerned about his criminal activity?

8    A.   Oh no, no, no.  The FBI is always monitoring that.

9    They're various methods apart from the drug testing that you

10   alluded to that I'm not aware of accomplishing those types of

11   things but the cooperating witness is always interviewed

12   following a meeting, is always surveilled during the meetings

13   and communications are continually being established during an

14   investigation.

15   Q.   Well you told us about the February 11th incident and you

16   said that that was discovered because actually the agents were

17   aware from the recording that the informant had actually

18   shoplifted this item?

19   A.   Well it was also – that was a component of what raised

20   their attention to the fact that something had happened.  It

21   was also in their debrief of the source that they felt that

22   this, you know, the story he had portrayed to them is what had

23   actually happened during a meeting wasn't accurate.  They

24   reviewed the consensually monitored meeting and then they also

25   saw that there was something amiss to it and that's when they

1  then confronted him very shortly after that meeting.

2  Q.  Now were you involved with the investigation at that time?

3  A.   No, I was not.

4  Q.  So you weren't present at that meeting?

5  A.   I was not.

6  Q.  Do you know if the FBI paid the store owner back for that

7  stolen item?

8  A.   I'm not aware of what you're referring to.  Oh, oh, oh,

9  I'm sorry, that stolen item.  No, I'm not aware - I don't

10  believe they've paid the store.

11  Q.  Did they report it to the local police?

12  A.   Did the FBI report it to the local police?

13  Q.  Yes.

14  A.  Not that I'm aware of.

15  Q.  Did the FBI tell the informant to go back and return the

16  item or pay for it?

17  A.  Not that I'm aware of.

18  Q.  And in fact it was completely unnecessary for him to steal

19  this item because if it was part of the investigation the FBI

20  would have paid him for it, right?

21  A.   It was unnecessary for him to steal the item.

22  Q.  And did he ever explain why he felt compelled to commit a

23  crime for no apparent reason while on an FBI surveillance tape

24  and while working for the FBI?

25  A.   Again, after speaking with the handling agent it was

67

1 presumed that, it was relayed to the CW by Mr. Ferdaus that

2 that component was something that, I forget what they referred

3 to it as, was something that he required, a relay, it was a

4 relay, that he, Mr. Ferdaus required and they didn't purchase

5 it so the CW, the source stole it from the package that they

6 looked at while in the store and wanted to provide it to the

7 FBI as proof that this was something he had wanted.

8 Q.    Why didn't he just pay for it?

9 A.    I don't know the answer to that.

10          MS. SIEGMANN:  Objection.

11          THE COURT:  Sustained.

12 BY MS. CONRAD:

13 Q.    In fact, let me just go back for a moment to, and I'm

14 sorry to skip around but I know my time is short here so I just

15 want to cover a few things, although we probably won't finish

16 today, but have you reviewed the tape recording that was made

17 on January 11th by the informant in a meeting with Mr. Ferdaus?

18 A.    Yes.

19 Q.    And at the end of that tape recording the informant says,

20 of course after Mr. Ferdaus has left, this dude is f'in crazy,

21 except he didn't say f'in, right?

22 A.    That's correct.

23 Q.    And that was after Mr. Ferdaus shared his thoughts about

24 how he wanted to drop a bomb on the Capital and the Pentagon

25 and launch a ground attack and take over the whole place; is

1   that right?

2            MS. SIEGMANN:  Objection, Your Honor, relevance to

3   the fact that the CW thought this guy, you know, he claimed was

4   a little crazy.  What does that have to do with dangerousness?

5            THE COURT:  Overruled.  You may have this.  Rephrase

6   the question.  Re-ask the question please.

7   BY MS. CONRAD:

8   Q.   So that comment which I think you'd already agreed with me

9   he made--

10  A.   Mmm-hmm.

11  Q.   --was after Mr. Ferdaus on that tape was talking about how

12  he wanted to drop a bomb on the Capital and on the Pentagon and

13  do a ground attack and "take the whole place over," right?

