# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA .        CRIMINAL NO. 11-10331-RGS
                         .
         V.              .        BOSTON, MASSACHUSETTS
                         .        NOVEMBER 14, 2011
REZWAN FERDAUS           .
     Defendant           .
. . . . . . . . . . . . .
```

### TRANSCRIPT OF DETENTION HEARING
#### BEFORE THE HONORABLE TIMOTHY S. HILLMAN
#### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

            For the government:  UNITED STATES ATTORNEY'S OFFICE
                                 BY: B. Stephanie Siegmann, Esq.
                                 Donald Cabell, Esq.
                                 One Courthouse Way, Suite 9200
                                 Boston, MA 02210
                                 617-748-3100

            For the defendant:   Federal Defender Office
                                 BY: Miriam Conrad, Esq.
                                 Catherine Byrne, Esq.
                                 51 Sleeper Street, Fifth Floor
                                 Boston, MA 02210
                                 617-223-8061
                                 miriam_conrad@fd.org
                                 catherine_byrne@fd.org

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

<u>**I N D E X**</u>

| **WITNESSES** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| **Government's:** | | | | |
| Bradley Davis | | 4 | 27 | 50 |
| John Woudenberg | 60 | 98 | 101 | |

| **EXHIBITS** | **DESCRIPTION** | **IDENT.** | **IN EVIDENCE** |
|---|---|---|---|
| **Government's:** | | | |
| 6 | Emails 6/10/11 | | 37 |
| 7 | Emails 10/10/11 | | 37 |
| 12 | Letter from Worcester Islamic Center | | 43 |
| **Defendant's:** | | | |
| A | Letter | 81 | |

3

1   CASE CALLED INTO SESSION

2   (11:11:50 a.m.)

3           THE CLERK:  The Honorable Timothy S. Hillman

4   presiding.  Today's date is November 14, 2011 in the case of

5   U.S.A. v. Ferdaus, Criminal action No. 11-10331.  Counsel;

6   please identify yourself for the record.

7           MR. CABELL:  Good morning, Your Honor, Donald Cabell

8   for the government.

9           THE COURT:  Good morning, Mr. Cabell.

10          MS. SIEGMANN:  Good morning, Your Honor, Stephanie

11  Siegmann for the government.

12          THE COURT:  Good morning, Ms. Siegmann.

13          MS. CONRAD:  Good morning, Your Honor, Miriam Conrad

14  for Mr. Ferdaus and with me is Catherine Byrne and also with

15  leave of the Court Winford Meadows who's an employee of our

16  office.

17          THE COURT:  Good morning and good morning.

18          MS. BYRNE:  Good morning, Your Honor.

19          THE COURT:  And we had left off with Agent Davis.  Is

20  he still here?  Can you come up please?  Mr. Davis.

21      PAUSE

22          THE COURT:  Mr. Davis good morning.

23          THE WITNESS:  Good morning.

24          THE COURT:  I'm just going to remind you that you are

25  still under oath from last week and I'm going to ask you to

4

1   again state your name and spell your last name for the record

2   please.

3            THE WITNESS:  Bradley Davis, D-A-V-I-S.

4            THE COURT:  Thank you.

5            And as I understand it Ms. Byrne has been nominated

6   to continue the cross examination that Ms. Conrad started; is

7   that also correct?

8            MS. CONRAD:  That is correct, Your Honor.  Thank you.

9            THE COURT:  All right.

10           Ms. Byrne, again and both, all counsel remember your

11   responsibility to make sure we have a clean record so try not

12   to go too far from the microphones if you can help it.

13           MS. BYRNE:  Okay.

14                      CROSS EXAMINATION

15   BY MS. BYRNE:

16   Q.   Good morning, Agent Davis.

17   A.   Good morning.

18   Q.   You testified the last time we were here, which I believe

19   was November 4th, about the cell phones, right?

20   A.   Correct.

21   Q.   Okay.  And the cell phones were - you testified that the

22   FBI explosives unit looked at the cell phones; is that right?

23   A.   Correct, and that agents, specially trained bomb

24   technicians from the Boston office also looked at them, yes.

25   Q.   Okay.  And the cell phones that they, well the cell phones

5

1  – let's talk about IED devices for a moment.  IED devices

2  consist of four things, right?

3  A.   Correct.

4  Q.   Okay.  The first is a switch or trigger, right?  The

5  second is an initiator, right?

6  A.   Correct.

7  Q.   The third is a power source?

8  A.   Correct in some cases.

9  Q.   The fourth is of course explosives?

10  A.   Correct.

11  Q.   Right?  The cell phones were supposedly the switch part;

12  is that right?

13  A.   That's correct.  The switch for the triggering mechanism,

14  correct.

15  Q.   Okay.  So the cell phones were not actually detonators; is

16  that fair to say?

17  A.   In technical terms it would be considered a switch as part

18  of the fusing system.

19  Q.   Okay.  And so would you agree that the switch is the

20  easiest part of an IED to make?

21  A.   Well plastic explosives are already made so I would--

22  Q.   Right.  Well you have to get the plastic explosives,--

23  A.   Correct.

24  Q.   --right?

25  A.   Correct.  You still need technical savvy to do it.  I

6

1   couldn't do it for example.  I would need to know how to do

2   it, yes.

3   Q.   Okay.  Have you ever looked it up on the internet?

4   A.   I have not, no.

5   Q.   So the, and, well let's put it this way in making an IED

6   the switch is the easiest part to obtain, would you agree with

7   that?

8   A.   I guess it's a very general question.   I--

9   Q.   Well a cell phone--

10  A.   Oh, you mean of a--

11  Q.   Cell phones are easy to obtain, right?

12  A.   Oh absolutely, correct.  Yes.

13  Q.   And they're easy to obtain--

14  A.   Absolutely.

15  Q.   --in the United States, right?

16  A.   Yes, that's correct.

17  Q.   And they're easy to obtain overseas, right?

18  A.   Yes.

19  Q.   And they're easy to obtain in the Middle East, right?

20  A.   Cell phones are, yes.

21  Q.   Right.  In fact they mostly use cell phones because

22  landlines are more rare in the Middle East; is that fair to

23  say?

24  A.   Sure.  That's correct.

25  Q.   Okay.  So the - you testified that the FBI evaluated the

7

1  mobile phone devices received from Mr. Ferdaus, right?

2  A.  Correct.

3  Q.  And that they, then they devised a similar device, right?

4  A.  Yes, that's correct.

5  Q.  Okay.  And they used a cell phone similar device to see if

6  it could work, right?

7  A.  That's right, they tested it to see that when a call was

8  placed to the phone that an electronic charge was passed

9  through the wires which were connected to the phone which then

10  could be used as a switch for an IED, correct.

11  Q.  Okay.  And they didn't test the actual phones that were

12  provided, right?

13  A.  They did not.

14  Q.  Is there a reason why they did not?

15  A.  Well the agents in the FBI Boston did not.

16  Q.  Why not?

17  A.  Because they didn't have those phones that he had

18  provided--

19  Q.  Okay.

20  A.  --to the undercovers.

21  Q.  All right, so the phones – were the phones that were

22  provided ever tested?

23  A.  I don't have a final, I haven't viewed a final report but

24  they've been sent to the FBI laboratory for testing.

25  Q.  Okay.  So as of now all that you know is that there was a

8

1  similar device that was tested; is that right?

2  A.   That's correct.

3  Q.    And you don't know whether any modifications were made to

4  the phone in order to make them work?

5  A.   I was not present for the construction of that, no.

6  Q.   So you don't know anything more about that?

7  A.   No.

8  Q.   And what the cell phones supposedly do is they provide an

9  electric current; is that right?

10 A.   That's correct.

11 Q.   Now – okay, so, and the electric charge or current that a

12 cell phone provides the question is was, do you know whether

13 that current was sufficient to set off a bomb?

14 A.   No, it was the initial current but it needs a boost.

15 Q.   Okay.

16 A.   It typically needs a boosted charge.

17 Q.   Right, because a cell phone emits a very small current; is

18 that fair to say?

19 A.   Most of them do, yes.

20 Q.   Right.  From the battery, right?

21 A.   Correct.

22 Q.   Okay.  Now also when you reviewed the transcripts and the

23 tape recordings in this case you learned that Mr. Ferdaus had

24 said at some point that the cell phones were locked, right?

25 A.   He said they were unlocked I believe--

1    Q.    Okay.

2    A.    --in one of the--

3    Q.    You never heard him say that they were locked?

4    A.    He may have said that.

5    Q.    Mmm-hmm.  And, well, you know that the cell phones can

6    only be used with a sim card; is that right?

7    A.    That's right.

8    Q.    Okay.  And they've got to be used with a sim card that

9    comes with the phone, right, to be unlocked?

10   A.    If it's an unlocked phone you can use any sim card,--

11   Q.    Right.

12   A.    --correct.

13   Q.    But to unlock the phone you need the sim card?

14   A.    Correct.

15   Q.    Okay.  And it was the, the undercover agents or employees,

16   it was their idea to send the cell phones overseas; isn't that

17   correct?

18   A.    I don't, I think it was in a discussion with Mr. Ferdaus

19   where they decided that they would be the best course of

20   action, yes.

21   Q.    Right, they decided that that would be the best course of

22   action, right?

23   A.    Mmm--

24   Q.    They suggested it, right?

25   A.    They may, they may have suggested it, yeah.

10

1   Q.   Right.  Well Mr. Ferdaus didn't have any contacts

2   overseas, right?

3   A.   He did not.

4   Q.   Right.

5   A.   Not to my knowledge.

6   Q.   And there's no evidence that in fact, that he had any

7   contact whatsoever with al-Qaida except for the people that

8   were pretending to be al-Qaida, right?

9   A.   As far as I know that's correct.

10  Q.   Right.  No evidence of any telephone calls to al-Qaida,

11  right?

12  A.   Not to my knowledge.

13  Q.   No evidence of any emails, right?

14  A.   Not to my knowledge, no.

15  Q.   No evidence of any meetings, right?

16  A.   Not to my knowledge.

17  Q.   Okay.  No evidence of any contact with al-Qaida, right?

18  A.   Not to my knowledge.

19  Q.   You testified that between November 17th of 2010 and

20  January 7th, well November 17th, excuse me, December 17th of 2010

21  was the first contact that the informant had with Mr. Ferdaus;

22  is that right?

23  A.   Correct.

24  Q.   And that was not recorded we know that?

25  A.   That's right.

11

1   Q.   And that was policy, right?

2   A.   It's not policy.  It's policy to use the least intrusive

3   method to conduct an investigation until deemed necessary to

4   use more sophisticated techniques--

5   Q.   Okay.

6   A.   --so.

7   Q.   And the more sophisticated techniques, meaning wearing a

8   wire and recording--

9   A.   That's right.

10  Q.   --conversations, correct?

11  A.   That's correct.

12  Q.   Okay.  And so, and then after that the first recorded

13  contact between the cooperating witness and Mr. Ferdaus was on

14  January 7th, right?

15  A.   That's right.

16  Q.   Okay.  And do you know whether there was any contact

17  between December 17th and January 7th between the cooperating

18  witness and Mr. Ferdaus?

19  A.   I do not know of any, no.

20  Q.   Okay.  You don't know, well you don't know whether the

21  cooperating witness did contact him, right?

22  A.   I don't know that.

23  Q.   And by the way on the issue of Mr. Ferdaus' lack of

24  contact with anyone in al-Qaida there's no evidence that he

25  even attempted to contact anyone in al-Qaida; is that fair to

12

1   say?

2   A.   I would have no knowledge of whether he attempted to or

3   not.

4   Q.   There's no evidence of it; is that right?

5   A.   Not that I'm aware of, no.

6   Q.   Right.  And you've seized his computer, right?

7   A.   Yeah, I haven't, I haven't reviewed--

8   Q.   Cell phones?

9   A.   I have not reviewed those, those things personally so I--

10  Q.   So you don't know?

11  A.   I don't, I don't know.  No, I don't know that.

12  Q.   Okay, so – and who, so you've reviewed everything that's

13  in the search warrant, I mean, excuse me, that's in the

14  affidavit; is that it?

15  A.   That's correct.

16  Q.   All right.  So you don't know what else is out there,

17  right?

18  A.   I mean I've seen some other things, yes, but I'm not aware

19  of any--

20  Q.   Well, at this point the FBI has certainly looked at Mr.

21  Ferdaus' computer, right?

22          MS. SIEGMANN:  Objection.  The computer was seized on

23  September 28th, Your Honor.  The forensic analysis takes some

24  time.

25          THE COURT:  All right, sustained.

1  BY MS. BYRNE:

2  Q.    Do you know whether anyone has examined the, Mr. Ferdaus'

3  computer at this point?

4  A.    I know that it's ongoing.

5  Q.    Mmm-hmm.

6  A.    I don't know what the results of them may be or--

7  Q.    Do you know whether anyone has seized his email account?

8  A.    I believe they have, yes.

9  Q.    Mmm-hmm.  And you've seen that, right?

10 A.    I have not seen his email account.

11 Q.    Okay, well you certainly would have been informed if there

12 were any contact with al-Qaida, right?

13        MS. SIEGMANN:  Objection.

14        THE COURT:  Sustained.

15 BY MS. BYRNE:

16 Q.    Well you were – did you talk to the agents that were

17 actually involved in this investigation before testifying?

18 A.    Yes, I have.

19 Q.    Right.  And nobody told you anything about Mr. Ferdaus

20 contacting al-Qaida; is that fair to say?

21 A.    That's fair to say.

22 Q.    At some point Mr. Ferdaus travels to Washington D.C.,

23 right?

24 A.    Correct.

25 Q.    And that is in, that is May 13th of 2011, right?

14

1   A.    That's correct.

2   Q.    And when he travels to Washington D.C. he's provided with

3   the plane ticket, right?

4   A.    Umm--

5   Q.    By the FBI?

6   A.    That's correct.  They purchased it, correct.

7   Q.    They booked a flight for him, right?

8   A.    He was involved in booking the flight but they provided

9   him funds--

10  Q.    Right.

11  A.    --to do so.

12  Q.    And provided him funds to stay in Washington D.C., right?

13  A.    That's correct, they provided him money.

14  Q.    Right.  And in fact it was the FBI employees, the

15  undercover agents it was their suggestion that he go to

16  Washington D.C.; isn't that correct?

17  A.    No, I believe he, he mentioned, he mentioned that he

18  needed to do some surveillance or some viewing of the areas

19  that he was discussing as target areas and also as the launch

20  site.

21  Q.    And they, and they didn't suggest that he went to

22  Washington D.C.?

23  A.    No.

24  Q.    Do you know?

25  A.    No.

1   Q.    You don't know the answer to that?

2   A.    I don't believe they did, no.

3   Q.    Now--

4   A.    Well I mean I believe there was suggestion that he needed

5   to do more research because they were questioning the--

6   Q.    The feasibility of the plan.

7   A.    --feasibility of the plan, correct.

8   Q.    Right.  They were questioning, in fact they questioned –

9   well first of all the cooperating witness questioned the

10  feasibility of the plan several times in the beginning, right?

11  A.    Yup.  Yes, he did.

12  Q.    And then the employees, the undercover agents questioned

13  the feasibility of the plan several times, right?

14  A.    They did a few times, yes.

15  Q.    And Mr. Ferdaus was told several times you need to do more

16  work on the plan, right?

17  A.    They needed to see more results in order to support his

18  plan further.

19  Q.    Right.  And they suggested that he needed pictures, right?

20  A.    I don't know if they suggested it but it was in part of

21  the discussions that they had had.

22  Q.    Right, that he could get pictures from Google Earth,

23  correct?

24  A.    I, I assume yes that was mentioned as well.

25          MS. SIEGMANN:  Objection.  The agent, the special

1  agent--

2         THE COURT:  Sustained as being speculative.

3  BY MS. BYRNE:

4  Q.   So you don't know, is that fair to say?

5  A.   I know there were conversations with regard to, you know,

6  conducting further activity in aid of his mission that he

7  decided to conduct, yes.

8  Q.   Mmm-hmm.  Okay.  Now you also--

9         MS. BYRNE:  Could I just have one moment, Your Honor?

10        THE COURT:  You may.

11        PAUSE

12  BY MS. BYRNE:

13  Q.   And have you looked at the plans yourself?  There were two

14  plans, right?

15  A.   Correct.

16  Q.   And it was suggested that the first plan wasn't detailed

17  enough; is that fair to say?

18  A.   Suggested by whom?

19  Q.   By the undercover agents?

20  A.   No, I don't believe so.

21  Q.   Okay.  And, well, it was after Mr. Ferdaus went to

22  Washington D.C. that there was a second plan; is that right?

23  A.   That's correct.

24  Q.   And you've looked at them, correct?

25  A.   I have, yes.

17

1  Q.   Now would you agree that everything that's in those plans

2  is available on the internet, all the information, right?

3  A.   Well some of the information I believe he obtained

4  photocopying things from the library and that there were actual

5  photographs that he took while on his trip--

6  Q.   Okay.

7  A.   --to Washington that were also in the plan.

8  Q.   Okay.  The trip that was being surveyed by the FBI; is

9  that fair to say?

10  A.   That's correct.

11  Q.   Okay.  The trip that he was discussing with the undercover

12  agents before he went, right?

13  A.   That's correct.

14  Q.   Right.  When they said that he needed to do more work,

15  right?

16  A.   Agreed, yes.

17  Q.   Now the plan involved flying a, well flying drone

18  airplanes, flying a drone airplane, right?

19  A.   Three drones, yes.

20  Q.   And, agent, you have served in the military, right?

21  A.   I have, yes.

22  Q.   Okay.  In the Air Force, right?

23  A.   That's correct.

24  Q.   Okay.  And you are familiar with flying drone airplanes,

25  not yourself, right, but you're familiar with what's involved

18

1  with flying a drone airplane; is that fair to say?