14  A.   That's correct.

15  Q.   And Mr. Ferdaus as of January 11th and even as of,

16  certainly prior to the time he met the undercovers, had no

17  means to drop bombs and launch a ground attack and take over

18  the entire place, did he?

19  A.   By means what are you describing?

20  Q.   Money, people--

21  A.   Not--

22  Q.   Explosives?

23  A.   No, I don't believe so.

24  Q.   Arms?  In fact repeatedly the informant said to him who do

25  you have, right?

69

1    A.   Correct.

2    Q.   And he didn't have anybody, right?

3    A.   Correct.

4    Q.   He just kept saying, well there's you and me and maybe

5    there's one other guy I can talk to, right?

6    A.   Correct.

7    Q.   So this plan that was introduced as I think Exhibit 5

8    which talks about different teams, right?

9    A.   Mmm-hmm.

10   Q.   There were no teams?

11   A.   At the time of the plan, no, there were no teams.

12   Q.   There were never any teams?

13   A.   During this investigation there were no teams, correct.

14   Q.   There was never anyone recruited to take part in a ground

15   attack, correct?

16   A.   Except for the undercover employees.

17   Q.   Right.

18   A.   Correct.

19   Q.   And in fact this discussion about how he was going to get

20   on a plane and go to Afghanistan, correct, after taking out the

21   Pentagon and the Capital with multiple AK47s, that wouldn't

22   have happened, would it?

23        MS. SIEGMANN:  Objection.

24        THE COURT:  Sustained.

25   BY MS. CONRAD:

70

1    Q.   Well, well - I'll move on.  And going back to the issue

2    of mental health, isn't it also true, I think you told Ms.

3    Siegmann that Mr. Ferdaus never indicated any reluctance and

4    never indicated that he wanted to back out but in fact in

5    August of 2011, just about a month before he was arrested,

6    isn't it true that Mr. Ferdaus told the undercovers that he is

7    filled with anxiety and hasn't been leaving the house, correct?

8    A.   Correct.

9    Q.   And he told them that he was having intrusive thoughts,

10   correct?

11   A.   Correct.

12   Q.   And he told them he was depressed?

13   A.   Correct.

14   Q.   And he told them he was starting to take medication?

15   A.   Correct.

16   Q.   And he told them that they might have to find someone

17   else?

18   A.   I don't recall that statement, no.

19   Q.   Didn't he tell them that he was not able to follow through

20   on the plan right now?

21   A.   I, I don't recall that statement, no.

22   Q.   Didn't he say we'll have to put the plan in storage until

23   the end of the month and then decide what to do?

24   A.   I, I don't recall.

25   Q.   And these were statements, statements about feeling

71

1  depressed and anxious and intrusive thoughts; these were

2  statements that he made over not in just one isolated

3  conversation but in a series of conversations during that

4  month, right?

5  A.   I believe there were two, two distinct meetings where that

6  was mentioned, yes.

7  Q.   And earlier - these are phone calls.  Did you listen to

8  the phone calls?

9  A.   I did listen to the phone calls that were addressed here,

10  yes.

11  Q.   And going back, sorry about jumping back, in fact the

12  first time the informant met Mr. Ferdaus he described to agents

13  as having "wild eyes"?

14  A.   Correct.

15  Q.   And isn't it also true that in February of 2011 there were

16  two police reports from local police departments regarding Mr.

17  Ferdaus' odd behavior?

18  A.   Correct.

19  Q.   And in one of those he was described as disheveled,

20  correct?

21  A.   Correct.

22  Q.   And in another one a caller in Hopkinton on February 11th,

23  the same day as the Radio Shack incident, called police and

24  said there was a man in the road who wouldn't move and appeared

25  to have wet his pants?