2  A.   Somewhat.  I didn't fly them myself.

3  Q.   Okay.  Well the Air Force does fly drone airplanes into

4  military targets, right?

5  A.   Yes, absolutely.

6  Q.   All right.  And they have people who are trained to do

7  that, right?

8  A.   That's correct.

9  Q.   And that is a whole realm of training; is that fair to

10  say?

11  A.   That's fair to say.

12  Q.   Right.  And it takes, it takes months to learn how to fly

13  a drone airplane--

14        MS. SIEGMANN:  Objection, Your Honor, I think the

15  comparison of the remote controlled airplane in the case--

16        THE COURT:  Stop.  If I need an explanation I will

17  ask for it.  Sustained.

18  BY MS. BYRNE:

19  Q.   And it, well, you agree that it takes training to fly one

20  of those things, right?

21        MS. SIEGMANN:  Objection to vagueness.

22        THE COURT:  Stop.

23        MS. SIEGMANN:  I'm sorry.

24        THE COURT:  Overruled, you may have that.

25  A.   It takes training to fly an Air Force drone, yes.

1  BY MS. BYRNE:

2  Q.   Okay.  Well do you agree that it takes – with your own

3  experience--

4  A.   Mmm-hmm.

5  Q.   --your own limited experience do you agree that it would

6  take training to fly one of the, to fly the airplane that was

7  involved in this case?

8  A.   Yes, I do.  No, not training, but it would take practice.

9  I mean there are obviously civilians who learn on their own how

10 to fly radio controlled aircraft.

11 Q.   Mmm-hmm.

12 A.   Yeah.

13 Q.   And so, and do you know whether Mr. Ferdaus ever had any

14 training?

15 A.   I don't know that, no.

16 Q.   Okay.  Or had ever flown one of those things before in his

17 life?

18 A.   I don't know.

19 Q.   Okay.  So when the bomb technicians that looked at this

20 they looked at the plan, right, and decided that it could work,

21 right?

22 A.   The bomb, no, I don't – no, I've never heard that they

23 reviewed his plans.

24 Q.   Who, who looked at the plans?

25 A.   The case agents and I looked at the plans.

20

1  Q.   Okay, well who was the one that decided that the plans

2  could work?

3           MS. SIEGMANN:  Objection, that--

4           THE COURT:  Sustained.  Let's lay a foundation.

5           MS. BYRNE:  All right.

6  BY MS. BYRNE:

7  Q.   Did anyone ever decide that Mr. Ferdaus' plan could work?

8  A.   Just through experience of conducting counterterrorism

9  investigations it looks like a feasible plan with

10 modifications, yes.

11 Q.   Right, with modifications, right?  For example Mr. Ferdaus

12 would have to know how to fly that plane, right?

13 A.   I'm not technically skilled in how a GPS might fly the

14 aircraft or using his laptop computer would function.  I just

15 don't know the details of that however if he were able to do

16 that as his plan detailed then it's a feasible plan.

17 Q.   Okay.  And the targets were pretty specific, right?

18 A.   Yes, very specific.

19 Q.   And in your opinion that would take some skill, right?

20 A.   To?

21 Q.   To fly a plane into those targets from the location that

22 Mr. Ferdaus was claiming he was going to do that?

23 A.   Again, if he were capable of configuring the GPS system as

24 described in his plan and as seemed to from his research,

25 online research and I think discussing it with the builder of

1   the aircraft, if that were successful to get that technology

2   to operate then my assumption is it would be able to hit the

3   target.

4   Q.   If that were successful, right?

5   A.   Correct.

6   Q.   And that would take skill, that's my question, right?

7   A.   It would take skill to or, you know, knowledge of

8   electronics and so forth to be able to make those aircrafts fly

9   that way, yes.

10   Q.   Okay.  So what were the modifications that you thought the

11   plan might need?

12   A.   That would be--

13        THE COURT:  Ms. Byrne, Ms. Byrne, I do not want to

14   turn this into a tutorial.

15        MS. BYRNE:  Yes, Your Honor.  I will narrow that and

16   I will move through this quickly.  I just have a few more

17   questions, Your Honor.

18   BY MS. BYRNE:

19   Q.   Well, you know, you did testify that in your opinion--

20   A.   Mmm-hmm.

21   Q.   --and the agents' opinions that looked at the plan that

22   this plan was feasible with certain modifications, right?

23   A.   Correct.

24   Q.   Okay.  Not feasible as it was but with certain

25   modifications, right?

22

1   A.    Correct.

2   Q.    Okay, what were the modifications?

3   A.    Modifications would be that the, from the original plan--

4          MS. SIEGMANN:  Objection, Your Honor.  I mean I think

5   you just--

6          THE COURT:  Sustained.

7   BY MS. BYRNE:

8   Q.    All right, so in other words the plan wasn't feasible as

9   it was without modifications, fair to say?

10  A.    In our opinion that's correct.

11  Q.    Right.  Well for one thing, I mean among other things the

12  plan called for numerous people, right, six at least?

13  A.    Correct.

14  Q.    Right.  And there was only Mr. Ferdaus, right?

15  A.    And he believed that he would have the cooperation of the

16  undercover employees and the cooperating witness as well.

17  Q.    Mmm-hmm.

18  A.    So there was four of them total.

19  Q.    Well the cooperating witness had disappeared from the

20  scene a long time ago, right?

21  A.    He had but I mean I am of the assumption that he felt he

22  was still involved.

23  Q.    Oh, so he was still in contact with the cooperating

24  witness, do you know that?

25  A.    No, I don't know that.

23

1  From the conversation with the undercover employees he was

2  concerned about the CW because he hadn't heard from him in

3  quite some time.

4  Q.   And according to Mr. Ferdaus' plan the plane would have to

5  hit a window, right?

6       PAUSE

7  BY MS. BYRNE:

8  Q.   Is that right?

9  A.   Mr. Ferdaus planned it to hit a window?

10 Q.   Right.

11 A.   I recall him saying that it needed to be targeted at two

12 exits on the Pentagon and the dome of the capital building.  I

13 don't recall whether he specifically said a window or not.

14 Q.   Okay.  And you'd agree that flying a remote control

15 aircraft as a hobby is different from flying with the precision

16 that was needed in this plan; is that fair to say?

17      MS. SIEGMANN:  Objection.  This is witness is not an

18 expert – oh, I'm sorry.

19      THE COURT:  Sustained.

20      MS. BYRNE:  May I have just a moment, Your Honor?

21      THE COURT:  You may.

22      PAUSE

23 BY MS. BYRNE:

24 Q.   Okay, agent, the last time that we were here on November

25 4th you testified that this plan could work.  Do you remember

1  that?

2  A.    I do.

3  Q.    Okay.  And now you're saying that you don't have the

4  knowledge really whether it could work or not; is that fair to

5  say?

6  A.    I don't have the technical knowledge.  The aspects of the

7  GPS put into the aircraft however the basics of the plan, what

8  I was referring to, could work in that if aircraft, remote

9  controlled aircraft were flown into the Pentagon with

10  explosives on board it would likely result in the evacuation of

11  the buildings which could then be, those individuals could be

12  attacked by people armed with automatic assault rifles and hand

13  grenades.

14  Q.    Right.  Okay.  And the automatic assault rifles that Mr.

15  Ferdaus had said he didn't know how to use, is that right?

16  A.    The--

17  Q.    That we were talking about?

18  A.    Yes, the ak-47s--

19  Q.    Okay.

20  A.    --that were delivered to him.

21  Q.    Right.  So, so in terms of one of those airplanes flying

22  into the Capital, right, okay, is it your testimony that if one

23  of those airplanes flew into the Capital dome it could destroy

24  it?

25  A.    No, I don't believe one of those airplanes could destroy

1  the dome in the Capital building.

2  Q.   Or even, even, even damage it?

3  A.   Well, again, I'm not a structural engineer so, and I

4  haven't researched the dome itself but in my opinion, you know,

5  five pounds of explosives may not crush the dome on the Capital

6  building--

7  Q.   Okay.

8  A.   --but it would certainly do damage.

9  Q.   But probably not even break into it; is that fair to say?

10  A.   I don't--

11  Q.   The way the Capital dome is made?

12  A.   I don't know.

13  Q.   Right.

14  A.   I don't know that.

15  Q.   So - you don't know?  You just don't know?

16  A.   I don't know that.

17  Q.   Okay.  So and you agree the GPS part of this plan is

18  really an important part of a plan, right, because if that

19  doesn't work then nothing works; is that fair to say?

20  A.   As part of his plan that was his plan--

21  Q.   Right.

22  A.   --so, yes, I would agree.

23  Q.   And your testimony is that you don't really know whether

24  this GPS system could work or not; is that right?

25  A.   Based on the research that he conducted it appears as

1  though, I mean I do know that GPS is used in flying radio

2  controlled aircraft.

3  Q.   Right.

4  A.   I do know that.

5  Q.   And you do know that because that's your military

6  training; is that fair to say?

7  A.   No, no, no.  I actually conducted a brief investigation a

8  number of years ago where somebody was using a GPS to fly a

9  radio controlled helicopter.

10  Q.   Okay.

11  A.   So I know that can function.

12  Q.   And you know that that person had training, right, to do

13  that?

14  A.   I don't know that he had training.  He was actually

15  contracted to do so--

16  Q.   Okay.

17  A.   --for a University.

18  Q.   All right.  So he knew how to do that?

19  A.   Yeah.

20  Q.   It was his job?

21  A.   Right.  Correct.

22  Q.   Now one part of Mr. Ferdaus' plan was that he was going to

23  be on a plane out of, going out of D.C. after this all

24  happened; is that fair to say?

25  A.   That was part of his plan, yeah.

27

1  Q.   Okay.  All right.  And doesn't that seem a little bit

2  unrealistic?

3          MS. SIEGMANN:  Objection.

4          THE COURT:  Sustained.

5  BY MS. BYRNE:

6  Q.   Well in your opinion would there be planes flying out of

7  D.C. if this actually happened?

8          MS. SIEGMANN:  Objection.

9          THE COURT:  Sustained.

10  BY MS. BYRNE:

11  Q.   Well were there any things about Mr. Ferdaus' plan that

12  you thought seemed unrealistic?

13          MS. SIEGMANN:  Objection, Your Honor.  Can we see you

14  at sidebar?

15          THE COURT:  No.  Sustained.

16  BY MS. BYRNE:

17  Q.   There's no evidence that Mr. Ferdaus ever travelled to the

18  Middle East; is that true?

19  A.   Not that I'm aware of.

20          MS. BYRNE:  Nothing further, Your Honor.

21          THE COURT:  Any cleanup?

22                    REDIRECT EXAMINATION

23  BY MS. SIEGMANN:

24  Q.   Special Agent Davis, I'm handing you Government Exhibit

25  No. 5.  You were just asked questions about the fact that, well

28

1  the defense attorney asked you questions about how much of

2  that came off the internet.  Can you count for us how many of

3  those pages in the front contained a narrative that Mr. Ferdaus

4  wrote?

5  A.    There were 14 pages at the beginning and then obviously

6  there's some photographs that he had taken toward the back of

7  the document.

8  Q.    So those 14 pages are they single spaced?

9  A.    Yes, they are.

10 Q.    So 14 pages of single spaced text accounts to the

11 narrative that Mr. Ferdaus supplied to the undercover

12 employees?

13 A.    Correct.

14 Q.    And just to refresh the Court's recollection on this, the

15 first plan was given on May 5, 2011 and then there was another

16 plan and that was, when was that given to the undercover

17 employees?

18 A.    June 9, 2011.

19 Q.    Did they instruct Mr. Ferdaus to prepare either one of

20 these plans?

21 A.    No, they did not.

22 Q.    Moving now to the questions regarding the telephone

23 detonators, Special Agent Davis, I'm going to direct your

24 attention to page 37 of Exhibit 1 which is the complaint

25 affidavit.

1    MS. BYRNE:  Objection, Your Honor, to the term

2 detonators.  I don't believe that's what the witness called

3 these devices.

4    MS. SIEGMANN:  Well, sorry.

5    THE COURT:  Sustained.  Go ahead.

6 BY MS. SIEGMANN:

7 Q.   What did Mr. Ferdaus, the defendant, call these devices?

8 A.   He called them detonators.

9 Q.   Thank you.  Okay, so the items that Mr. Ferdaus called

10 detonators in that paragraph on page 37 that I circled can you

11 read the paragraph number I circled?  I don't have it any

12 longer.

13 A.   Paragraph 72 on page, the bottom of page 37, August 1,

14 2011 Ferdaus met with the UCs--

15 Q.   Now I just want to give that to you.

16 A.   Oh.

17 Q.   In that paragraph--

18 A.   Can I read it silently?

19 Q.   Sure.  Just read it silently and then I would ask you some

20 questions about that.

21    MS. SIEGMANN:  I'm sorry; I'm just trying to speed us

22 up.

23    PAUSE

24    MS. BYRNE:  Your Honor, could I ask what document

25 he's looking at now?

1        THE COURT:  Exhibit 1.

2        MS. SIEGMANN:  Exhibit 1.

3        THE COURT:  Page 37.

4        MS. SIEGMANN:  Seven--

5        THE WITNESS:  Thirty-seven and 38.

6        THE COURT:  It's the affidavit.

7        MS. BYRNE:  Okay.  Thank you.

8    PAUSE

9  BY MS. SIEGMANN:

10  Q.   Special Agent Davis, have you read that paragraph?

11  A.   I have.

12  Q.   Okay, and in that paragraph does Mr. Ferdaus come up with

13  an idea--

14        MS. BYRNE:  What page please?

15        MS. SIEGMANN:  Page 37 and 38, paragraph 72.

16  BY MS. SIEGMANN:

17  Q.   Does Mr. Ferdaus come up with an idea?

18  A.   Yes, he indicates that he'd like to up the production of

19  telephone production and he'd like to do as many of them as

20  possible.  He discussed the possibility of using 50 phones, 50

21  telephones.

22  Q.   That he intended to use for what purpose?

23  A.   Detonators.

24  Q.   And that was in August of 2011?

25  A.   That's correct, August 1, 2011.

31

1    Q.   Going back to the video that we watched, Government 4,

2    the first recorded meet between the CW, the cooperating

3    witness, and the defendant did Mr. Ferdaus mention detonators

4    during that meeting?

5    A.   He did, yes.

6    Q.   And at that point who mentioned the detonators first, Mr.

7    Ferdaus or the CW?

8    A.   Mr. Ferdaus does.

9    Q.   What'd he say about detonators?

10   A.   He said that they were feasible I believe I can recollect

11   it.

12   Q.   Let me refresh your memory of Government Exhibit 1.

13   PAUSE

14   BY MS. SIEGMANN:

15   Q.   Directing your attention to paragraph 15--

16        MS. BYRNE:  Your Honor, I object – strike that.

17   BY MS. SIEGMANN:

18   Q.   Directing your attention to paragraph 15, the last

19   sentence, what does Mr. Ferdaus say on January 7, 2011 about

20   detonators?

21   A.   He said that detonators are easy and they'd only need a

22   spark plug, mechanical switch and a cell phone.

23   Q.   Thank you.  Turning now you were asked several questions

24   before concerning the defendant's interactions with Ashland

25   police department.  Do you remember that?

32

1  A.    I do.

2  Q.    And the defendant was questioned in April 2010 and

3  February 2011 by the Ashland police department?

4  A.    Correct?

5  Q.    Is that correct?  Have you reviewed the reports relating

6  to those incidents?

7  A.    I did.

8  Q.    And do you recall why the defendant was being questioned

9  by Ashland police department in April 2010?

10  A.    I believe April 2010 he was, I believe that was the time

11  he was praying on the school grounds.

12  Q.    All right, would it refresh your memory--

13  A.    Yes, please.

14  Q.    --to see a copy of the report?

15  A.    Yes, it would.  Thank you.

16  Q.    Could you please read the highlighted portions and look up

17  at me when you're done.

18       PAUSE

19  BY MS. SIEGMANN:

20  Q.    Special Agent Davis, does that refresh your memory as to

21  why Mr. Ferdaus was being questioned in April 2010 by the

22  Ashland police department?

23  A.    Yes.

24  Q.    Why was he being questioned?

25  A.    He was in the woods acting suspiciously around the train

1  station in Ashland.

2  Q.   Did he make any comments to the police officers as to why

3  he was there and what he was doing there?

4  A.   He said he missed his train and he was walking home.

5  Q.   Initially.

6  A.   Initially he said--

7  Q.   And then the last, he was, the officer - if you can direct

8  your attention to the last paragraph of that police report does

9  it indicate that he wanted to get a good luck at the train

10 station?

11 A.   Yes.  He said I know this looks very suspicious but I was

12 just trying to get a good look at the train station.

13 Q.   Turning now to the April, I'm sorry, the February 2011

14 incident.  Do you remember what happened at that time?

15 A.   I'd like to look at the report, please.  Thank you.

16      PAUSE

17 BY MS. SIEGMANN:

18 Q.   Before asking you about, I want to, I forgot a question I

19 want to go back to.  The April 2010 was the incident regarding

20 the surveillance; he appeared to be surveilling a train

21 station.  We were just discussing that?

22 A.   That's correct.

23 Q.   When, according to the affidavit, does it indicate that

24 Mr. Ferdaus, and when did Mr. Ferdaus tell the undercover

25 employees that he started planning this jihad against the

1   United States?

2   A.    Well before he'd ever met the undercover employees.

3   Perhaps a year before that time.

4   Q.    So that would be 2010?

5   A.    Correct.

6   Q.    Turning to the February 2011 incident.  Could you tell the

7   Court for what reason the defendant was being questioned on

8   that day?