1   A.    That's correct.

2   Q.    And that person was identified as Mr. Ferdaus, correct?

3   A.    Correct.

4   Q.    And so those incidents which were right in the middle of

5   this investigation coupled with the comments of the undercovers

6   in August 2011 didn't that give the FBI concern about the

7   mental health of the target of this terrorism investigation?

8   A.    It's a consideration, but it's not a concern.  Our concern

9   is for public safety and even individuals, and I'm not saying

10  that we believed he had mental health issues, but even

11  individuals with mental health issues are a danger and a threat

12  to the public.

13  Q.    And this investigation lasted over a period of some nine

14  months, right?

15  A.    Correct.

16  Q.    So apparently the FBI's concern about public safety was

17  not so great that it didn't feel that it was safe to allow Mr.

18  Ferdaus to remain in the community from December of 2010

19  through September of 2011 when he was arrested?

20  A.    There was no indication other than when Mr. Ferdaus

21  mentioned constructing his own explosives or considering

22  constructing his homemade explosives at which time the

23  undercover employees told him they didn't want him to do that.

24  Other than those, than that, those times I don't believe there

25  were any other indications that he was an immediate threat to

73

1   the public.

2   Q.   Now focusing again on the mental health issues didn't the

3   undercovers tell him that he needed to try to blend in more?

4   A.   That's correct.

5   Q.   And that he – odd behavior would make him not an effective

6   operative in a terrorism operation, correct?

7   A.   Not so much odd behavior but behavior that was so extreme

8   that he would be detected by other security people in airports

9   and elsewhere.

10  Q.   And he had been acting in an extreme way; is that correct?

11  A.   He had been, yes.

12  Q.   And in fact he had recounted to an informant that he had

13  gotten into nearly a violent argument with someone on the

14  street in New York because he refused to move out of the way--

15  A.   That's correct.

16  Q.   --on the sidewalk?

17  A.   That's correct.

18  Q.   Right?  So he wasn't, he was acting in many ways in an odd

19  and agitated manner, right?

20  A.   Umm, yes, or an extreme manner.  There are other words you

21  could use to describe it.

22  Q.   That would draw attention to himself?

23  A.   That's correct.

24  Q.   And it did draw attention to himself, right?

25  A.   Yes, it did.

74

1   Q.   With, for example, the calls to the Ashland and the

2   Hopkinton police?

3   A.   That's correct.

4   Q.   And--

5           MS. CONRAD:  May I have a moment, please, Your Honor?

6           THE COURT:  Ms. Conrad, would this be a good point to

7   suspend?

8           MS. CONRAD:  Could I just check with Ms. Byrne for a

9   moment please?

10          THE COURT:  Mmm-hmm.

11      PAUSE

12          MS. CONRAD:  I have nothing further at this time,

13  Your Honor, just for purposes of suspending but I'm not

14  complete with my examination.

15          THE COURT:  I understand.  So as I have this we are

16  going to form up again on Monday November 14th at 10 a.m. is

17  that what everybody else has?

18          MR. CABELL:  Yes, Your Honor.

19          MS. SIEGMANN:  Yes, Your Honor.

20          MS. CONRAD:  Yes.

21          MS. SIEGMANN:  Can we quickly see you at sidebar

22  though to discuss just a logistic issue for November 14th?

23          THE COURT:  Sure.  Does it need to be on the record?

24          MS. SIEGMANN:  No.

25          THE COURT:  Okay.  Good.  Agent Davis, you can step

1    down.  Thank you.

2          THE WITNESS:  Thank you, sir.

3       WITNESS EXCUSED

4          THE COURT:  Come on up.  We are--

5                           SIDEBAR CONFERENCE – INAUDIBLE

6          THE COURT:  All right, we're in recess.

7    (Court adjourned 3:58:02)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

76

1                         CERTIFICATION

2          I, Maryann V. Young, court approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    digital sound recording of the proceedings in the

5    above-entitled matter.

6

7    /s/ Maryann V. Young                November 10, 2011

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**