9   A.    This was, on the day he was at the David Mindess School

10  and he was apparently praying on the grounds of the school, and

11  they were called because of suspicious activity by Mr. Ferdaus.

12  Q.    Were school children present when he was doing this when

13  he was on the school grounds?

14  A.    I believe so.

15  Q.    And was he searched by Ashland police department at that

16  time?

17  A.    He was.

18  Q.    What was found in his pockets?

19  A.    Parts to cellular telephones.

20  Q.    Was there also chargers and extra batteries in his

21  pockets?

22  A.    Yes.  Yes, there were.

23  Q.    At the conclusion of the interview on April 2011 was there

24  a discussion about whether the officer would see the defendant

25  around again?

1  A.    There was, yes.

2  Q.    Can you describe that to the Court please?

3  A.    Basically the officers said I'll see you around and Mr.

4  Ferdaus said basically I don't know about that and the

5  discussion was, it appeared that Mr. Ferdaus didn't plan to see

6  the officer again for an unknown reason.

7  Q.    Was this at the same time that Mr. Ferdaus was planning to

8  attack the Pentagon?

9  A.    Correct, it was.

10  Q.    Was there a discussion between Mr. Ferdaus and the CW, the

11  cooperating witness, about the possibility of Mr. Ferdaus dying

12  in that attack?

13  A.    Yes, there was.

14  Q.    Now the defense counsel asked you also questions about an

15  FBI interview on October 21, 2011.  Do you recall that on

16  November 4th that Ms. Conrad asked you questions about the

17  interview by the FBI agents?

18  A.    Yes, of Mr. Ferdaus you're talk--

19  Q.    Yes.

20  A.    Yes.

21  Q.    I'm sorry.  And what did the FBI tell the defendant was

22  the reason why he was being interviewed on that day?

23  A.    He was being interviewed because of an incident a gun

24  smiths or a gun shop.

25  Q.    A gun shop.  Do you recall what the incident involved?

36

1   A.   An individual came up to the gun shop inquiring about

2   purchasing weapons and was acting suspiciously in the gun shop.

3   I believe the person even took a photograph in the inside of

4   the persons gun shop so the gun shop owner, you know, after the

5   individual left the gun shop owner went down, outside and saw

6   the vehicle and got the vehicle license number and description

7   and that information was passed to law enforcement and the

8   vehicle came back to Mr. Ferdaus' vehicle or Ferdaus family

9   vehicle.

10  Q.   I'm sorry; I think I might have mentioned the wrong date.

11  This interview occurred on October 21, 2010?

12  A.   `10, correct, yes.

13  Q.   This is before the cooperating witness was interviewed,

14  correct?

15  A.   That's right.

16  Q.   Okay.  And so did FBI ask Mr. Ferdaus questions about this

17  gun shop incident?

18  A.   They did.

19  Q.   And how did Mr. Ferdaus respond to their questioning?

20  A.   He was very defensive and fairly uncooperative I guess as

21  they described it.

22  Q.   During this interview how did the defendant describe

23  America, do you remember?  If you don't remember I have a copy.

24  A.   Yeah, I don't recall exactly what he said.

25  Q.   Directing your attention to the last page of the report,

1  how did he describe America?

2  A.    That America is a racist nation against Muslims and he

3  questioned the FBIs authority to interview him in the first

4  place.

5  Q.    Now I'm showing you Government Exhibit Nos. 6 and 7.  Do

6  you recall testifying that those emails came from the

7  defendant's Google account on November 4th?

8  A.    Yes.

9         MS. SIEGMANN:  And, Your Honor, the government now

10  moves to admit these emails regarding, that predate the

11  investigation.  You had sustained our request to admit them on

12  direct because the defendant had rebutted or presented evidence

13  of--

14         THE COURT:  Any objection?

15     PAUSE

16         THE COURT:  Ms. Byrne, any objection?

17         MS. BYRNE:  Yes, Your Honor, I'm sorry, I didn't hear

18  the question.  Could I hear the question again, please?

19         THE COURT:  They moved Exhibit 6 and 7.

20         MS. BYRNE:  We objected before, Your Honor, and we

21  still object.

22         THE COURT:  All right, they will be so admitted and

23  marked.

24     GOVERNMENT EXHIBIT NOS. 6 AND 7, MARKED AND ADMITTED

25  BY MS. SIEGMANN:

38

1   Q.   Now Special Agent Davis--

2        PAUSE

3   BY MS. SIEGMANN:

4   Q.   Looking now at Government Exhibit No. 6, does Government

5   Exhibit 6 contain a string of emails exchanged between the

6   defendant and another individual in June 2010?

7   A.   It does, yes.

8   Q.   In his emails dated June 2010 did the defendant refer to

9   the U.S. Army as a kafir army that killed thousands of Muslims?

10            MS. BYRNE:  Objection to leading, Your Honor.

11            THE COURT:  Whoa, whoa, whoa, whoa, whoa, whoa, whoa.

12   First of all, just a one word objection if you would.  Second

13   of all, sustained.

14            MS. SIEGMANN:  Well--

15            THE COURT:  Let's try to do this by direct

16   examination please.

17            MS. SIEGMANN:  Sure.

18   BY MS. SIEGMANN:

19   Q.   Special Agent Davis, how did he describe the U.S. Army in

20   his emails in Government Exhibit No. 6?

21   A.   He described it as, as indicated in the comment here the

22   U.S. and whatever other kafir armies.

23   Q.   What is a kafir?

24   A.   A nonbeliever, Islamic religion, unbeliever.

25   Q.   And this is an email dated June 2010, correct?

39

1  A.    Correct.

2  Q.    And it's, oh sorry, I don't think we're on the right

3  section.

4        PAUSE

5  BY MS. SIEGMANN:

6  Q.    That was the line that you were just referring to up

7  there?

8  A.    Yes, that is, yes.

9  Q.    Now did the defendant similarly refer to kafirs in his

10  recorded conversations with the undercover employees and the

11  cooperating witness?

12  A.    Yes, he did.

13  Q.    Could you, and I'm looking at - directing your attention

14  now to the top portion of the, where you see my little, oh you

15  can't see my, sorry, we're having some problems here. See that

16  first email there, on the top there.  Can you read the last two

17  sentences of the first email that's written by Mr. Ferdaus to

18  another individual?

19  A.    The one that begins I am not brainwashed, that section?

20  Q.    No.  The U.S., the U.S. and others--

21  A.    I'm sorry.

22  Q.    It's the last two sentences of the first email.  Oh, right

23  there.

24  A.    Oh, oh, okay.  The U.S. and others shouldn't kill my

25  people.  My people do have a right to defend themselves.  U.S.

40

1  foreign policy is horrendous.

2  Q.   Now turning to Government Exhibit No. 7 does this exhibit

3  contain a string of emails exchanged between the defendant and

4  another individual in October 2010?

5  A.   Yes, it does.

6  Q.   And how does the defendant describe, well, sorry.  Does

7  the defendant just talk about al-Qaida in this email?

8  A.   He does, yes.

9  Q.   And how does he describe al-Qaida in this email on page,

10  I'm sorry there's no page numbers, on page three?

11  A.   He indicates that al-Qaida are defending innocence and

12  that if America doesn't want any opposition it should leave the

13  occupied lands and stop supporting corrupt oppressors and

14  killing.

15  Q.   Turning to the first page of that email can you read to us

16  the email October 4, 2010 at 11:37 p.m. that Mr. Ferdaus sent?

17  A.   We don't want corrupt non-Islamic governments.  We want

18  sharia and are prepared to sacrifice to establish it.

19  Q.   What is sharia?

20  A.   Sharia is the law of Islam, Islamic law.

21  Q.   I'm showing you what has been marked Government Exhibit

22  No. 12.  Special Agent Davis, do you recognize that document?

23  A.   Yes, I do.

24  Q.   What is it?

25  A.   It's a letter from the Worcester Islamic Center to Mr.

41

1  Ferdaus indicating he was no longer, he should no longer

2  attend the Islamic Center.

3         MS. SIEGMANN:  Your Honor--

4  BY MS. SIEGMANN:

5  Q.   Where was this found, Special Agent Davis?

6  A.   This, a copy of this was found in the search of Mr.

7  Ferdaus' bedroom.

8         MS. SIEGMANN:  The government moves to admit

9  Government Exhibit No. 12.

10         MS. BYRNE:  Objection, Your Honor.

11         THE COURT:  What's your objection please?

12         MS. BYRNE:  I haven't seen this, Your Honor.

13         MS. SIEGMANN:  I'm sorry; it was in the discovery

14  that was produced on October 19th.  It was the results of the

15  search of Mr. Ferdaus' house.

16         THE COURT:  Did you guys put a Bates No. on anything?

17         MS. SIEGMANN:  It is Bates but I don't have a Bates

18  copy.  I actually was using the hard copies but it was produced

19  with the discovery.  All documents that were obtained from Mr.

20  Ferdaus' house were produced.

21         THE COURT:  All right.  Ms. Byrne?

22         MS. BYRNE:  I don't recall seeing it, Your Honor, and

23  if I could look – I would like to look at it.

24         THE COURT:  Sure.  Take a minute and look at it.

25         MS. BYRNE:  If she has the Bates copy I would

42

1  appreciate that.

2       THE COURT:  Well we can look on that after but let's

3  take a minute and take a look at it.

4       PAUSE

5       MS. BYRNE:  I withdraw the objection, Your Honor.

6  BY MS. SIEGMANN:

7  Q.   Special Agent Davis--

8       THE COURT:  Hold on a minute.

9       MS. SIEGMANN:  Sorry.

10       THE COURT:  Did you offer that?

11       MS. SIEGMANN:  I'm going to move to admit it.  The

12  government moves to admit Government Exhibit 12.  I think I did

13  move to admit it.

14       THE COURT:  I thought you had offered it.

15       MS. SIEGMANN:  Yeah.

16       THE COURT:  And, Ms. Byrne, you're withdrawing your

17  objection to it?

18       MS. BYRNE:  Correct, Your Honor.

19       THE COURT:  All right.

20       MS. BYRNE:  Yes, Your Honor.

21       THE COURT:  So it is so marked.  What exhibit number

22  are we on please?

23       MS. SIEGMANN:  No. 12, Your Honor.

24       THE COURT:  Hold on.  What are we on, not what

25  they're on.  Twelve?

43

1          THE CLERK:  (Inaudible - #12:00:37).

2          THE COURT:  Okay.

3          THE CLERK:  (Inaudible - #12:00:40).

4          THE COURT:  It is 12, thank you.

5      GOVERNMENT EXHIBIT NO. 12, ADMITTED

6  BY MS. SIEGMANN:

7  Q.   Can you read the date at the top of the letter, Special

8  Agent Davis?

9  A.   Yes, March 10, 2011.

10  Q.   And if you could I'd like you to read the highlighted

11  portion on the screen in front of you?  Can you see what--

12  A.   Yes.

13  Q.   --portion I highlighted?

14  A.   Yes, I can.

15  Q.   Oops, I'm sorry, let me make it a little - there you go.

16  A.   The leadership of the Worcester Islamic Center, WIC,--

17  Q.   Oh sorry, it's addressed to who?

18  A.   It's addressed to Mr. Fer, Rezwan Ferdaus.

19  Q.   Okay.  Go ahead.

20  A.   The leadership of the Worcester Islamic Center, WIC, is

21  hereby issuing you a formal warning.  The decision was taken

22  after not one but multiple outbursts and incidents where your

23  behavior was disruptive and violated the norms of the WIC.

24  Among the incidents that prompted this warning are the

25  following, one, during the Tablighi Ijtemah conference held in

44

1  December 2010 you took the microphone without permission and

2  attempted to discredit the visiting group and their beliefs.

3  Two, during a recent Friday halaqa you disrupted the presenters

4  lecture yelling at him to quit talking, insulting him and take

5  a very aggressive, threatening posture to the extent that

6  brothers got up to restrain you in the event that you turned

7  violent.  And three, in the past few weeks you told two

8  visiting non-Muslim females whose stated objective was to learn

9  more about Islam that they were not welcome at the WIC.  You

10  were told that this behavior was not acceptable and yet you

11  persisted therefore please note that any further instances of

12  misconduct on your part will result in your being banned from

13  the premises of the WIC which includes the facilities and

14  grounds.

15  Q.    Thank you, special agent.  Now do you recall being

16  questioned by defense counsel about the defendant's financial

17  resources on November 4th?

18  A.    Yes.

19  Q.    And during conversations with the cooperating witness and

20  undercover employees did the defendant mention the possibility

21  of making homemade explosives?

22  A.    Yes, he does.

23  Q.    Special Agent Davis, does it cost a lot of money to make

24  homemade explosives?  I'm sorry, I didn't enunciate very well

25  there.  Special Agent Davis, does it cost a lot of money to

1  make homemade explosives?

2          MS. BYRNE:  Objection, Your Honor, that's –

3  objection.

4          THE COURT:  Overruled.  You may answer.

5  A.   No, it does not.  If you purchase the proper precursor

6  items from a store that's opened to the public you can do it

7  very easily with little money.

8  BY MS. SIEGMANN:

9  Q.   And Special Agent Davis, do you recall that there was

10  conversations with the cooperating witness where they actually

11  did purchase one precursor element?

12  A.   Yes, they on I believe it was March 4, 2011 they purchased

13  ammonia together.

14  Q.   And we're not going to do a tutorial but that could be

15  used?

16  A.   Yeah, yes.

17  Q.   Okay.  During the entire investigation while the defendant

18  was planning his attack and constructing detonation devices for

19  people he believed to be members of al-Qaida, where was the

20  defendant living?

21  A.   He was living in Ashland with his parents.

22  Q.   In August 2011 the defendant told the undercover employees

23  he was experiencing some anxiety issues; is that right?

24  A.   That's correct.

25  Q.   And how did the undercover employees respond when he said

1    he was experiencing some anxiety issues?

2    A.    They attempted to or they showed their concern for his

3    well-being and asked him if he was, you know, would still want

4    to continue with his plan because of what he was experiencing.

5    Q.    What did he tell the undercover employees was the source

6    of his anxiety?

7    A.    His family and, yeah.

8    Q.    Did they ask him whether they themselves were causing him

9    anxiety?

10   A.    Yes, it was discussed that - Mr. Ferdaus indicated that it

11   was his family issues that were causing him the anxiety not,

12   not meeting with the brothers that was causing it.

13   Q.    What about his plan, was that causing him anxiety?

14   A.    No, he did not indicate that his plan was causing him

15   anxiety.

16   Q.    Did he wish to go forward with his plan even though he was

17   experiencing anxiety issues at home?

18   A.    That's what he indicated to the undercover employees.

19   Q.    And after the defendant told the undercover employees he

20   had some anxiety did the undercover employees inquire at

21   subsequent meetings whether he still wanted to go through with

22   the plan?

23   A.    Yes, they did on each subsequent meeting.

24   Q.    Leading up to his arrest?

25   A.    Yes.

1  Q.   Now were you the case agent on the Richard Reed shoe

2  bomber case?

3  A.   I was.

4  Q.   Did he exhibit--

5          MS. BYRNE:  Objection, Your Honor.

6          THE COURT:  Well so far I've just got he was the case

7  agent.

8  BY MS. SIEGMANN:

9  Q.   Did Richard Reed exhibit any signs of anxiety or mental

10 health issues?

11         MS. BYRNE:  Objection, Your Honor.

12         THE COURT:  Sustained.

13 BY MS. SIEGMANN:

14 Q.   Would the fact that a target exhibit some signs of anxiety

15 cause the FBI to close a case or stop an investigation?

16         MS. BYRNE:  Objection, Your Honor.

17         THE COURT:  Sustained.

18 BY MS. SIEGMANN:

19 Q.   Based upon your review of the recordings did the defendant

20 appreciate the wrongfulness of his behavior with regard to the

21 planned attack--

22         MS. BYRNE:  Objection, Your Honor.

23 Q.   --and construction of detonators.

24         THE COURT:  Sustained.

25 BY MS. SIEGMANN:

48

1  Q.   Now the defense counsel asked you a number of questions

2  about the cooperating witness, do you remember that?

3  A.   I do.

4  Q.   And defense counsel tried to suggest there may have been

5  some unrecorded meetings between the cooperating witness and

6  the defendant without the FBIs knowledge.

7  A.   I remember that, yes.

8  Q.   Does the cooperating witness have a car?

9  A.   During this time period he did not have a vehicle of his

10  own.

11  Q.   And the cooperating witness was living in Worcester and

12  the defendant was living in Ashland, right?

13  A.   Correct.

14  Q.   So did the cooperating witness have any means or ability

15  to actually get to Ashland to meet with the defendant but for

16  the FBI?

17  A.   No, he did not.  Not to my knowledge.

18  Q.   Now you mentioned on cross that the cooperating witness

19  was a productive source for the FBI?

20  A.   Correct.

21  Q.   Could you explain what you meant by that?

22  A.   That he was as a cooperating witness for the FBI and as a

23  result of his cooperation the FBI was able to successfully

24  prosecute and convict several drug gang related subjects over

25  the years.  I don't remember the exact number of how many.

1  Q.   The defense counsel asked you questions about the role

2  played by the FBI in this investigation, do you remember that?

3  A.   Yes.

4  Q.   When the undercover employees got involved in this

5  investigation what did the defendant tell them he was planning

6  to do?

7  A.   He was planning to attack the Pentagon.

8  Q.   And based upon your experience, why does the FBI conduct

9  undercover investigations of targets like the defendant with

10  limited financial resources?

11          MS. BYRNE:  Objection, Your Honor.

12          THE COURT:  Sustained.

13  BY MS. SIEGMANN:

14  Q.   Now defense asked you, defense counsel asked you a number

15  of questions suggesting that the undercover employees

16  encouraged the defendant to take certain actions and ignored

17  signs of mental illness, do you recall that?

18  A.   I do, yeah.

19  Q.   Now whose idea was it to attack the Pentagon and the U.S.

20  Capital building?

21  A.   Mr. Ferdaus.

22  Q.   Whose idea was it to acquire a remote controlled aircraft?

23  A.   Mr. Ferdaus.

24  Q.   Whose idea was it to fill the remote controlled aircraft

25  with explosives?

50

1  A.   Mr. Ferdaus.

2  Q.   Whose idea was it to gun down innocent civilians after the

3  aircraft hit the Pentagon?

4  A.   Mr. Ferdaus.

5  Q.   Whose idea was it to acquire fully automatic weapons for

6  this purpose?

7  A.   Mr. Ferdaus.

8  Q.   And lastly, whose idea was it to acquire cell phones and

9  turn them into detonators?

10  A.   Mr. Ferdaus.

11        MS. SIEGMANN:  No further questions.

12        THE COURT:  Ms. Byrne?

13                   RECROSS EXAMINATION

14  BY MS. BYRNE:

15  Q.   So Agent Davis, Mr. Ferdaus referred to the cell phones as

16  detonators, right?

17  A.   That's correct.

18  Q.   He doesn't know what a detonator is, does he?

19        MS. SIEGMANN:  Objection.

20        THE COURT:  Overruled.

21  A.   I don't know whether he knows what they are or not.

22  BY MS. BYRNE:

23  Q.   Well they weren't detonators, we established that; is that

24  correct?

25  A.   We--

51

1   Q.   Themselves they were not detonators; is that right?

2   A.   That's correct.  The technical term for them is not

3   detonator, yes.

4   Q.   It's switch?

5   A.   A – yes, a switch.

6   Q.   Okay.

7   A.   Is a portion of an IED.

8   Q.   All right.  You testified that the cooperating witness

9   didn't have a car?

10  A.   To my knowledge he did not have a car during that time.

11  Q.   Well he was driving a car during the course of this

12  investigation, right?

13  A.   Correct.

14  Q.   All right.  And do you know whether he was simply given a

15  car for the meetings with Mr. Ferdaus or whether he was allowed

16  to drive around in the car that was provided by the FBI, do you

17  know?

18  A.   No, I believe it was specifically for the meetings with

19  Mr. Ferdaus that he used the vehicle.

20  Q.   And only when he met with Mr. Ferdaus?

21  A.   That's correct.

22  Q.   And you said he lives in Worcester, right?

23  A.   That's correct.

24  Q.   Where the Worcester Mosque was located, right?

25  A.   Correct.

52

1   Q.   Where he met with Mr. Ferdaus, right?

2   A.   Correct.

3   Q.   Now you were just asked questions about an investigation

4   into events that occurred in a gun shop, right?

5   A.   Correct.

6   Q.   And there was no indication that Mr. Ferdaus was ever in

7   the gun shop, right?

8   A.   That's correct.

9   Q.   All right.  And did the FBI ever identify the person who

10  actually went into the gun shop?

11  A.   I believe so, yes.

12  Q.   When was that?

13  A.   When was the gun shop incident?

14  Q.   When was that person identified?

15  A.   I don't know exactly when.  It was in October of 2010 that

16  that occurred so I assume around that timeframe.

17          MS. SIEGMANN:  Objection to assumptions.

18          THE COURT:  Sustained.

19  BY MS. BYRNE:

20  Q.   Now you were just asked questions by Ms. Siegmann about a

21  series of emails, right?

22  A.   Correct.

23  Q.   Okay.  And you've looked at those emails, right?

24  A.   Yes.

25  Q.   And in those emails Mr. Ferdaus is expressing his opinion

53

1   about the United States targeting Muslims; isn't that right?

2   A.   Predominantly it's his opinion, yes.

3   Q.   Right.  And he is, well it's not a crime to express an

4   opinion, is it?

5   A.   No, it is not.

6   Q.   And he doesn't suggest any action in those emails does he?

7   A.   He doesn't indicate his own actions but he indicates that

8   things have to be--

9   Q.   I'm asking if he suggests any action, that he's going to

10  take any action?  Perform any violent acts--

11  A.   He does not indicate that--

12  Q.   --against America?

13  A.   He does not indicate he's going to perform a violent act.

14  Q.   Right.

15          MS. BYRNE:  Your Honor, I would move to strike the

16  emails at this point as the issue is dangerousness here and he

17  is not indicating any in these emails apparently.

18          THE COURT:  Well except that you all have gone to

19  great pains to point out the nature, circumstances and strength

20  of the case.  In fact it was the foundation for an earlier

21  motion that we talked about and I would think this would go to

22  that.  And frankly the relevance of it I think I'm going to let

23  you argue to me on your closing because I think it's marginally

24  relevant on the issues that I have to decide but I am going to

25  take them.

54

1      MS. BYRNE:  Okay, Your Honor.  Note my objection,

2   thank you.

3   BY MS. BYRNE:

4   Q.   And – okay, the FBI agents met with Mr. Ferdaus on October

5   21, 2010, right?

6   A.   Correct.

7   Q.   Okay.  And you're familiar with the report of that

8   meeting, right?

9   A.   Yes.

10  Q.   Okay.  And Mr. Ferdaus didn't have to talk to the FBI,

11  right?

12  A.   That's correct.

13  Q.   And but he did, right?

14  A.   He did, yes.

15  Q.   And he expressed his views that they were targeting

16  Muslims, right?

17  A.   The FBI was targeting Muslims?

18  Q.   Right.

19  A.   Yes.

20  Q.   Right.  And he also said they had a problem with racism in

21  America, right?

22  A.   Correct.

23  Q.   And he didn't say anything during that interview about

24  intending to commit any acts of violence, right?

25  A.   Not in that interview, no.

1  Q.   Okay.  All right, and by the way in that same interview

2  with the FBI on October 21, 2010 he, Mr. Ferdaus when he was

3  complaining of racism and racial profiling he used the word,

4  repeatedly used the word botheration, right?

5  A.   Correct.

6  Q.   Prior to the FBI beginning this investigation of Mr.

7  Ferdaus there was no evidence that he committed any acts of

8  violence in furtherance of jihad, right?

9  A.   Not to my knowledge.

10  Q.   No evidence that he committed any acts of violence in

11  support of al-Qaida, right?

12  A.   Not to my knowledge.

13  Q.   No evidence that he even said anything about him

14  committing any acts of violence of that nature, right, prior to

15  the FBI involvement in this case?

16  A.   Well there was indications that he had met earlier with an

17  individual in Dorchester in 2010 which was prior to the FBI

18  investigation and at that meeting which he described the person

19  in Dorchester indicated he wanted to attack a recruiting center

20  but Mr. Ferdaus wanted to do something bigger so that was prior

21  to, it was his indication that it was prior to the FBIs

22  involvement.

23  Q.   Right.  That was what he was bragging to the FBI, right?

24  Would you agree?

25  A.   That was through discussions both I believe with the

56

1   cooperator and the undercover employees, yes.

2   Q.   Okay.  Did the FBI ever do anything to confirm that by,

3   for example, investigating who this person was in Dorchester

4   that he had supposedly met with?

5   A.   Yes.

6   Q.   Okay.  And what did they find out about that?

7   A.   They found out that there is in fact an individual in

8   Dorchester who he had met with--

9   Q.   Mmm-hmm.

10  A.   --and they'd had discussions.

11  Q.   And who is that?

12  A.   An individual--

13          MS. SIEGMANN:  I object, Your Honor.  Objection.

14          THE COURT:  Sustained.

15  BY MS. BYRNE:

16  Q.   Is there a report about that?

17  A.   There are reports, yes.

18  Q.   Okay.  Have they been provided to the government?

19  A.   I don't know.

20  Q.   And was that person interviewed?

21  A.   Yes.

22  Q.   By the FBI?

23  A.   Yes.

24  Q.   Mmm-hmm.  Was the person given their Miranda warnings?

25          MS. SIEGMANN:  Objection, Your Honor.

57

1        THE COURT:  Sustained.

2  BY MS. BYRNE:

3  Q.   Did the – oh and by the way in the letter that was, that

4  you were just shown from the Worcester Islamic Center there are

5  no indications there that Mr. Ferdaus had stated any, that he

6  intended to perform any acts of violence against America, isn't

7  that true?  There's nothing in that letter that indicates that

8  he said anything like that, right?

9  A.   No.  No, there is not.

10 Q.   But just that he was being disruptive, right, and talking

11 in an aggressive, threatening way to other people in the

12 Mosque, right?

13 A.   That's correct and they--

14 Q.   Right.

15 A.   --said if he turned violent they had other people to

16 restrain him there.

17 Q.   And was this, then this was about the same time when the

18 undercover employees told Mr. Ferdaus that he had to keep a low

19 profile, right?

20 A.   I believe that was about that time, yes.

21 Q.   Right.  Because he was acting kind of out of control,

22 right?

23        MS. SIEGMANN:  Objection.

24        THE COURT:  Sustained.

25 BY MS. BYRNE:

58

1   Q.   Now--

2           MS. BYRNE:  Final topic, Your Honor.

3   By MS. BYRNE:

4   Q.   You testified the last time that we were here that you had

5   no information about Mr. Ferdaus' mental health prior to this

6   investigation beginning, right?

7   A.   That's correct.

8   Q.   Okay.  However during the course of the investigation did

9   the undercover employees ever discuss Mr. Ferdaus' mental

10  health with you or with any other supervising officers?

11  A.   They may have but I'm not aware of it.

12  Q.   Not with you?

13  A.   Not with me, no.

14  Q.   Were there ever any discussions about terminating this

15  investigation with Mr. Ferdaus, terminating this operation the

16  FBI was doing?

17          MS. SIEGMANN:  Objection.

18          THE COURT:  Sustained.

19          MS. BYRNE:  Nothing further, Your Honor.

20          THE COURT:  Thank you, Agent Davis.  You may step

21  down.

22          THE WITNESS:  Thank you, sir.

23      WITNESS EXCUSED

24          THE COURT:  Ms. Siegmann, any further evidence on the

25  issue of detention?

1          MS. SIEGMANN:  No, Your Honor.

2          THE COURT:  Who's going to call the next witness?

3          MS. CONRAD:  I would call Agent Woudenberg, Your

4  Honor.  I don't know if I need to go out and get him or if the

5  court officers can.  Thank you.

6      PAUSE

7          MS. SIEGMANN:  Oh, Your Honor, may I retrieve the

8  exhibits that are left at,--

9          THE COURT:  You may.  You may.

10          MS. SIEGMANN:  --on the witness stand?

11          THE COURT:  Actually, and thank you for reminding me,

12  before we depart today whether we finish or not I want you all

13  to make sure the exhibits are in order to the extent we have

14  them.

15          MS. CONRAD:  Should I go outside and take a look, I

16  thought Agent Davis was going to get him.

17          THE COURT:  I think somebody went to get him but if

18  you want to go take a look.

19          MS. CONRAD:  Thank you.

20      PAUSE

21      DEFENSE WITNESS, JOHN WOUDENBERG, SWORN

22          THE CLERK:  Could you state your name and spell your

23  last name for the record.

24          THE WITNESS:  Yes, John Woudenberg,

25  W-O-U-D-E-N-B-E-R-G.

60

1                    DIRECT EXAMINATION

2  BY MS. CONRAD:

3  Q.   Good morning agent.  My name is Miriam Conrad.  I

4  represent the defendant in this case.

5  A.   Good morning.

6  Q.   Can you tell us how you're employed, please?

7  A.   Yes, I'm a special agent with the FBI assigned to the

8  Boston field division.  I'm currently assigned to the Worcester

9  resident agency.

10 Q.   And how long have you been with the FBI?

11 A.   Almost 21 years.

12 Q.   And how long have you been in Worcester?

13 A.   Since April of 2008.

14 Q.   now drawing your attention to 2009 did you become

15 acquainted with an informant who in connection with this

16 investigation was known as Calial (ph)?

17 A.   Yes.

18 Q.   And when did you first meet that informant?

19 A.   I believe that was late February of 2009.

20 Q.   And were you the one who signed him up as an informant?

21 A.   I was.

22 Q.   And prior to signing someone up as an informant under the

23 Attorney General guidelines and FBI policy you are required to

24 conduct a suitability determination, correct?

25 A.   Yes.

61

1   Q.   And did you conduct such a determination?

2   A.   Yes, an evaluation of his background.

3   Q.   And that includes his criminal history, correct?

4   A.   Correct.

5   Q.   And in this case his criminal history consisted of two

6   convictions for selling drugs, right?

7   A.   I believe so, yes.

8   Q.   A conviction for unlawful restraint, correct?

9   A.   I believe so.

10  Q.   And that arose out of a case in which he was originally

11  charged with violent rape, correct?

12           MS. SIEGMANN:  Objection, Your Honor, leading.

13           THE COURT:  Sustained.

14           MS. CONRAD:  Well, Your Honor, it's a government--

15           THE COURT:  I agree that that's a hostile witness but

16  I'm more concerned about the characterization of the violent

17  rape part.

18           MS. CONRAD:  Okay.

19  BY MS. CONRAD:

20  Q.   Was that in connection with a case in which he was

21  originally accused of rape?

22  A.   I believe there was some type of sexual misconduct.  I'm

23  not sure of the full allegations that were made against him.

24  Q.   Oh, you never read the police report?

25  A.   I did not.

62

1   Q.   You didn't read the police report where the woman

2   described being raped and being beaten?

3              MS. SIEGMANN:  Objection, Your Honor.

4              THE COURT:  Sustained.

5   BY MS. CONRAD:

6   Q.   And he also was convicted of robbery, correct?

7   A.   I believe so, yes.

8   Q.   And that was in 2006, yes?

9   A.   Correct.

10  Q.   And he received an eight year sentence, right?

11  A.   I believe that's true, yes.

12  Q.   And but ultimately he got that sentence reduced to three

13  years, right?

14  A.   I believe that's correct as well.

15  Q.   And that is as a result of his cooperation as a government

16  witness with the Bridgeport DA's office, right?

17  A.   That's right.

18  Q.   I'm sorry, Bridgeport Connecticut, right?

19  A.   Yes.

20  Q.   So he had been an informant in Connecticut before you'd

21  ever met him, right?

22  A.   That's correct.

23  Q.   And he'd gotten five years get out of jail free card,

24  right?

25              MS. SIEGMANN:  Objection.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

63

1      THE COURT:  Sustained.

2  BY MS. CONRAD:

3  Q.   He got five years reduced from his sentence when he did

4  that, right?

5  A.   I believe that five years is a correct number.

6  Q.   Now when you met him and you conducted the suitability

7  determination did you learn whether he had been a gang member?

8  A.   I believed he was, yes.

9  Q.   And which gang is he a member?

10  A.   I can't recall.  I mean I know his dad was connected with

11  the Latin Kings.

12  Q.   And his brother also is in prison for murder, correct?

13  A.   I'm not aware of that.

14  Q.   You're not aware that at some point he said his brother is

15  in prison for murder?

16  A.   I'm not sure.

17      MS. SIEGMANN:  Objection, relevance to the brother?

18      THE COURT:  Overruled.  I'll take that.

19  BY MS. CONRAD:

20  Q.   Did you investigate whether his other family members had a

21  criminal history?

22  A.   No.

23  Q.   You did not?

24  A.   No, I did not.

25  Q.   Did you investigate whether he was a user or addict of

64

1   illegal drugs?

2   A.   When I signed him up I believed him to be clean.

3   Q.   Did you believe him to have a history of using illegal

4   drugs?

5   A.   I wasn't sure.

6   Q.   You didn't ask?

7   A.   I asked him if he had a current problem.

8   Q.   But you didn't ask him about his past history?

9   A.   No.

10  Q.   Did you - but he had in 2003 been convicted of possession

11  of narcotics and larceny, right?

12         MS. SIEGMANN:  Objection.  Relevance to 2003 to 2010,

13  2011.

14         THE COURT:  I'll let you have this but let's cut to

15  the chase.

16         MS. CONRAD:  Yip.  This is my last question on that

17  point.

18  BY MS. CONRAD:

19  Q.   He was convicted in 2003 of possession of narcotics,

20  right?

21  A.   I believe that's correct, yes.

22  Q.   And that didn't indicate to you that he had a drug

23  problem?

24         MS. SIEGMANN:  Objection.

25  A.   Well the difference between being a user--

1    THE COURT:  Overruled.  You may answer.

2    MS. CONRAD:  I'm sorry?

3  A.  Difference between being a user and seller.  I knew that he

4  had been convicted I think of trafficking.

5  BY MS. CONRAD:

6  Q.  But in that instance it was possession?

7  A.  Okay.

8  Q.  I'm sorry?

9  A.  Is that a question?

10  Q.  Yes.  In that--

11  A.  I'm not sure.  I'd have to look at his record to.

12  Q.  Apart of asking whether he was currently illegally using

13  drugs, and that was in February of 2009, what if any steps did

14  you take to determine whether he had in the past or was

15  currently using drugs?

16  A.  Just in discussing and evaluating with him, seeing--

17  Q.  How did you evaluate that?

18  A.  Just in talking with him, seeing what he was about,

19  seeing--

20  Q.  So if he said, no, I'm not using drugs you took that at

21  face value, right?

22  A.  Correct.

23  Q.  Okay.  Now at some point during the course of your work

24  with him, well strike that.

25    Do you know whether he was in drug treatment in February

1  of 2009?

2  A.   I don't believe he was, no.

3  Q.   In June of 2009 he was actually arrested by the Worcester

4  police, correct?

5  A.   I believe that's the time he was arrested, yes.

6  Q.   And he was working as an FBI informant at that time?

7  A.   He was.

8  Q.   Paid FBI informant?

9  A.   We were paying him to make buys, yes.

10  Q.   To make drug buys, right?

11  A.   Correct.

12  Q.   And at the time he was arrested he was, he actually was

13  arrested while he was about to use crack cocaine with another

14  individual, right?

15       MS. SIEGMANN:  Objection.

16       THE COURT:  Overruled.  You may answer.

17  A.  I know he was arrested with another individual.  They were

18  in possession of some cocaine.  They were on property where

19  they didn't belong.  They were charged with trespassing and

20  possession.

21  BY MS. CONRAD:

22  Q.   And so it was crack cocaine, right?

23  A.   I don't know if it was crack or powder.

24  Q.   You didn't read the report?

25  A.   I may have a long time ago.  It has been awhile.

1   Q.   And was the other individual a target of an

2   investigation?

3   A.   I have no idea.

4   Q.   Well you wouldn't know what people were targets of your

5   own investigations?

6   A.   Was the--

7           MS. SIEGMANN:  Objection.

8   BY MS. CONRAD:

9   Q.   The person he was arrested with was that person a target

10  of an FBI investigation at the time?

11  A.   No, not to my knowledge.

12  Q.   But he was in fact at that time, in June of 2009 he

13  purchased heroin for himself at the same time he was buying

14  from a target, right?

15  A.   Yes.

16  Q.   And how did you find out about that?

17  A.   I believe he later came clean with that after we looked at

18  the videotape and approached him on it.

19  Q.   So this was a videotaped purchase of heroin from an FBI

20  target, correct?

21  A.   Yes.  Yes.

22  Q.   And he was given money to conduct what's usually referred

23  to as a controlled buy, right?

24  A.   Correct.

25  Q.   But in this case apparently it wasn't controlled enough to

68

1   keep him from buying some for himself, right?

2   A.   The control that we placed on it is, you know, it's not

3   perfect.  I mean it's a pretty structured investigative

4   technique but it's not without its--

5   Q.   So how did he manage to purchase heroin for himself during

6   a videotape buy?

7   A.   He just purchased a very little quantity and was able to

8   conceal it so that we weren't able to find it on search.

9   Q.   Where did he conceal it?

10  A.   I believe it was in his sock.

11  Q.   So the search that you conducted apparently was

12  insufficient to determine whether he had purchased something

13  for himself, right?

14  A.   Correct.

15  Q.   And that's actually important because when you're doing a

16  controlled buy you want to make sure that the person, for

17  example, didn't already have drugs on him when they went in to

18  do the buy, right?

19  A.   That's correct.

20  Q.   And so if you weren't able to detect something that was on

21  him during a controlled buy you wouldn't know whether he had

22  gone in to the buy with something already on him, right?

23       MS. SIEGMANN:  Objection, relevance to the case at

24  hand.

25       MS. CONRAD:  Well--

1          MS. SIEGMANN:  That doesn't involve drugs.

2          THE COURT:  One at a time.  And just please, please,

3    please, just say objection.  I get it you guys.  I know what

4    you're doing here.  So I'm going to give you this, but I have

5    heard this from the other witness on cross and this witness on

6    direct so let's get to the point of this.  So I'm going to

7    overrule the objection this time.

8    BY MS. CONRAD:

9    Q.   And--

10         MS. CONRAD:  One moment, please.

11   BY MS. CONRAD:

12   Q.   So when you find out about his drug use in June of 2009

13   did you terminate him as an informant?

14   A.   At that time we helped him get into a program and he was

15   substantially terminated.  His file was not closed but he was

16   sent to rehab.

17   Q.   And that was for about a week, right?

18   A.   I believe it was longer than that that we didn't use him,

19   probably quite a few weeks.

20   Q.   But he was only in the rehab for a week?

21   A.   I believe that's true.

22   Q.   And did the FBI pay for that?

23   A.   No.

24   Q.   And what was the, at that point you could have terminated

25   him, right?

1   A.   Yes.  He was involved in an investigation that we were

2   conducting into drug and gang activity up in Fitchburg.

3   Q.   And so by that point you learned that he was using in June

4   of 2009 both heroin and crack cocaine, right?

5   A.   I believed it to be heroin.  I wasn't sure about crack

6   cocaine.

7   Q.   Well the arrest was for crack cocaine, right?

8   A.   I believe that arrest that Worcester made was with crack

9   cocaine.

10  Q.   So what steps did you take after he came out of rehab and

11  returned working for the FBI to ensure that he wasn't using

12  heroin?

13  A.   I'd say he was scrutinized much more.  He was under the

14  microscope to make sure that he was behaving.

15  Q.   In what way was he scrutinized?

16  A.   Just making sure that we were aware of how he looked and

17  how he was answering questions, how he was behaving.

18  Q.   Did you ever give him a drug test?

19  A.   No.

20  Q.   Why not?

21  A.   It's currently not FBI policy to issue drug tests to

22  informants.

23  Q.   Even when you know that an informant has been using

24  heroin?

25  A.   Well, you know, we hopefully we can get him into a program

1    where they can be treated and hopefully we can monitor and

2    evaluate that based on our experience to see how they're

3    acting.

4    Q.   Are you an expert in drug abuse?

5    A.   Not an expert, no.

6    Q.   And so at this point in June of 2009 he is not only been

7    using heroin and been arrested but he also has, he also

8    tampered with the integrity of an investigation, right?

9    A.   To a certain extent, yes.

10   Q.   But you kept him on, right?

11   A.   We did.

12   Q.   And at that point he was only investing drug and gang

13   activity, correct?

14   A.   Correct.

15   Q.   And at some point did you learn that he had resumed the

16   use of drugs?

17   A.   Yes.  He had difficulties again I believe it was towards

18   the spring of 2010.

19   Q.   And when you say difficulties can you tell us what you

20   mean by difficulties?

21   A.   I believed that at that point he was using again.  I

22   believe that was the instance when I had seen him on the

23   street, I hadn't seen him in a while.  I saw him on the street

24   and I also had talked to individuals with the Worcester police

25   department who had told me he was on the street and at that

1  point I figured that he was either back selling or using.

2  Q.   And, well in fact you saw him on the street and you asked

3  him what he was doing, right?

4  A.   Yes.

5        MS. SIEGMANN:  Objection.  Relevance.

6        THE COURT:  I'll - let's get - overruled, you may

7  have that.

8  BY MS. CONRAD:

9  Q.   You saw him on the street and you asked him what he was

10  doing, right?

11  A.   I did.

12  Q.   And what did you see him doing?

13  A.   Just walking with a girlfriend.

14  Q.   What made you think he was selling drugs at that point?

15  A.   I didn't know if he was or not.  I just grabbed him and

16  wanted to talk to him and make sure, give him a warning.

17  Q.   Well you had already given him a warning, right?

18  A.   Multiple.

19  Q.   Right, multiple warnings not to commit crimes, right?

20  A.   Correct.

21  Q.   Multiple warnings not to buy drugs from targets, right?

22        MS. SIEGMANN:  Objection.

23        THE COURT:  Sustained.

24  BY MS. CONRAD:

25  Q.   And in June of 2010 you consulted with and met with - well

1    strike that.

2         When you saw him in May of 2010 you told him to get off

3    the streets, right?

4              MS. SIEGMANN:  Objection.

5              THE COURT:  Sustained.

6    BY MS. CONRAD:

7    Q.   You told him that if he was seen selling drugs on the

8    street he would be arrested by local police, right?

9              MS. SIEGMANN:  Objection.

10             THE COURT:  Sustained.

11             MS. CONRAD:  Well, Your Honor, - okay.

12   BY MS. CONRAD:

13   Q.   Under FBI and Attorney General guidelines if you become

14   aware that an informant is committing unauthorized, illegal

15   acts you are required to report that to the federal prosecutor,

16   correct?

17   A.   Yes.

18   Q.   And that was not done in June of 2009 was it?

19   A.   I believe that when he was arrested by the Worcester

20   police we did file a report.

21   Q.   And when it is reported to a federal prosecutor the

22   federal prosecutor is required to notify the authorities having

23   jurisdiction over that offense, correct?

24   A.   I believe that's so.

25   Q.   You believe that's so?

1    A.    Yes.

2    Q.    But as far as you know when he admitted to selling drugs

3    in May of 2010 that was not reported to local police?

4    A.    It was reported to local police by me.  I work with the

5    Worcester police drug unit, and I advised them to keep an eye

6    out for him and if was seen selling drugs on the street to

7    arrest him.

8    Q.    There's no report on that is there?

9    A.    On?

10   Q.    The fact that you told Worcester police that?

11   A.    I work with the Worcester police every day.

12   Q.    Is there a report on that?

13   A.    I don't, I don't know.

14          MS. SIEGMANN:  Objection.

15          THE COURT:  Overruled.

16   A.    I don't believe so.

17   BY MS. CONRAD:

18   Q.    And in June of 2010 he was terminated as an informant,

19   correct?

20   A.    I believe that's true, yes.

21   Q.    And that was at the direction of the U.S. Attorney's

22   Office, correct?

23   A.    Yeah, that was in consultation with the U.S. Attorney's

24   Office because I had cases involving him with them?

25   A.    And it was "decided the best course of action for the time

75

1   being was to no longer utilize him as a testifying

2   confidential source," correct?

3   A.   Pertaining to drug matters, yes.

4   Q.   Now in fact he was terminated – well strike that.

5       In fact in May of 2010 he also was buying drugs for

6   himself from one of the targets of the FBI investigation,

7   correct?

8           THE COURT:  I'm sorry, repeat the question for me

9   please.

10  BY MS. CONRAD:

11  Q.   In May of 2010 not only was he selling and using drugs, he

12  was also buying drugs from a target of the FBI's investigation.

13          THE COURT:  Overruled, you may answer.

14  A.   Yeah, we later found out he was continuing to buy from an

15  individual that he had bought from during our case.

16  BY MS. CONRAD:

17  Q.   So again during controlled buys he was still managing to

18  buy for himself?

19          MS. SIEGMANN:  Objection.

20          THE COURT:  Sustained.  I get it.

21  BY MS. CONRAD:

22  Q.   So when he was terminated he was terminated as a result of

23  his unauthorized conduct, correct?

24  A.   Yes, he was difficult to manage and he had had some

25  instances so we decided it was best to shut him down at that

76

1    time.

2    Q.   But when you shut him down your memorandum did not

3    indicate that he was being terminated for cause?

4    A.   I believe we left that open to see how he did in the

5    future and possibly reopen him in the future.

6    Q.   Even though he was being terminated for committing illegal

7    acts, right, you didn't consider that a termination for cause?

8    A.   I didn't at the time, no.

9    Q.   Well because if you called it a termination for cause

10   under the FBI regulations you couldn't have further contact

11   with him, right?

12            MS. SIEGMANN:  Objection.

13            THE COURT:  Sustained.  You know, I understand this

14   guy's had some problems.

15            MS. CONRAD:  I'm leading up to something, Your Honor.

16            THE COURT:  Okay, then let's--

17            MS. CONRAD:  And I'm trying to lay a foundation.

18            THE COURT:  Let's, why don't we try that.

19   BY MS. CONRAD:

20   Q.   So if you had indicated that he was terminated for cause

21   you wouldn't have been able to enlist him in this investigation

22   without approval from Washington?

23   A.   It would have been more difficult for sure.

24   Q.   And at the time that he was terminated did you envision

25   using him in a terrorism investigation?

1  A.   No.

2  Q.   And how was it that he became reenlisted in this

3  investigation as an informant?

4  A.   I continued to have dealings with him because we needed to

5  do trial prep with the Worcester DA's office and the Worcester

6  U.S. Attorney's Office with regard to drug defendants.  He

7  performed really well during those meetings.  He showed up when

8  he was asked to.  He appeared clear minded and spoke well and

9  at that point after about a month or so evaluation it was

10 decided that he could possibly be of use again.

11 Q.   Now at some point didn't you learn that he was using drugs

12 at least from September 2009 to September 2010?

13 A.   Could you repeat that question?

14 Q.   Did you at some point--

15      MS. SIEGMANN:  Objection.  That's a confusing

16 question.

17 BY MS. CONRAD:

18 Q.   At some point--

19      MS. CONRAD:  Well it's not a question of whether Ms.

20 Siegmann finds it confusing.

21      THE COURT:  Let's, hey--

22      MS. CONRAD:  I'll rephrase it.

23 BY MS. CONRAD:

24 Q.   Is it true that the informant was using heroin regularly

25 from September 2009 to September 2010?

78

1   A.    I don't have knowledge of that.

2   Q.    Well you worked with Assistant U.S. Attorney Karen Bell in

3   a number of cases involving the same informant; is that

4   correct?

5   A.    Yes.

6   Q.    And you're familiar with what discovery letters are; isn't

7   that correct?

8   A.    Yes.

9   Q.    And in 2010 Ms.--

10         MS. CONRAD:  May I approach the witness, Your Honor?

11         THE COURT:  You may.

12         MS. SIEGMANN:  Can I see what you're showing him?

13         THE COURT:  Show your sister what you have in your

14   hand please.

15         PAUSE

16   BY MS. CONRAD:

17   Q.    And in November of 2010 in the case of United States v.

18   George Guzman, Ms. Bell wrote me a discovery letter, correct?

19   A.    It appears so.

20         MS. SIEGMANN:  Objection.

21   BY MS. CONRAD:

22   Q.    And in that discovery letter she stated--

23         MS. SIEGMANN:  Objection.

24         THE COURT:  Yeah.  Sustained.  Let's do this, if you

25   want to direct his attention to something--

1      MS. CONRAD:  Okay.

2      THE COURT:  --in order to ask him a question--

3      MS. CONRAD:  Okay.

4      THE COURT:  --please don't--

5      MS. CONRAD:  Okay.

6      THE COURT:  Please don't summarize the letter.

7      MS. CONRAD:  Well taken.  Thank you.

8  BY MS. CONRAD:

9  Q.  Calling your attention to page six, this particular

10  paragraph does that refresh your collection that the informant

11  resumed the use of heroin in September of 2009?

12      MS. SIEGMANN:  Objection.  She's just reading it.

13      MS. CONRAD:  Well I asked the question.  He said he

14  didn't have a memory so now I'm asking him whether it refreshes

15  his memory as to that thing.

16      MS. SIEGMANN:  But that's not how you refresh

17  recollection.

18      THE COURT:  Whoa, whoa, whoa, whoa, whoa.  I'll tell

19  you what if you guys would like we can just take a nice long

20  break and you all can just brush up on your trial procedures

21  and how to ask questions and comport yourself, would that help?

22      MS. SIEGMANN:  No, Your Honor.

23      THE COURT:  Let's have a question please.

24  BY MS. CONRAD:

25  Q.  Does that refresh your recollection as to the informant's

1  resumption of heroin use in September of 2009?

2  A.   I believe this to be a summary in general that the CW had

3  some heroin problems.  I don't think we were actually aware of

4  how many times he used but basically saying hey, this is a guy

5  who's had a regular heroin problem and he's lapsed.

6  Q.   From September of 2009 to September 2010?

7  A.   Those are the dates that we, I mean during that period of

8  time we, those are when the instances occurred obviously in

9  June 2009 and during the summer 2010, spring and summer.

10 Q.   But you acquired information that he continued to use

11 heroin at least until September of 2010?

12 A.   I'm not aware, like I had significantly shut him down I

13 believe in July of 2010 so I didn't really have contact with

14 him between July and into probably September when we started

15 using him for trial prep.

16 Q.   So when you started using him for trial prep did you learn

17 that he had recently been using heroin on regular basis?

18 A.   As I said before I believe when we met him for trial prep

19 he was looking very good.  I mean he had showed up and he was

20 acting well.

21 Q.   Did you provide that information to Ms. Bell?

22 A.   Probably in consultation with Ms. Bell, yeah.

23          MS. CONRAD:  I'm going to offer this letter.

24          MS. SIEGMANN:  The government objects, Your Honor.

25          MS. CONRAD:  Stated by the--

1          THE COURT:  Stop, stop, stop.

2          MS. CONRAD:  Sorry.

3          THE COURT:  Stop.  What I'm going to do is this,

4   we're going to mark the letter for identification and let's

5   keep moving so we can finish, try to finish this witness and

6   then I will give you each an opportunity to address me on that.

7   BY MS. CONRAD:

8   Q.   So--

9          THE COURT:  Hold on.

10         MS. CONRAD:  Sorry.

11         THE COURT:  So we're going to mark that A for

12  identification please.

13     DEFENSE EXHIBIT A, MARKED FOR IDENTIFICATION

14         THE COURT:  All right, go ahead please, Ms. Conrad.

15         MS. CONRAD:  Thank you.

16  BY MS. CONRAD:

17  Q.   So, I'm sorry, I think I was asking you how it was that

18  you wound up reenlisting the informant in the fall of 2010 or

19  in December of 2010?

20  A.   I believe I had mentioned he had done well during his

21  trial prep.  This was into probably late fall of 2010.  At that

22  time another one of my colleagues had mentioned that he had a

23  case where they could use somebody familiar with Islam.  I know

24  this informant to be familiar with Islam from some interaction

25  of the nature of Islam group in prison and at that time we

1    reopened his file.

2    Q.   And that was specifically for purposes of this

3    investigation?

4    A.   Correct.

5    Q.   And what steps did you take at that time to determine

6    whether he was still using heroin?

7    A.   Just continued evaluation of him, make sure he was

8    behaving well, staying out of trouble.

9    Q.   Well did you ever give him a drug test?

10   A.   No, we did not.

11   Q.   So according to the letter we just looked at he was using

12   heroin regularly at least until September of 2010, right?

13   A.   Like I said I don't know he was using till when he was

14   using or how much he was using until when.  I knew that he had

15   heroin addiction issues and had been to treatment.

16   Q.   And you weren't really concerned with whether he was

17   continuing to use?

18   A.   Of course I was concerned.

19   Q.   But you didn't take any steps to monitor that?

20   A.   Like I said I would monitor him by his behavior.

21   Q.   Now there was one – have you reviewed the tape recordings

22   in this case?

23   A.   Yes, I've reviewed some of them that involve the

24   confidential source.  I have not reviewed--

25   Q.   And is it, are you familiar with a recording on January

1   20th where he says, where the informant says I need a gram of

2   dope, I feel sick?

3   A.   Yes.

4   Q.   And are you also aware that during the first meeting with

5   the undercovers on March 9th he fell asleep during a meeting,

6   correct?

7   A.   Yes.

8   Q.   And also said he felt sick during that meeting?

9   A.   Yes.

10  Q.   And at that point were you concerned that he was using

11  heroin or drugs?

12  A.   Yes.

13  Q.   And what steps did you take to determine whether or not he

14  was using heroin or drugs?

15  A.   Shortly after that episode with the introduction of the

16  undercover agents he was no longer utilized.

17  Q.   What about the January 20th event?

18  A.   He was counseled on that and told, you know, this can't be

19  happening.  And he denied it and his behavior seemed to be

20  acceptable so we continued to use him.

21  Q.   So, but again wouldn't the easiest way to find out whether

22  he was using drugs would be just to ask him to take a drug

23  test?

24          MS. SIEGMANN:  Objection.

25          THE COURT:  Overruled.  You may answer.

84

1   A.   We thought of it and the Bureau policy didn't allow for it

2   so we didn't do it.

3   BY MS. CONRAD:

4   Q.   The Federal Bureau policy didn't allow for it?  Can you

5   tell me where it says that in the Bureau policy?

6   A.   There was no funding for that type of thing so, and it

7   wasn't regularly done.  It's not policy to do it.

8   Q.   So it's not policy to do it but it's not policy not to do

9   it?

10  A.   Correct.

11  Q.   So there's nothing preventing you from doing it?

12  A.   Correct.

13  Q.   So you didn't do it because you didn't want to do it?

14          MS. SIEGMANN:  Objection.

15          THE COURT:  Sustained.

16  BY MS. CONRAD:

17  Q.   Now there were also, there was an incident in February of

18  2011 where the informant shoplifted an item from Radio Shack,

19  correct?

20  A.   Correct.

21  Q.   So this was the, what, the third time that he committed a

22  crime while he was being, this was the third time that you know

23  of at least that he had actually committed a crime while being

24  videotaped by the FBI?

25  A.   I don't know if it's the third.  I didn't go back and

85

1   count them but--

2   Q.   June 2009, May 2010, February 2011?

3   A.   Yeah, we were, I mean we were aware that he had issues.

4   He was a difficult to handle informant.

5   Q.   He was unreliable, wasn't he?

6   A.   No.  Based on my history with this informant I found him

7   to be an informant that had certain skills on the street.  He

8   had a confidence with gang members and we were able to develop

9   good evidence through him to convict probably 16 or 17 of them.

10  Q.   And he also committed unauthorized crimes?

11  A.   That's correct.

12  Q.   So wouldn't you consider someone who commits unauthorized

13  crimes and thereby violates repeated admonitions from the FBI

14  to be unreliable?

15         MS. SIEGMANN:  Objection.

16         THE COURT:  Sustained.

17  BY MS. CONRAD:

18  Q.   And this February 2011 incident did he explain to you why

19  he shoplifted this item?

20  A.   Myself and the other case agent met with him.  He

21  basically explained to us that he felt that, you know, we would

22  have wanted this item.  He wanted to keep the investigation

23  going.  He wanted to help us and that was his rationale.

24  Q.   During this same time he was also pretty desperate for

25  money from you wasn't he?

86

1   A.   This informant was definitely motivated financially.

2   Q.   And did that ever occur to you that that might be partly

3   because of his heroin addiction?

4   A.   Yes, I mean during my career I mean I've dealt with a lot

5   of informants that were financially motivated.  That's what

6   they, they needed money to live.  Whether they spent their

7   money on drugs or rent is hard for us to control.

8   Q.   And you don't really care, do you?

9           MS. SIEGMANN:  Objection.

10           THE COURT:  Sustained.

11   BY MS. CONRAD:

12   Q.   Is it FBI policy to use heroin addicts as informants?

13           MS. SIEGMANN:  Objection.

14           THE COURT:  Sustained.

15   BY MS. CONRAD:

16   Q.   Now with respect to the February 2011 incident did he

17   explain why he didn't just buy the item and then seek

18   reimbursement from the FBI?

19   A.   No, you know, I can't recall my actual conversation with

20   him as to, and we obviously were very frustrated with that

21   happening as well and, you know, he was admonished severely for

22   that incident but, no, I don't know.

23   Q.   So when you say admonished severely is that different from

24   the other admonishments that you had given him previously?

25   A.   Along the same lines.

1  Q.    So, but there was no action taken against him, right?

2  A.    As far as?

3  Q.    Any disciplinary action?

4  A.    Well I believe as far as legal action, no, that I know of.

5  Q.    And was that recorded to the local authorities as required

6  by the Attorney General's guidelines?

7  A.    I believe we filed that report with the, the unlawful

8  activity report.

9  Q.    With the federal prosecutor's office?

10  A.    Correct.

11  Q.    But you don't know if it was to police, for example?  Was

12  it even in Worcester, but wherever it was that the local police

13  were notified that he had committed this crime?

14  A.    The Worcester police are part of this investigation so

15  they were notified.

16  Q.    And a couple times on the tape, at least once on the tape

17  where he apparently shoplifted some potato chips while he was

18  with Mr. Ferdaus or attempted to, do you recall that?

19         MS. SIEGMANN:  Objection, Your Honor.

20         THE COURT:  Overruled.

21  A.    I would have to have my memory refreshed on that.

22  BY MS. CONRAD:

23  Q.    Now after this Radio Shack incident he was told, the

24  informant was told not to initiate any contact with Mr.

25  Ferdaus, correct?

1  A.   Yes, after he was out of the investigation that's

2  correct.

3  Q.   No, no, no.  In February of 2011 you wrote a report

4  indicating that after you discovered this Radio Shack incident

5  you told the informant not to have any contact with Mr. Ferdaus

6  and to avoid contact unless otherwise instructed by the agents,

7  correct?

8  A.   I believe that would have been something we would have

9  said to him, that we want to instruct your contacts, yes.

10 Q.   Okay.  But he continued to have contact with Mr. Ferdaus,

11 correct?

12 A.   I believe any contact was initiated by the defendant.

13 Q.   But he was told to avoid contact, correct?

14 A.   Well it's tough--

15 Q.   Unless instructed by the agents.

16 A.   It's difficult to avoid contact when somebody's calling

17 you.  I mean he's--

18 Q.   You don't have to answer your phone, do you?

19 A.   The problem was the phone he had was not his own.  He

20 didn't have many cell phones.  He used his mother's and his

21 sister's.

22 Q.   The informant?

23 A.   Yes.

24 Q.   So you wouldn't consider that to be a violation of your

25 instructions to him?

1        MS. SIEGMANN:  Objection.

2        THE COURT:  Sustained.

3   BY MS. CONRAD:

4   Q.   But there was contact that you had not told him to

5   initiate, correct?

6        MS. SIEGMANN:  Objection.

7        THE COURT:  I'm sorry, repeat the question Ms.

8   Conrad.

9   BY MS. CONRAD:

10  Q.   That was contact you had not instructed him to initiate?

11       THE COURT:  Sustained.  I think we've had the answer

12  to that several times.

13  BY MS. CONRAD:

14  Q.   Are you aware of any other instances where he had contact

15  with Mr. Ferdaus that you had not instructed him to initiate?

16  A.   No.

17  Q.   Now by the way on this first, his first venture into the

18  Mosque in Worcester back in December of 2010, it was December

19  17, 2010, he reported that he'd had contact with an individual

20  named Jalial (ph), correct?

21  A.   Yes, I believe that's correct.

22  Q.   And he also called you from Jalial's telephone, didn't he?

23  A.   I believe he called; he didn't have a phone so I believe

24  he called us from somebody's phone.

25  Q.   And was that--

1  A.   I'd have to look at the report.

2  Q.   Was that standard procedure for him to use somebody

3  else's, possibly a target's phone to call you?

4  A.   Standard procedure?

5  Q.   Yes.

6  A.   I don't understand--

7            MS. SIEGMANN:  Objection.

8            THE COURT:  Sustained.

9  BY MS. CONRAD:

10  Q.   Now he told you that – strike that.

11       You start to talk a little bit about his interest in

12  money.  Can you tell us a little bit more about that?  You said

13  he was very interested in money.

14            MS. SIEGMANN:  Objection.

15            THE COURT:  Overruled.

16  A.   What – I don't understand the question.

17  BY MS. CONRAD:

18  Q.   Well he texted you repeatedly during the course of this

19  investigation, right?

20  A.   Yes.

21  Q.   Not only asked you to give him money but he asked you to

22  take him places, right?

23  A.   Yes, if he had something he needed to get paid or done

24  like renew his driver's license or whatever he would text and

25  say I need a ride here or to do this or that.

91

1  Q.    Well you also – on January 26th he texted you and said is

2  there going to be work today, I need money?

3  A.    Yes.

4  Q.    And also texted you on numerous occasions because he had

5  parking tickets and court fees he had to pay off, right?

6  A.    Yes.

7  Q.    And he wanted money for that, right?

8  A.    Correct.

9  Q.    And he wanted you to take him to the registry, correct?

10 A.    Yes.

11 Q.    And he wanted you to take him to the court, correct?

12 A.    I believe that's correct, yeah.

13 Q.    Did you take him?

14 A.    I dropped him off at the courthouse at one point where he

15 went in and paid a fine.

16 Q.    And he also texted you in March, on March 17.  So this

17 would have been after the incident where he fell asleep during

18 the meeting with the undercovers, that was March 9th, right?

19 A.    Okay.  Yes.

20 Q.    And on March 17th he texted you and said I need to see you

21 at the office, do you remember that?

22 A.    I remember him texting me a few times like that where he

23 would say I need to see you.

24 Q.    And do you know why he needed to see you?

25 A.    Probably looking for money.

92

1   Q.   And did you meet with him on March 17th?

2   A.   I can't recall.

3   Q.   You said that that was after he was kind of out of the

4   picture, right?

5   A.   I think he was in the investigation probably for another

6   month after the undercovers came in.

7   Q.   So in March--

8   A.   So around early April.

9   Q.   As of March 9th you were concerned that he was addicted to

10  heroin, right, or using heroin?

11  A.   We knew he'd had a problem.

12  Q.   And he was continuing to participate in this investigation

13  for the next month?

14  A.   Not significantly but--

15  Q.   And he was--

16  A.   --just enough to maintain some credibility.

17  Q.   Now during the course of his work for the FBI by the way

18  he also had a restraining order taken out against him, correct?

19  A.   I believe that's correct, yes.

20  Q.   August of 2009?

21  A.   Yes.

22  Q.   Do you know what prompted that incident?

23  A.   Yes.

24          MS. SIEGMANN:  Objection.

25          THE COURT:  I'm going to let that answer stand.

1   Let's hear what your next--

2   BY MS. CONRAD:

3   Q.   And what was the underlying incident?

4           MS. SIEGMANN:  Objection.

5           THE COURT:  Sustained.

6   BY MS. CONRAD:

7   Q.   And this was during the time he was working for the FBI

8   and he had an outstanding restraining order?

9   A.   Correct.

10  Q.   And he also had, there was a woman that he was involved

11  with who was afraid of him, right?

12          MS. SIEGMANN:  Objection.

13          THE COURT:  Sustained.

14  BY MS. CONRAD:

15  Q.   In April of 2011 the FBI rented a motel room for him,

16  correct?

17  A.   Correct.

18  Q.   And he caused some damage to that motel room?

19          MS. SIEGMANN:  Objection.

20          THE COURT:  Just yes or no please.

21  A.   His girlfriend did the damage to the motel room.

22  BY MS. CONRAD:

23  Q.   And you know that because that's what he told you?

24  A.   That's what the hotel clerk told me.

25  Q.   And who paid for that?

1  A.    We did.

2  Q.    Is this the same girlfriend who wanted to get her stuff

3  out of the apartment when he wasn't home?

4           MS. SIEGMANN:  Objection.

5           THE COURT:  Sustained.  Sustained.

6  BY MS. CONRAD:

7  Q.    Was Camille actually a Muslim?

8  A.    No.

9  Q.    And with respect to all these text messages he repeatedly

10  sent you a text saying, you know, call me, it's important, I

11  want to meet with you, and is it your testimony that that was

12  generally about wanting more money, right?

13  A.    Could you repeat the question?

14  Q.    The text messages that you received from him repeatedly

15  saying call me, it's important, I need to meet with you, those

16  generally were text messages where he wanted, he was looking

17  for more money, right?

18  A.    I don't know what each particular one would have been for

19  but primarily that was a common theme.

20  Q.    And during the course of this investigation he was paid

21  approximately $10,000 by the FBI; is that correct?

22  A.    I don't know the exact numbers but I would believe that to

23  be in the ballpark.

24  Q.    And over the course of his work for the FBI generally he

25  was paid somewhere in the neighborhood of $40,000, correct?

95

1    A.    I believe that to be close.

2    Q.    And told to pay taxes on that money, correct.

3    A.    One of our standard procedures is to instruct them that

4    they should be filing, that the money that they're receiving is

5    taxable income.

6    Q.    And he did not file taxes in either 2009, 2010, correct?

7              MS. SIEGMANN:  Objection.

8              THE COURT:  Sustained.

9              MS. CONRAD:  May I have a moment please?

10        PAUSE

11   BY MS. CONRAD:

12   Q.    Oh, at one point the informant when he and Mr. Ferdaus

13   were discussing how to finance this plot the informant

14   suggested steal money from the Mosque, correct?

15   A.    I'm not aware of that.

16   Q.    You're not aware of that?

17             MS. CONRAD:  May I have a moment please?

18             MS. SIEGMANN:  I would object to that.

19             THE COURT:  Well let's - how much longer do you--

20             MS. CONRAD:  That's pretty much my last question.

21             THE COURT:  All right.

22        PAUSE

23             MS. CONRAD:  May I approach?

24             THE COURT:  You may.

25   BY MS. CONRAD:

96

1   Q.   Drawing your attention to the bottom of the page that's

2   Bates marked 6992 and the top of 6993, can you read that and

3   tell me if that refreshes your recollection whether the

4   informant suggested getting money from the Mosque?

5        PAUSE

6   A.   I don't see the word steal in here.

7   BY MS. CONRAD:

8   Q.   Well take, get?

9   A.   I think my recollection was that the informant said that

10  the defendant was collecting money and that he could use that

11  money.

12  Q.   Well there was actually a discussion isn't there about

13  money that went to support the Mosque that is for utility bills

14  and the like?

15  A.   He mentions the electric bill, heating.

16  Q.   And so the informant was suggesting was he not that that

17  money could be used to finance the supply?

18            MS. SIEGMANN:   Objection.

19            THE COURT:   Yeah, sustained.

20       PAUSE

21  BY MS. CONRAD:

22  Q.   And just I would ask you some questions about after the

23  February 11th incident at Radio Shack, him being instructed not

24  to initiate contact with Mr. Ferdaus and to avoid contact

25  unless otherwise instructed by agents, does that document

1  refresh your recollection drawing your attention to the last

2  sentence?

3         MS. SIEGMANN:  What document are you showing him?

4         MS. CONRAD:  It's Bates No. 1605.  It's a Woudenberg

5  memo from February 11th.

6         MS. SIEGMANN:  Okay.

7  A.   Yes.

8  BY MS. CONRAD:

9  Q.   And in fact he was instructed to that effect on February

10  11th, right?

11  A.   Apparently so.

12         MS. SIEGMANN:  Asked and answered.

13         THE COURT:  Yeah, I remember this.

14         MS. CONRAD:  I just asked if he would refresh his

15  recollection and then I just wanted to get the substance of the

16  answer.

17  BY MS. CONRAD:

18  Q.   During the course of this investigation were you aware of

19  whether the informant was Mr. Ferdaus for money?

20  A.   I am not aware of individual instances.  It wouldn't

21  surprise me if there was money to be asked for that he would

22  say hey do you have a small amount of money but my recollection

23  in the investigation neither of them had any money so.

24  Q.   And you don't, are you aware of an incident in which the

25  informant told Mr. Ferdaus that he needed money for his

1  mother's funeral?

2          MS. SIEGMANN:  Objection.

3          THE COURT:  Just yes or no to that one.

4  A.   I'm not aware.

5          MS. CONRAD:  May I have just one moment?

6      PAUSE

7          MS. CONRAD:  Nothing further.

8          MS. SIEGMANN:  Just a few questions, Your Honor.

9                      CROSS EXAMINATION

10 BY MS. SIEGMANN:

11 Q.   Going back to the December 17, 2010, the first meeting,

12 what reason did the FBI choose this cooperating witness, I'm

13 sorry I didn't mean to point my hand at the defendant when I

14 said that cooperating witness, this particular cooperating

15 witness Calial (ph) other than other cooperating witnesses?

16 A.   As I mentioned before this confidential source had a

17 background from prison with the Nation of Islam, was a street

18 kid, fairly simply street kid who could, who knew guns.  We

19 knew the defendant had gone to a gun shop and may have an

20 interest in purchasing guns.  We figured the informant would be

21 a good person to meet him and see what he was about.

22 Q.   Were any instructions provided to the cooperating witness

23 before this meeting?

24 A.   Just that information that this was possibly an individual

25 who was interested in guns, see if he could meet him, talk to

1  him about whatever, just try to be friendly and see if we can

2  develop a relationship.

3  Q.   Where was he going to meet him?

4  A.   He was going to meet him at the Worcester Islamic Center.

5  Q.   Had the cooperating witness ever been there before?

6  A.   No.

7  Q.   Was there any anticipation as to whether he would in fact

8  see the defendant on that day?

9  A.   No, we expected that it would take a while to actually get

10  that done.

11  Q.   Was that why the meeting wasn't recorded?

12  A.   Correct.  It's routine for us in most investigations if we

13  were to try to do an initial meet and greet with an informant

14  that we would not wire them up.

15  Q.   And how long have you been working with informants,

16  Special Agent Woudenberg?

17  A.   Almost 21 years.

18  Q.   And so based upon your experience it's unusual to actually

19  wire somebody up on the first meeting?

20  A.   Until we know that a substantive meet is going to take

21  place and that we're going to start getting into some

22  evidentiary conversation that's when we would start going with

23  wiring people up.

24  Q.   Now you indicated before it wasn't FBI policy to do drug

25  testing, do you recall that questioning?

1  A.    Correct.

2  Q.    Was there any program that the FBI had for drug testing of

3  cooperators?

4  A.    Not that I'm aware of, no.

5  Q.    Prior to working on this investigation to the best of your

6  knowledge what was the cooperating witness' level of technical

7  knowledge?

8  A.    Very minimal.  He's a very simple kid, hasn't been

9  educated very far along in school, just raised on the streets

10  pretty much.

11  Q.    So had he ever heard of terms like initiators, detonators,

12  worked with explosives before?

13  A.    Absolutely not.

14  Q.    Based upon your experience, do you believe the cooperating

15  witness would be able to come up with the plan to use remote

16  controlled aircraft to blow up the Pentagon?

17           MS. CONRAD:  Objection.

18           THE COURT:  Sustained.

19  BY MS. SIEGMANN:

20  Q.    Now when was it that the FBI decided to introduce

21  undercover employees into this investigation?

22  A.    I believe, and I'm not the primary case agent for this

23  investigation, I was the individual who had the connection with

24  the confidential source.  But I believe that once we started to

25  receive the information that the confidential source had met

1 the defendant we knew that there would come a time when this

2 would be way over the confidential source's head technically

3 and also after the falling asleep at the initial meeting with

4 the undercovers we knew that the confidential source had to get

5 out of the investigation.

6 Q.   Was there any, well at that point you had already decided

7 to introduce undercover employees, correct?

8 A.   Correct.

9 Q.   And was it based upon the fact that he just didn't have

10 the technical knowledge to be able to converse with the

11 defendant?

12 A.   Absolutely.

13 Q.   Was the cooperating witness provided instructions as to

14 what to say during each of the meetings?

15 A.   No.  Matter of fact the informant was told during most of

16 the meetings to just keep his mouth shut and let the defendant

17 talk and explain what he wanted to do.

18         MS. SIEGMANN:  Your Honor, if I could have a moment.

19      PAUSE

20         MS. SIEGMANN:  No further questions.

21         THE COURT:  Ms. Conrad on that?

22         MS. CONRAD:  I have a little bit.

23                         REDIRECT EXAMINATION

24 BY MS. CONRAD:

25 Q.   He did a good job making friends with Mr. Ferdaus, right?

102

1   A.   I believe he did.

2   Q.   In fact during a lot of this time he seemed to be Mr.

3   Ferdaus' only friend, right?

4          MS. SIEGMANN:  Objection.

5          THE COURT:  Sustained.  Why do I care about that?

6          MS. CONRAD:  Well I'd be happy to make a proffer at

7   sidebar.

8          THE COURT:  Let's keep moving.

9   BY MS. CONRAD:

10  Q.   During a lot of this Mr. Ferdaus seemed to be lonely,

11  right?

12         MS. SIEGMANN:  Objection.

13         THE COURT:  Overruled.  You may have that.

14  A.   I don't know how Mr. Ferdaus felt during the

15  investigation.

16  BY MS. CONRAD:

17  Q.   He made a lot of comments to Calial that he didn't really

18  see anybody other than Calial?

19  A.   I believe that to be true.

20  Q.   And that it was good for him to spend time with somebody

21  else?

22  A.   I believe he was happy to spend time with the confidential

23  source.

24  Q.   And that he was happy to have some company?

25  A.   I believe there were comments in that general nature.

1  Q.   And in fact despite your instructions in the first

2  recorded meeting on January 11th the informant was the one who

3  brought up the subject of guns, correct?

4  A.   Can you ask that again?

5  Q.   In the first recorded meeting on January 11th it was the

6  informant who brought up the subject of guns?

7  A.   I would have to review the transcript to see.  I know

8  there were guns discussed and I know that the information that

9  came from that recording corroborated previously, information

10  previously given by the confidential source from the first

11  meeting.

12  Q.   I'm sorry, well information – so let's go back to that

13  first meeting where the informant claimed that he was

14  approached by Mr. Ferdaus, right?  Right?

15  A.   Okay.

16  Q.   The informant claimed that he was approached by Mr.

17  Ferdaus as opposed to the other way around, right?

18  A.   I recall from my report that he was talking with the other

19  individual and Mr. Ferdaus came up to him, yes.

20  Q.   And that's his version of what happened, right?

21  A.   I believe so.

22  Q.   You don't have any corroboration of that because you don't

23  have, you didn't make a recording of that meeting, right?

24  A.   We did not record that meeting, that's correct.

25  Q.   And one thing you accomplish by not recording a meeting is

104

1  you don't have anything to contradict your informant, do you?

2          MS. SIEGMANN:  Objection.

3          THE COURT:  Sustained.

4  BY MS. CONRAD:

5  Q.  One thing that you have as a result of not recording a

6  meeting is you don't have any evidence of what actually--

7          THE COURT:  You know what--

8          MS. SIEGMANN:  Objection.

9          THE COURT:  --I understand where you're going with

10  that.  You can save it until the closing argument.

11  BY MS. CONRAD:

12  Q.  And just to go back to, I misstated that date.  It was the

13  January 5th conversation, the first recorded conversation in

14  which the informant brought up the subject of guns.

15          MS. SIEGMANN:  Time of recording, Ms. Conrad?

16          MS. CONRAD:  January 7th?

17          MS. BYRNE:  Yeah, January 7th.

18          MS. CONRAD:  Sorry.  Thank you.  January 7th.

19  BY MS. CONRAD:

20  Q.  On January 7th the first recorded meeting the informant

21  brought up the subject of guns, correct?

22  A.  I don't know.  I'm not aware.  I'd have to look at the

23  transcript and see how it went.  I know they were discussed.  I

24  don't know who brought it up.

25  Q.  Okay.  And at that--

1      MS. SIEGMANN:  Your Honor, objection.  That

2  recording's in evidence.

3      MS. CONRAD:  Yeah, it is in evidence and I can take

4  the time to set up that particular portion and replay it or I

5  can just show him the transcript and ask if it reflects his

6  recollection.

7      THE COURT:  Knock yourselves out, I don't care,

8  whichever way.

9      MS. CONRAD:  Well I thought this would be more

10  efficient.

11      THE COURT:  Do you have an objection to that method?

12      MS. SIEGMANN:  It's just it's already in evidence so

13  that's why I was commenting on it.

14      THE COURT:  All right.  You may use it to refresh his

15  memory.

16      MS. CONRAD:  Thank you.

17  BY MS. CONRAD:

18  Q.  Drawing your attention to the middle of page six, does

19  that refresh your recollection that it was the informant who

20  brought up the subject of guns?

21  A.  It appears that during that portion of the conversation

22  that he mentions guns, he, about the guns, yup.

23  Q.  And that's in response to Mr. Ferdaus saying how's life

24  with you, right?

25  A.  I'd have to see that again.  I didn't memorize the

106

1  transcript, I'm sorry.

2      PAUSE

3  A.    Yes, that appears to be true.

4  BY MS. CONRAD:

5  Q.    So contrary to what you instructed the informant which was

6  to keep his mouth shut and not bring things up he did bring it

7  up, right?

8  A.    Well apparently he brought up the guns which, you know, he

9  was instructed to go in and to talk to him about guns so.

10 Q.    So his instructions didn't include not raising the subject

11 of guns?

12 A.    Well once we, once we decided that he would come back with

13 information that the defendant was interested in guns then, and

14 a plan was starting to come together that he was talking about

15 at that point we told him, listen, let him do the talking.

16 Q.    Now you referred to him, the informant, as a kid a number

17 of times.  He's not a kid, is he?

18 A.    He's a--

19        MS. SIEGMANN:  Objection.

20 A.    He's in his 30s.

21        THE COURT:  Yeah, I'll take that.  That - overruled.

22 I will take that answer.

23 BY MS. CONRAD:

24 Q.    And with respect to not being able to drug test him are

25 you aware that parents sometimes buy drug test kits to test

1  their kids?

2          MS. SIEGMANN:  Objection.

3          THE COURT:  Sustained.

4  BY MS. CONRAD:

5  Q.   Do you know how much it would cost to get a drug test kit?

6          MS. SIEGMANN:  Objection.

7          THE COURT:  Sustained.

8  BY MS. CONRAD:

9  Q.   Do you know if it'd be harder to get a drug test kit than

10  to get C-4 explosives?

11          THE COURT:  All right, do you have any other

12  questions that are going to help us out here and not help the

13  discovery process because--

14          MS. CONRAD:  No, that--

15          THE COURT:  --frankly we are way off line.

16          MS. CONRAD:  I have nothing else.

17          THE COURT:  All right.  Do you have anything else?

18          MS. SIEGMANN:  No, Your Honor.

19          THE COURT:  Thank you.  You may step down.

20      WITNESS EXCUSED

21          THE COURT:  Any further evidence?

22          MS. CONRAD:  Well just we have a proffer regarding

23  the defendant's personal circumstances.  I think Ms. Byrne is

24  prepared to make the report.

25          THE COURT:  All right, Ms. Byrne, if you would

1    please?

2          MS. BYRNE:  Yes, Your Honor.

3          Your Honor, Mr. Ferdaus is 26 years old.  He lives

4    with his parents and his brother in Ashland.  And he has lived

5    there basically his entire life.  He attended the Ashland High

6    School and graduated in 2003.  He then attended Northeastern

7    University and graduated in 2008.  He's lived with his parents

8    since that time, Your Honor.  His father has had a career at

9    Raytheon where he worked as a software engineer.  He's recently

10   retired and I believe he is at home most of the time now.  His

11   mother still works for the Commonwealth of Massachusetts in the

12   Department of Transitory Assistance and has worked for the

13   Commonwealth of Massachusetts for a long time as I understand,

14   Your Honor.

15         As you can see he has an extended family who is also

16   here.  I know that his contacts in the community are not the

17   issue as the government has only moved on the issue of

18   dangerousness, but I did want to give you some background about

19   Mr. Ferdaus.  And the only other things that I would just call

20   your attention to is that he basically has no prior record,

21   Your Honor.  His only record is for a possession of Class D

22   which was a case which I believe was in 2005 and was continued

23   without a finding.  Other than that he has no other

24   convictions.  So I just wanted to give you that background

25   about him.

1    THE COURT:  And I obviously have to digest an

2  enormous amount of material.  I presume that - Ms. Cuascut have

3  you spoken - has he been interviewed?

4    MS. BYRNE:  He has not been interviewed at this

5  point, Your Honor, because I guess the real issue here is

6  dangerousness which the interview won't really illuminate.

7  However if the Court is inclined to set conditions certainly we

8  will obviously have him interviewed.  I'm sure you would want

9  that and that's no problem at all.  It's just that it seemed

10  like it was sort of putting the cart before the horse in this

11  situation.

12    THE COURT:  And just so that I have all of the

13  material that I'm going to need for my equation is the family

14  prepared to post?

15    MS. BYRNE:  I'm sure they would be, Your Honor.  We

16  actually haven't discussed that specifically but I'm sure that

17  they are willing to do whatever, whatever is within their power

18  to do.

19    THE COURT:  Thank you.

20    MS. BYRNE:  And, Your Honor, the - just to make the

21  point about what the issue is here, it's not about, the concern

22  of the government's is not - so I'm not sure that the

23  posting the house or something like that would actually be

24  necessary in this case.  It's more what kind of conditions

25  could Your Honor set that would reasonably assure the safety of

1   the community and I do believe that there are conditions that

2   could be set and I know that Ms. Conrad has more to say on

3   that.

4          THE COURT:  All right.  Thank you very much, Ms.

5   Byrne.

6          All right, let me hear from the government first on

7   the issue of detention and then I will hear from--

8          MS. SIEGMANN:  Yes, Your Honor.

9          THE COURT:  --Ms. Conrad.

10         MS. SIEGMANN:  The defendant should be detained for

11  the safety of the community, Your Honor.  He is charged with

12  several crimes of violence and three federal crimes of

13  terrorism.  Indeed as this Court is well aware under 18 U.S.C.

14  Section 3142(e)(3)(C) there is a rebuttal presumption that

15  detention is warranted in this case to reasonably assure the

16  appearance of the defendant at trial and protect the safety of

17  the community.

18         The government has produced overwhelming evidence of

19  the defendant's guilt.  The, Exhibit 1 summarizes the numerous,

20  the hundreds of the hours of recordings that the government has

21  as evidence of the defendant's commission of crimes, of the

22  crimes that the grand jury has indicted him for, six separate

23  counts, and it details the recorded statements where the

24  defendant beginning in 2010 as a 26 year old Northeastern

25  University graduate with a Bachelor's degree in physics began

1  planning to commit a violent jihad against the United States,

2  the country in which he was raised which he considers an enemy

3  of Alla.  And those emails, Your Honor, Government Exhibit 6

4  and 7, discuss that, discuss how he believes al-Qaida to be the

5  defenders of the innocent; that he does not agree with the U.S.

6  government policies, that he considers it a kafir army.  Those

7  are the types, the same types of things that he was saying to

8  the undercover employees as well as the cooperating witness.

9  It goes to show that he was predisposed to commit these crimes

10 and he was in fact planning a jihad beginning in 2010 before he

11 met the CW with obviously you've heard his problems, but the CW

12 was tasked to see if there was some thread of evidence or to

13 asked to see if he was inclined to commit an attack on the

14 United States because of his gun shop incident, to see if there

15 was a crime there.  And what did the CW find out?

16          On January 7th at the meeting that we played in court

17 it was clear, yes, there was the cooperating witness asked one

18 question, hey, I have the guns and the bombs, and after that

19 what did Mr. Ferdaus do?  He then described in detail his plan

20 to use a remote controlled aircraft to attack the United

21 States, to actually attack the Pentagon.  And that he'd only

22 have one chance, one hit and it had to count.  And he talks

23 about detonators, things that the cooperating witness had no

24 knowledge of.  Mr. Ferdaus extensively planned and attempted to

25 attack the Pentagon and U.S. Capital building using large

1  remote controlled aircraft filled with C4 plastic explosives.

2  These are the plans that he put together.  This is not a one

3  page thing.  This is not something he took lightly.  He was

4  dedicated to this plan.  He wanted to see it committed.  He

5  wanted to die seeing it.  He was willing to die seeing that was

6  accomplished.  And there's two at least, I mean all the

7  research, Your Honor, that he had put into these plans.  That

8  was not something he was instructed to do by the undercover

9  employees.

10        The defendant should be detained because he poses a

11  significant danger to the community.  In addition to what I've

12  just laid out the fact that he was planning this attack he also

13  talked about creating homemade explosives.  Homemade explosives

14  that Special Agent Davis indicated don't cost very much money

15  to put together and he said that repeatedly during the recorded

16  meetings.  He told the cooperating witness that he was

17  interested in doing that.  They purchased at least one

18  component for those homemade explosives.  And then when he

19  mentioned that subject to the undercover employees, had a

20  concern from the community, they told him not to experiment,

21  not to do this because they were concerned he could and he

22  would because he was visiting jihadi websites.  That's what it

23  says in Exhibit 1.  He actually talked about how the reason he

24  became so radicalized and why he came to see how evil the

25  United States was was through jihadi websites and that he

1   thought that jihad was the only solution and he was not any

2   longer interested in making money.  That the only thing he

3   wanted to do in life was this and that's one of the reasons you

4   should hold the defendant, Your Honor, because he is so

5   committed to committing jihad that he does pose a danger.

6            The defendant told the undercover employees that he'd

7   been planning to attack the United States long before he met

8   the undercover employees or the cooperating witness.  He

9   actually talked about a plan to attack a local military

10  recruitment center with another individual in Dorchester.  And

11  while he thought that was, he was supportive of his friend, his

12  Dorchester associate of that plan, he thought that a bigger

13  attack was necessary.  He also in these meetings talked about

14  attacking a subway station, a Colorado military base.  He was

15  not limiting his direction and his violent activities just

16  against Washington D.C., Your Honor.

17           What was his motivation?  Why did he want to attack

18  the United States, the country in which he was raised?  He said

19  his goal was to terrorize the United States, decapitate its

20  military center and kill as many kafirs as possible.  And kafir

21  as special agent explained means non-believer.  He didn't have

22  any problem even killing women and children.  He was asked that

23  question by the undercover employees, you know your attack

24  might kill women and children, and he was okay with that

25  because any kafirs blood was okay.

114

1           And in addition to attempting to attack the

2    pentagon and United States Capital building in Washington D.C.,

3    Mr. Ferdaus designed, built and supplied 12 separate mobile

4    devices, mobile cell phone devices, that he believed would work

5    as a detonator.  Recall his video in which he described step by

6    step how it was that people could actually create these things

7    and he said this is how to create a cell phone detonator.  That

8    was the first words in that video.  And then a conclusion after

9    he tested it with the LED lights to show that it worked it is

10   now ready to be shipped as a detonator.  And why was he doing

11   that?  Because he actually believed that these things were

12   being given to al-Qaida who was then using them for roadside

13   bombs and killing U.S. soldiers.  And when they told him on

14   June 17, 2011, and it's documented in Exhibit 1, that they

15   worked he was excited.  This was what he indicated that was

16   exactly what he had hoped would happen.  And much of that work

17   was done right in his home in Ashland where if he were released

18   he would go back to, Your Honor.

19           For public safety reasons the government believes

20   that it's very important that he not be released.  And recall

21   that after each subsequent delivery of these things that he

22   believed were being used as detonators he was anxious to find

23   out how many more people it killed, how many more people could

24   he kill?  And then in August of 2011 he came up with a plan to

25   mass produce these.  Instead of just doing one or two at a

1    time, we could do 20, 30, 40, with these tracfones that he

2    had found at CVS that cost less than $10.

3         The defendant's dangerousness is also demonstrated by

4    the letter from the WIC, the Worcester Islamic Center, that was

5    introduced today indicated that he was becoming very

6    aggressive, threatening to the point that people needed to

7    restrain him.  His desire, his aggression, his agitation wasn't

8    just directed at individuals, the Army, U.S. Army that's far

9    afield or to the Pentagon or the Capital Building but even in

10   his own community he was becoming hostile, agitated and

11   threatening.

12        Now the cooperating witness' criminal history, his

13   drug use and misconduct is merely a red herring in this

14   investigation.  The government will not rely upon the testimony

15   of the cooperating witness at trial.  The indictment doesn't

16   even mention the cooperating witness.  The government will be

17   relying upon the recorded statements of the defendant.  The

18   government will be relying upon his words, his actions, his

19   plans.  And just to remind the Court on the strength of the

20   evidence issue, the defense of entrapment if it were to be

21   raised at trial requires that the defendant present, it's their

22   obligation to produce evidence, evidence of two things.  First,

23   that the defendant was not predisposed to commit crime.  And

24   second, that the government engaged in improper inducement.

25        The defendant cannot show that he wasn't predisposed

116

1    to commit this crime because he's already planning it in

2    2010, long before he met the cooperating witness or the

3    undercover employees.  And second, there is no evidence of

4    improper inducement either.  As the agents testified this

5    cooperating witness had such limited technical capabilities

6    that they decided early on to introduce the undercover

7    employees.  This was a gun and drug guy.  He didn't know

8    anything about remote controlled aircraft.  He certainly didn't

9    plant this idea into the defendant's mind.  It was all the

10   defendant's idea.  The person who went and graduated

11   Northeastern and got a physics degree, the person who said

12   during the meetings that this stuff was easy for him,

13   electronics came easy for him.  He knew from the very beginning

14   about this technology and the availability of this technology.

15   That does pose a national security threat.

16          Now there were some questions about whether his plan

17   required modifications, et cetera.  Recall that this is attempt

18   charge, Your Honor, and feasibility is not a defense.  The fact

19   that if it would or would not work is not a defense to a charge

20   of attempt.  Recall also that the undercover employees told the

21   defendant more than 30 times you don't have to go through with

22   this, you don't have to go through with this.  There's no shame

23   in backing out and yet the defendant each and every time wanted

24   to go through.  This was what gave his life meaning.  This is

25   what he wanted to do and to spend his time working on.

1            Now the mental health issues were also, the defense

2    counsel has attempted to cloud the issue of the defendant's

3    mental abilities by the fact that he experienced some anxiety.

4    Your Honor, I don't know one person in this country that

5    doesn't experience anxiety at some point in time.  He is

6    certainly, he's not insane.  He is not incompetent.  You saw

7    him on that video.  Could he have looked any more in control of

8    what he was saying and what he was doing?  He methodically went

9    through and described how it is you build a cell phone

10   detonator using tools on that video.  And in fact when he was

11   asked questions about his anxiety issues he clearly indicated

12   they had to do with his family life and not anything to do with

13   his plan, nor the undercover employees.  Now what is clear is

14   that the defendant is a ticking time bomb and thank goodness

15   the agents actually found him before he was able to contact

16   individuals that really did want to hurt our country and attack

17   us in our home.

18           In conclusion, with regard to the defendant's

19   dangerousness I just wish to point your attention to Government

20   Exhibit 1 at pages 39 to 40.  On that he confided to the

21   undercover employees he realized how evil America is and that

22   jihad is the solution.  He had no interest in making money and

23   his only desire was to change the world using the skills Alla

24   has given him to strike the infidels by carrying out his

25   planned attacks and building bomb components to kill the kafir

1   armies.  Lastly, he told the undercover employees, I just

2   can't stop, there is no other choice for me.  For all these

3   reasons the defendant should be detained.  Let me just make

4   sure I didn't forget any – thank you, Your Honor.

5          MS. CONRAD:  Your Honor, before I start Ms. Byrne

6   reminds me that I think I never moved into evidence Exhibit A

7   which was Ms. Bell's letter, discovery letter in the Guzman

8   case.

9          THE COURT:  Give me an offer of proof on that.

10         MS. CONRAD:  Okay.  So it indicates the length of

11  time, the timeframe during which the informant was using drugs.

12  It states that he was using heroin from September of 2009 to

13  September 2010, using heroin regularly several times a month

14  and despite that Agent Davis, excuse me, Agent Woudenberg said

15  that in September of 2010 when he met with him as part of trial

16  prep he seemed to be fine.  And it seems to me that it goes to

17  the FBI's knowledge of the reliability of this informant when

18  they recruit him to go into a place of worship and attempt to

19  ensnare someone in an undercover investigation.  And I think it

20  also goes to the credibility of the FBI's own self-proclaimed

21  monitoring procedures which Agent--

22         THE COURT:  Well, and you can, I mean there has just

23  been a lot of evidence about all of that and I think what I'm

24  going to ask you to do is use it in your closing rather than,

25  cause I, you know, we've gone over and over and over this

1   stuff.  So let's morph into the--

2          MS. CONRAD:  Okay.

3          THE COURT:  --closing here if we would.

4          MS. CONRAD:  Thank you.

5          Your Honor, the issue here is whether there are any

6   conditions that can reasonably assure the safety of the

7   community.  And as to that issue the government bears the

8   burden of proof by clear and convincing evidence.  The

9   government has not presented in this proceeding any evidence

10  that the defendant's plan would had actually worked.  Now Agent

11  Davis testified on direct, yes, it would have worked, but then

12  when he was cross examined by Ms. Byrne he backed off and said,

13  well, it would require some modifications, I'm not really an

14  expert, you'd have to have certain skills and so forth.  But

15  one thing we can even be sure of beyond that whether it was

16  possible for someone to implement this plan, now a little more

17  about that in a moment, it is clear on his own without the FBI

18  Mr. Ferdaus would not have done anything.  The FBI gave him the

19  weapons.  The FBI gave him or rented the storage space for him.

20         The FBI, in fact there was never any discussion on

21  his part, there's no evidence he ever had any intent to make

22  contact with al-Qaida, whether he had any internet to reach out

23  to al-Qaida, whether he had any efforts to make contact with

24  al-Qaida until these two undercovers introduced by the

25  informant, the government wants to know why the informant is so

1 important, introduced by the informant these two individuals

2 show up and basically say or imply, hi, we're from al-Qaida.

3 Well he didn't reach out to them.  He didn't say to the

4 informant, there's no evidence he said bring me somebody from

5 al-Qaida.  No, this was always going to be just him and Calial

6 (ph) except he didn't have the weapons.  He didn't know how to

7 use weapons.  He, certainly there's no indication that he had

8 the ability to obtain C4 explosives or to obtain grenades or to

9 obtain AK-47s.  And this plan I would submit is basically

10 fantasy.  The plan is fantasy because he is saying to the

11 informant we're going to crash into the dome, we're going to

12 mow down all the politicians.  The two of them?  The two of

13 them, how are they going to do that?  It's completely a fantasy

14 and, Your Honor, it reads like something out of a videogame

15 with Team A and Team B.  There were teams.  This was not going

16 to happen.  To me one of the most baffling things is this

17 shipment of AK-47s, well there's more AK-47s then there are

18 people.  There's just one person.  So what are they going to

19 hold one AK-47 in two hands?  I mean this is just a fantasy and

20 the government put the weapons in his hand.

21         The government, Ms. Siegmann relies at length, and I

22 find this kind of puzzling too, on these emails.  Well, you

23 know, I'm renewing my objection to the emails especially since

24 – well strike that.  I'm renewing my objection to the emails

25 because what the emails are is they are a political discussion.

1   And what I suggest is that the government in relying on those

2   emails and relying on other statements made by Mr. Ferdaus is

3   confusing thought with action.  It's not a crime to criticize

4   the United States.  It is not a crime to say, you know, I think

5   what al-Qaida is doing is a good find.  We may find it

6   reprehensible but it's not a crime and it's not even evidence

7   of predisposition.  And of course we're not trying the case

8   here but evidence of predisposition would be if he had said

9   something like I, in those emails, I am going to initiate a

10  terrorist attack.  He said nothing of the sort.  And I have

11  some concerns particularly, I'll say it now, about the emails,

12  Your Honor, because after our last session somehow the U.S.

13  Attorney's Office released photographs of Mr. Ferdaus holding

14  an AK-47 to the press and that's how the press reported it,

15  they were released by the U.S. Attorney's Office.  Are they

16  going to release these emails now in an effort to prejudice the

17  public against Mr. Ferdaus as if there hasn't been enough

18  negative publicity?  And that's my concern because frankly I

19  think as Your Honor said it's minimal relevance, if any

20  relevance.  Well why are they in evidence because they want to

21  distribute it to the press?  And I think that the government -

22  so if the Court is not going to strike those I would ask them

23  to be kept under seal for precisely that purpose.

24          The - I'm sorry.

25      PAUSE

1        MS. CONRAD:  There's no evidence that Mr. Ferdaus

2   ever travelled overseas.  There's no evidence that he had made,

3   this business about the 2010 discussion about opening fire on a

4   recruiting station as I understood that that was something he

5   said someone else had suggested to him, not something he had

6   suggested.  And the only evidence of that is a comment he made

7   to Calial and Calial was, I would suggest he was sort of

8   encouraging him in almost this childlike fashion to fantasize

9   about what they were going to do.

10       The government sort of misinterprets I think the

11  evidence regarding Mr. Ferdaus' mental state.  He didn't just

12  say he was experiencing anxiety.  He said he was having

13  intrusive thoughts.  He brought, he called the attention of the

14  Ashland police for his disoriented demeanor.  He called the

15  attention of the Hopkinton police in 2011 oddly around the same

16  time as this incident, the letter from the Mosque where--

17       THE COURT:  And help me out on that.  How does that

18  assist me on the issue of dangerousness or detention?  If it's

19  not an issue of competence or criminal responsibility it might

20  be an issue for sentencing.  It might be an issue for motive

21  but--

22       MS. CONRAD:  Well there's two things.

23       THE COURT:  But I mean, and it's an unfortunate and

24  it's a terrible thing but I'm not sure it helps the defendant.

25  I think it helps the government more--

123

1    MS. CONRAD:  Well there's two things here, Your

2    Honor.  I mean I think first of all, you know, when you

3    consider that in light of the grandiosity of this so-called

4    plot which was completely unrealistic, this vision of firing

5    off AK-47s--

6    THE COURT:  So - okay, let me ask it this way then.

7    On what issue would it be admissible if this were a trial?

8    MS. CONRAD:  I think it would be admissible, Your

9    Honor, on the issue first of all of entrapment because in terms

10   of the defendant's distorted sense of reality I think that

11   attempt has to be what he believes, reasonably believes is

12   necessary and his beliefs in this regard were simply not

13   reasonable.  He wasn't going to be sitting on a plane flying to

14   Afghanistan after taking out AK-47s in front of the Pentagon

15   and the Capital.  He was going to be wrestled to the ground and

16   lying on the ground.  It was completely an unrealistic fantasy

17   that the government used their resources, their considerable

18   resources to exploit and to reel him in as it were.  So the

19   question is, is he really a danger?  Is he a real terrorist?

20   And the answer I suggest is a resounding no and his mental

21   state is relevant to that.

22   In addition, Your Honor, I understand what the Court

23   is saying or suggesting, maybe the Court isn't but I recognize

24   that the issue of mental health may be relevant to the issue of

25   danger for purposes of this proceeding.  But I do think that

1   that is precisely an area in which reasonable conditions

2   could reasonably assure the safety of the community especially

3   since Mr. Ferdaus will be living with his parents and his

4   father could be the third party custodian.  His father is home.

5   They could see to it that he gets proper psychological

6   treatment and medication and he would be a danger unless al-

7   Qaida shows up at his door and says, here, you know, we're

8   going to give you an AK-47, he is not a danger.  And even if

9   they did if he's on house arrest he's not going anywhere.

10          So, you know, the business about the letter from the

11  Mosque I would suggest illustrates precisely why this was one a

12  feasible plot.  Nobody would take him seriously.  A real al-

13  Qaida operative would not be interested in working with him

14  because he was too conspicuous.  He was drawing attention to

15  himself.  He was out of control.  And even the agents said to

16  him you have to tone your behavior down but he couldn't.  So

17  what the government did was take somebody who was mentally

18  troubled, who had a fantasy that was encouraged by an informant

19  and by two trained undercover agents to believe this was

20  actually going to happen.  But in fact even on their best

21  evidence it was never going to happen and that is relevant to

22  his danger.

23          Oh, and also about cell phones, Your Honor, I mean

24  the idea that these cell phones, which are really nothing more

25  than a switch, would be sent overseas to al-Qaida as opposed to

1  someone whose building an improvised explosive device not

2  being able to put together a cell phone switch which one can

3  find out about on the internet seems to me to be ridiculous and

4  I think it's an illustration of the extent to which Mr. Ferdaus

5  was living in a fantasy world.  Why in the world would he think

6  that al-Qaida would want to be shipping his cell phones

7  overseas?  That idea came from the agents.

8          May I just have one more minute?

9          THE COURT:  Mmm-hmm.

10     PAUSE

11         MS. CONRAD:  The government, Ms. Siegmann says that,

12  you know, the fact that this wasn't feasible is not a defense.

13  Well the fact that this wasn't feasible is relevant to the

14  question of danger.  I submit to Your Honor that based on all

15  of the evidence that Mr. Ferdaus requiring him to be under

16  house arrest in his family's home in Ashland with his father as

17  a third party custodian, if the Court wants us to explore the

18  question of bail we certainly will explore that with the

19  family.  They do own their own home and I'm sure there's some

20  equity that could be posted.  But those are conditions that

21  would be, that would reasonably assure the safety of the

22  community.

23         THE COURT:  Thank you everybody.

24         MS. SIEGMANN:  Your Honor, there's just one item that

25  I need to clarify for the record regarding one of the exhibits.

126

1          THE COURT:  Mmm-hmm.

2          MS. SIEGMANN:  And by the way with regards to the

3   releasing, the exhibits are public record and once they're

4   introduced in court and so rather the FOIA request being filed

5   with the Court my office did release those photos but that was

6   pursuant to the fact that they were public exhibits.

7          With regards to the video where he's showing how to

8   make a detonator, we want to make sure that the only portions

9   of the item, the CDs that are actually in evidence are the

10  portions that were played because we do have concerns about

11  that getting out on YouTube for example and so with regards to,

12  I played the portions on that DVD 001.  I only played the first

13  minute of that portion, and then I played 006.  And so the rest

14  of that DVD we request would not be admitted as an exhibit.

15         THE COURT:  I'm going to ask you like I had said

16  earlier, I want you to go through these exhibits, make sure

17  they are in order and in place and see if you can agree on a

18  protocol how that should be disseminated.

19         MS. SIEGMANN:  Okay.

20         MS. CONRAD:  Is the Court ruling on my motion to seal

21  or to strike Exhibits 6 and 7?

22         THE COURT:  I need you to do that in writing.

23         MS. CONRAD:  Okay.

24         THE COURT:  And I'm not going to--

25         MS. CONRAD:  But in the meantime I take it those--

127

1          THE COURT:  I am not going to release it.  When are

2    you going to file that?

3          MS. CONRAD:  I can file it probably tomorrow.

4          THE COURT:  That's fine.  We are not going to release

5    anything until you file that motion.

6          MS. CONRAD:  I take it--

7          THE COURT:  And by the way you all know my feeling on

8    sealed stuff okay, so--

9          MS. CONRAD:  Well, but--

10         THE COURT:  I don't like it.

11         MS. CONRAD:  I prefer striking it frankly.  I don't

12   think--

13         THE COURT:  Yeah, I know.  Well it's in so that's

14   over.

15         All right, thank you.

16         MS. SIEGMANN:  Thank you, Your Honor.

17         MR. CABELL:  Thank you, Your Honor.

18

19

20

21

22

23

24

25

128

1        CERTIFICATION

2        I, Maryann V. Young, court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   digital sound recording of the proceedings in the

5   above-entitled matter.

6

7   /s/ Maryann V. Young              December 2, 2011

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**