```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2


 3      *  *  *  *  *  *  *  *  *  *  *  *  *  *
        *UNITED STATES OF AMERICA    *
 4                                   *   CRIMINAL ACTION
                    v.               *   No. 11-10331-RGS-1
 5      *                            *
        REZWAN FERDAUS,              *
 6      a/k/a Jon Ramos,             *
        a/k/a Dave Winfield         *
 7      *  *  *  *  *  *  *  *  *  *  *  *  *  *


 8


 9              BEFORE THE HONORABLE RICHARD G. STEARNS
                    UNITED STATES DISTRICT JUDGE
10                           PLEA HEARING
                            July 20, 2012
11


12      APPEARANCES:


13             UNITED STATES ATTORNEY'S OFFICE (By AUSA B.
        Stephanie Siegmann) 1 Courthouse Way, Suite 9200,
14      Boston, Massachusetts  02210, on behalf of the United
        States of America
15
               FEDERAL PUBLIC DEFENDER OFFICE (By Miriam Conrad,
16      Esq., and Catherine K. Byrne, Esq.) 51 Sleeper Street,
        5th Floor, Boston, Massachusetts  02210, on behalf of
17      the Defendant


18


19


20                                   Courtroom No. 21
                                     1 Courthouse Way
21                                   Boston, Massachusetts 02210


22


23                        James P. Gibbons, RPR, RMR
                            Official Court Reporter
24                        1 Courthouse Way, Suite 7205
                          Boston, Massachusetts  02210
25                           jmsgibbons@yahoo.com
```

```
1                    P R O C E E D I N G S
2          THE CLERK:  All rise for this Honorable Court.
3      Court is open.  You may be seated.
4      The case before this Court carries Case No. 11-10331,
5  United States of America versus Rezwan Ferdaus.
6      Counsel, please identify yourselves for the record.
7          MS. SIEGMANN:  Good morning, your Honor.  Stephanie
8  Siegmann for the United States.
9          MS. CONRAD:  Good morning, your Honor.  Miriam
10  Conrad, and with me is Catherine Byrne, for Mr. Ferdaus.
11          MS. BYRNE:  Good morning, your Honor.
12          THE COURT:  Good morning.
13      Ms. Conrad, I understand from the plea agreement that
14  your client is offering to plead "guilty" to Counts One and
15  Five of the indictment?
16          MS. CONRAD:  That is correct.
17          THE COURT:  I assume that the United States
18  contemplates, if the plea is accepted, dismissing Counts
19  Two, Three, Four, and Six?
20          MS. SIEGMANN:  Yes, your Honor, and that is so
21  stated in Section 1 of the plea agreement.
22          THE COURT:  All right.  The clerk may proceed with
23  the plea.
24          THE CLERK:  Mr. Ferdaus.
25          THE DEFENDANT:  Yes.
```

```
 1                    THE CLERK:  Please stand.
 2                    THE DEFENDANT:  Okay.
 3                    THE CLERK:  Mr. Ferdaus, Count One of the
 4      indictment filed by the United States Attorney charges you
 5      with attempting to damage and destroy a federal building by
 6      means of an explosive, from in or about March 2011 and
 7      continuing through in or about September 2011, in violation
 8      of Title 18, United States Code, Section 844(f); to which
 9      count you have previously pled "not guilty."
10          Do you now wish to change your plea?
11                    THE DEFENDANT:  Yes.
12                    THE COURT:  How do you plead to Count One, "guilty"
13      or "not guilty"?
14                    THE DEFENDANT:  Guilty.
15                    THE CLERK:  Count Five of the indictment filed by
16      the United States Attorney charges you with attempting to
17      provide material support to terrorists, from in or about
18      June 2011 and continuing through in or about September 2011,
19      in violation of Title 18, United States Code, Section 8339A;
20      to which count you have previously pled "not guilty."
21          Do you now wish to change your plea?
22                    THE DEFENDANT:  Yes.
23                    THE COURT:  How do you plea to Count Five, "guilty"
24      or "not guilty"?
25                    THE DEFENDANT:  Guilty.
```

| | |
|---|---|
| 1 | THE CLERK:  Please raise your right hand. |
| 2 | **REZWAN FERDAUS, sworn**. |
| 3 | THE CLERK:  Would you please take a seat in the |
| 4 | witness box. |
| 5 | Counsel, would you join him, please. |
| 6 | (Pause in proceedings.) |
| 7 | THE COURT:  Mr. Ferdaus, my name is Richard |
| 8 | Stearns.  As I am sure is evident, I am a judge of the |
| 9 | United States District Court. |
| 10 | I am going to ask some questions.  The reason for the |
| 11 | questions is that I have to make an independent |
| 12 | determination that your decision to plead guilty is a |
| 13 | voluntary decision and one made with full understanding of |
| 14 | the consequences of pleading guilty. |
| 15 | If any question I ask or anything I say seems imprecise |
| 16 | or confusing, either ask me to clarify it or feel free to |
| 17 | consult with Ms. Conrad before you answer, okay? |
| 18 | THE DEFENDANT:  Sure. |
| 19 | THE COURT:  For the record, can you tell us your |
| 20 | full name? |
| 21 | THE DEFENDANT:  My full name is Rezwan Mortin [ph.] |
| 22 | Ferdaus. |
| 23 | THE COURT:  "Rezwan" from the Arabic or Persian? |
| 24 | THE DEFENDANT:  A variation. |
| 25 | THE COURT:  A variation. |

1          It's usually spelled R-I-Z-W-A-N, I think.

2              THE DEFENDANT:  It depends.

3              THE COURT:  It depends.

4          The indictment has you as 26.  Are you now 27?

5              THE DEFENDANT:  I'm still 26.

6              THE COURT:  Still 26.

7          Were you born in Ashland?

8              THE DEFENDANT:  I was born in Natick,

9      Massachusetts.

10             THE COURT:  Did you grow up in Natick or in

11     Ashland?

12             THE DEFENDANT:  I grew up in Ashland the majority

13     of my life.

14             THE COURT:  You went to school in Ashland?

15             THE DEFENDANT:  Yes.

16             THE COURT:  And your family resides there?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Brothers and sisters?

19             THE DEFENDANT:  One brother.

20             THE COURT:  One brother.

21         How far did you go in school?

22             THE DEFENDANT:  I finished college with an

23     undergraduate degree.

24             THE COURT:  What is your degree in?

25             THE DEFENDANT:  Physics.

1                THE COURT:  Physics.

2        And from which school?

3                THE DEFENDANT:  Northeastern University.

4                THE COURT:  Northeastern.

5        Have you been employed outside of working in school?

6                THE DEFENDANT:  Yes, I have.

7                THE COURT:  What have you done by way of

8 employment?

9                THE DEFENDANT:  I have been employed by various

10 companies, including two different companies, as part of my

11 cooperative education while I was an undergrad at

12 Northeastern and other various jobs after graduating.

13                THE COURT:  So these were related to your study in

14 physics?

15                THE DEFENDANT:  Not all of them.

16                THE COURT:  Not all of them?

17                THE DEFENDANT:  Yeah.

18                THE COURT:  You were in the Northeastern co-op

19 program?

20                THE DEFENDANT:  Yes.

21                THE COURT:  This question I am not asking to in any

22 way embarrass you, so just answer me generally.

23        Have you ever been treated for any mental condition or

24 psychological problem?

25                THE DEFENDANT:  Yes, I have.

1          THE COURT:  Again, without going on unnecessarily

2     into issues of privacy, can you, just generally, tell me

3     what the issue was?

4          THE DEFENDANT:  I was being treated for mild

5     depression and anxiety.

6          THE COURT:  Is that as a result of this indictment,

7     or was that prior to the indictment?

8          THE DEFENDANT:  It was prior to that.

9          THE COURT:  Are you taking medication?

10         THE DEFENDANT:  Yes.

11         THE COURT:  Just generally, antipsychotic,

12    antidepressant?

13         THE DEFENDANT:  It's an antianxiety --

14         THE COURT:  Antianxiety.

15         THE DEFENDANT:  -- medication.

16         THE COURT:  When did you last take the medication?

17         THE DEFENDANT:  Last night.

18         THE COURT:  Last night.

19      Is there anything about the medication that would cause

20    you to doubt your ability to comprehend or understand the

21    proceeding today?

22         THE DEFENDANT:  No.

23         THE COURT:  Ms. Conrad, you are fully confident

24    that your client is clear minded?

25         MS. CONRAD:  Yes.

1          THE COURT:  Mr. Ferdaus, the indictment, of course,

2     is simply a charging document.  It is not evidence of a

3     crime.  It simply states an accusation brought by the

4     government through a grand jury to which a defendant must

5     answer.  There are two counts in which you are pleading

6     guilty, Count One and Count Five, of the indictment itself.

7          I know you have read the indictment.

8          Have you discussed it with were Ms. Conrad?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Has she explained to you the elements

11     of these offense?  By "elements" a lawyer means the critical

12     components of each offense that the government would have to

13     prove beyond a reasonable doubt to obtain a conviction.

14          THE DEFENDANT:  Yes, she has.

15          THE COURT:  In that case I think I can be

16     reasonably brief in summarizing what the indictment alleges.

17          Let me begin, though, with a general principle of law,

18     because the indictment is phrased around a theory of

19     criminal liability called "attempt."

20          An "attempt," as it would sound just from the nature of

21     the word itself, means a crime that was not completed.  An

22     attempt under the law typically requires something more than

23     preparation.  It requires a conscious intent on the part of

24     the person who undertakes the attempt to eventually see the

25     crime succeed, but, obviously, it would not be called an

PDF created with pdfFactory trial version www.pdffactory.com

1     "attempt" if the crime did succeed.

2          Mere preparation is generally not enough.  There must

3     actually be more than mere preparation.  There must be at

4     least one overt step taken toward completion of the crime, a

5     step that is closely enough related to the crime to convince

6     me, or a jury if that were the case, that there was a

7     serious intent on the part of the actor to see the crime

8     succeed.

9          So we start with that as a general proposition that

10    informs both of these counts.

11         Count One also carries an element called "malice."

12    This is the maliciously destroying or attempt to maliciously

13    destroy by means of an explosive real property owned by the

14    United States.

15         Malice means something short -- in common terms, it

16    might sound like it means evil.  It means less than evil.

17    It means actual knowledge that what you are doing is a

18    violation of the law itself.  In other words, that it is a

19    wrong act under the law, is the sense that we mean it when

20    we use it in terms of a crime.

21         Count Five charges attempting to provide material

22    support to terrorists knowing it would be used in carrying

23    out a violation of 18, United States Code, Section 1114.

24         "Material support," as it is used in the statute, is

25    self-defined, but it includes things ranging from currency,

1   on the one hand, to providing weapons, lethal substances,

2   personnel, transportation, anything that would aid a person

3   or another entity in carrying out the defined crimes,

4   Section 1114.

5        Section 1114, again, is an attempt crime, an attempt to

6   kill an officer or employee, including a member of the

7   uniformed branches of the United States Armed Services, who

8   is engaged in the performance of his or her official duties.

9        So, in very general terms, that's what the two counts

10  allege.

11       You are confident that you understand the nature of the

12  crimes and also the elements of each of the offenses?

13            THE DEFENDANT:  Yes.

14            THE COURT:  Let me -- I realize this is somewhat

15  beside the point, but I think, for the record, we do have to

16  ask what the maximum statutory penalties are, even though I

17  know there is a contemplated disposition.

18            MS. SIEGMANN:  Yes, your Honor.

19       In regard to Count One, the maximum sentence is five

20  years -- I'm sorry.

21       A minimum sentence of five years' imprisonment, and

22  maximum sentence of 20 years' imprisonment, three years'

23  supervised release, a $250,000 fine, and $100 special

24  assessment.

25       With regard to Count Five, which is the material

1    support charge, 2339A, the maximum penalty is imprisonment

2    of up to 15 years, supervised release for life, a $250,000

3    fine, and a special assessment of $100, your Honor.

4           THE COURT:  Mr. Ferdaus, more important to us is

5    the plea agreement, that I will turn to in a minute.  But

6    you do understand that if you went to the statute books and

7    looked for the maximum penalties that a judge could impose

8    for these offenses, they would be as they were described by

9    the prosecutor?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Do you also understand that because

12   these offenses are felonies they carry with them certain

13   what lawyers would call "collateral consequences"; that is,

14   they impact certain civil rights that a defendant has.  For

15   example, in Massachusetts, the right to vote, the right to

16   hold public office, the right, for a given term, to serve

17   on a jury, and, obviously, the right to possess a firearm or

18   ammunition of any kind.

19       Do you understand that?

20          THE DEFENDANT:  Yes.

21          THE COURT:  All right.  I think the most useful

22   thing would be for you to outline the plea agreement.

23          MS. SIEGMANN:  Yes, your Honor.

24          THE COURT:  I have read it, so I think you can

25   confine yourself to what the government and Ms. Conrad

1  consider to be the salient features of the agreement.

2      I may explain a little bit more, Mr. Ferdaus, about the

3  agreement and then ask if there are any questions that you

4  have about its content.

5          MS. SIEGMANN:  Yes, your Honor.

6      With regard to the plea agreement, I am going, as you

7  indicated, to highlight the non-boilerplate language.

8      With regard to Section 1, it indicates that the

9  defendant agrees to plead guilty to Counts One and Five of

10  the indictment.

11     Count One, again, charges the defendant with attempting

12  to damage and destroy a federal building using an explosive,

13  and Count Five is the charge related to material support,

14  attempting to provide material support to terrorists.

15     In exchange for this plea of guilty, the U.S. Attorney

16  has agreed to dismiss Counts Two, Three, Four, and Six of

17  the indictment following imposition of the sentence at the

18  sentencing hearing.

19     In addition, Section 1 also indicates that the

20  defendant admits that he, indeed, committed the crimes

21  charged in Counts One and Five.

22     Section 2 sets forth the maximum penalties that we've

23  previously discussed.

24     Section 3 indicates that this agreement is made

25  pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).

1    If the Court accepts the plea, then the Court is required to

2    impose the agreed disposition that appears later in the

3    agreement.

4         Section 4 sets forth the Sentencing Guidelines.

5         With respect to Count One, the defendant's base offense

6    level is 24, in accordance with Section 2K1.4 of the

7    Sentencing Guidelines.

8         With respect to Count Five, the base offense level is

9    33, in accordance with Sections 2X2.1 and 2A2.1 of the

10   Sentencing Guidelines.

11        Due to the application of the terrorism enhancement at

12   Section 3A1.4, the defendant's offense level is increased by

13   12 levels, and his Criminal History Category is increased to

14   Category VI, resulting in an adjusted offense level of 45,

15   which carries a guideline range of life.

16        The grouping principles do not really matter here

17   because the adjusted offense level is at 45 for Count Five.

18        I note that the Sentencing Guidelines are higher than

19   the statutory maximum offense levels that we talked about

20   earlier.

21        Due to the defendant's prompt acceptance, the parties

22   agree that his offense level will be decreased by three

23   levels.

24        Section 4 also sets forth what conduct by the defendant

25   would justify the U.S. Attorney being released from its

1    obligations under the agreement.

2        Section 5, which is one of the more important

3    provisions, sets forth the agreed disposition for the case,

4    and that is incarceration for 204 months, 17 years; a fine

5    in an amount to be determined by the Court; supervised

6    release for 120 months, that is ten years; and a mandatory

7    assessment of $200.

8        Section 7 indicates that the defendant has waived any

9    right he has to challenge the sentence and his conviction on

10   direct appeal or in any future proceeding.  For example, he

11   also has waived any collateral challenge brought under

12   Section 2255, but he does reserve the right to challenge or

13   claim that his attorney was ineffective in negotiating the

14   plea and/or the entry of his guilty plea.

15       This section also indicates that the parties agree that

16   the sentence will be final, and the U.S. Attorney agrees not

17   to appeal the imposition of the agreed sentence.

18       Section 10 states that if the defendant moves to

19   withdraw his guilty plea, or if this Court rejects the plea

20   or any aspect of the agreement, the U.S. Attorney may

21   declare the agreement null and void.

22       Section 11 descries under what circumstances the

23   defendant will be deemed to have breached the agreement.

24       And then the agreement also contains some boilerplate

25   sections.  There is a forfeiture section.  There is a

1    section about the agreement being a complete and knowing

2    agreement between the parties, and a section regarding civil

3    liability, your Honor.

4            THE COURT:  Ms. Conrad, given the fact that the

5    plea is offered under the (C) provision, I am not sure that

6    the explanation I ordinarily give about the Sentencing

7    Guidelines is as relevant as the plea agreement itself.

8        I assume you have discussed the Guidelines and how they

9    operate independent with Mr. Ferdaus?

10           MS. CONRAD:  Yes.

11           THE COURT:  Let me pass over that.  I think that is

12   somewhat beside the point, given the agreement that's been

13   offered.

14       Mr. Ferdaus, when I made the reference to the fact that

15   the plea was being offered under a particular provision of

16   the rules, this is Rule 11(c)(1)(C), unlike the typical plea

17   where the sentence is left to the discretion of the judge,

18   here your counsel on your behalf has reached an agreement

19   with the government that a given recommendation, 17 years,

20   will be made.

21       I have the option of rejecting the agreement or

22   accepting it, but nothing in between.  In other words, this,

23   if the agreement is accepted, will be the sentence that the

24   Court will impose; which leads me to another provision of

25   the agreement, and, that is the provision where you waive

the right to appeal or bring what are called a "collateral

challenge."  That means a *habeas corpus* challenge to either

the sentence or the guilty plea itself.

When these provisions began to appear in plea

agreements years ago, they were very controversial.  They

have now been examined by every Court of Appeals, to my

knowledge, in the country, and every Court has come to the

same conclusion:  A plea agreement is a contract, obviously

not between the Court and the defendant, but between the

defendant and the government.

Under contractual principles, consideration is given

for a particular undertaking by a defendant or an

undertaking by the government.  As the contract would then

become enforceable by way of consideration, so is a plea

agreement.

I'm confident that a Court of Appeals, looking at this

agreement, would find consideration from the fact that the

sentence given otherwise would be the Guidelines, and the

possibility of consecutive sentences would be 35 years,

would be a maximum that a Court could impose on these two

counts, by agreeing to a 17-year sentence, I think any Court

of Appeals would say the government made and gave

significant consideration in exchange for your plea.

The reservation of the one area of appeal that has been

preserved in the agreement, that is, the right to argue that

1    your counsel was ineffective in negotiating the plea, let me

2    honestly say has more to do with a recent Supreme Court

3    decision than it does with Ms. Conrad.  I think, and I'll

4    warn you now, it is very unlikely that a Court of Appeals

5    would ever find her ineffective as a counsel.  But the

6    Supreme Court has said that the plea process, because it

7    figures in so much of the criminal work that is done in the

8    United States courts, is so much now a part, an integral

9    part, of the criminal process itself, that it stands like a

10   jury trial, in a special category, where certain rights

11   attach to a defendant that are preserved as a constitutional

12   matter regardless of any waiver and any agreement.

13        So those would be my initial comments about the

14   agreement itself.  The agreement look pretty straightforward

15   to me, but do you have any questions about it?

16        I see you have signed it.

17             THE DEFENDANT:  Yes, I have.

18             THE COURT:  You acknowledge you have read it and

19   discussed it with Ms. Conrad?

20             THE DEFENDANT:  Yes.

21             THE COURT:  You are satisfied that you understand

22   the terms?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Do you understand that when you plead

25   "guilty" -- I'm sure you do, but let me ask -- that you give

1    up your right to have your case tried before a jury?

2         THE DEFENDANT:  Yes.

3         THE COURT:  Have you ever served as a juror, or do

4    you have any experience with a jury?

5         THE DEFENDANT:  Very little.  I was called for jury

6    duty, and I was exempt from it after telling the judge about

7    some things that he was asking about the jury pool in

8    general.  So even though I showed up in court, later on he

9    let me go.  So I didn't end up staying for the full court

10   session.

11        THE COURT:  But you saw the preliminary part, the

12   judge asked questions and then interviewed you?

13        THE DEFENDANT:  Yeah.  Just the preliminary part

14   about interviewing the jury pool.

15        THE COURT:  Let me then explain.  These are things

16   I am sure you absorbed in high school civics and in college.

17        Under the Constitution of the United States, while

18   judges are given a great deal of authority over matters of

19   law, when it comes to binding matters of fact, if either the

20   government or a defendant insist on it, that decision is not

21   made by the judge, but by a panel of citizens we call the

22   "jury," twelve in number, who hear the government's evidence

23   in the case, hear the lawyer's arguments, hear the judge's

24   teachings or instructions on the law, and then are required

25   to come to a unanimous decision as to whether a person is

PDF created with pdfFactory trial version www.pdffactory.com

1    guilty or not guilty of an offense.

2        Where do the jurors come from?

3        Well, you most likely were called to a county jury,

4    which is simply the way the State calls its jurors.  But the

5    same Jury Commissioner chooses our jurors from the same pool

6    of people, it's just a larger pool, eastern Massachusetts,

7    rather than a given county.

8        On the day the case is scheduled for trial, the jurors

9    assemble here in the courtroom.  They are interviewed,

10   principally by the judge, but the lawyers participate as

11   well, to determine their eligibility to sit on the case that

12   is to be tried that day.

13       In the process of selecting the ultimate twelve, a

14   defendant and his lawyer are permitted to object to any ten

15   that he does not want seated, as the government can object

16   to any six that it does not want seated.

17       As I said, the jury, after hearing the evidence and the

18   judge's instructions, must come to a unanimous verdict as to

19   whether a person is guilty or not guilty.

20       So when I say that you give up your right to have your

21   case tried before a jury, I mean not only the right to have

22   the jury make the ultimate decision as to whether you are

23   guilty or not guilty, but also the right to participate in

24   the very selection of the jury that would make that

25   decision.

1              Do you understand that?

2                   THE DEFENDANT:  Yes, I do.

3                   THE COURT:  Do you understand that I would instruct

4      the jury that they must presume you innocent unless and

5      until the government succeeded in proving your guilt beyond

6      a reasonable doubt?

7                   THE DEFENDANT:  I understand.

8                   THE COURT:  Do you understand that the burden of

9      proof in a criminal trial is proof "beyond a reasonable

10     doubt," a very heavy burden that the government carries

11     throughout the trial?

12                  THE DEFENDANT:  Yes.

13                  THE COURT:  Let me put that in practical terms.

14             Because the government exclusively bears the burden of

15     proof, you would have no obligation to prove your innocence,

16     to call witnesses, to produce evidence, nor, certainly,

17     could you ever be compelled to testify at trial.

18             Do you understand that?

19                  THE DEFENDANT:  Yes, I do.

20                  THE COURT:  Do you understand that, on the other

21     side of the coin, you give up the right to testify before

22     the jury on your own behalf, if you should choose to do so,

23     or to offer the jury, for that matter, mitigating or

24     exculpatory evidence?

25                  THE DEFENDANT:  Yes, I do.

1      THE COURT:  Do you understand that you give up the

2    right to confront the witnesses against you?  That's a

3    lawyer's expression for having Ms. Conrad cross-examine the

4    government's witnesses.

5      THE DEFENDANT:  Yes, I do.

6      THE COURT:  Do you understand that you would be

7    entitled to her assistance throughout the trial of the case,

8    throughout the jury selection process, throughout anything

9    that was important and related to the trial itself?

10     THE DEFENDANT:  Yes, I do.

11     THE COURT:  Do you understand that you give up the

12   right to remain silent, at least for today's purposes?

13     THE DEFENDANT:  Yes.

14     THE COURT:  With that in mind, then, let me ask the

15   prosecutor to summarize the evidence that she would present

16   to the jury if the case did proceed to trial before a jury.

17     I recognize that there will always be differences over

18   details of things, so I am not really looking for those.

19   What I am looking for is whether you agree you are

20   responsible for the important allegations that the

21   government makes and states that it can prove; that is,

22   those things that go to make up the elements of the two

23   crimes that are charged.

24     All right, Ms. Siegmann.

25     MS. SIEGMANN:  Thank you, your Honor.

1      If the defendant went to trial, the government would

2    have proven beyond a reasonable doubt the following facts,

3    among others:

4      At trial the government would have shown using

5    consensual recordings, initially with an FBI cooperating

6    witness and later with two FBI undercover employees that

7    were assigned -- I'm sorry.  Task force officers that were

8    assigned to a Joint Terrorism Task Force, that beginning in

9    2010 and continuing until the defendant's arrest in

10   September 2011, that the defendant planned to commit acts of

11   violence against the United States.

12      The defendant extensively planned and took substantial

13   steps to damage and destroy the Pentagon and U.S. Capitol

14   Building using a remote-controlled aircraft filled with C-4

15   plastic explosives.

16      The defendant, as you heard, is a Northeastern graduate

17   with a Bachelor's degree in Physics.

18      Additionally, beginning in January 2011, the defendant

19   began designing and constructing detonation components for

20   improvised explosive devices, IEDs, using mobile phones.

21      Between June 2011 and September 2011, the defendant

22   supplied 12 mobile phones, each of which he had modified to

23   act as an electrical switch for an IED, to the FBI

24   undercover employees, whom he believed were members of al

25   Qaeda.  When the defendant gave these items, these

1    detonation components, to the undercover employees, he

2    intended that they were to be used to kill U.S. soldiers

3    stationed overseas.

4        Now, the defendant met with the FBI undercover

5    employees on numerous occasions between March 2011 until his

6    arrest in September 2011.

7        On March 9, 2011, he was introduced to the FBI

8    undercover employees by the cooperating witness.  At that

9    meeting he briefly described his plan, his planned attack on

10   the Pentagon, and he told the FBI undercover employees that

11   he planned to attack the Pentagon using a remote-controlled

12   aircraft filled with explosives.

13       Later that same month, he met the undercover employees

14   again, and at this meeting he actually describes his plan in

15   more detail, that he had hoped to obtain remote-controlled

16   aircraft filled with grenades and then launch it and fly it

17   into the Pentagon using a built-in GPS system.

18       The defendant also told the FBI undercover employees at

19   that meeting in late March that he had researched his idea

20   on the Internet, and he had found a website that sells such

21   planes, such remote-controlled aircraft, and that these

22   aircraft could actually fly at 100 miles per hour.

23   Additionally, during this meeting, he told the undercover

24   employees that he had come up with this idea, this aerial

25   attack idea, before he had met the cooperating witness.  And

PDF created with pdfFactory trial version www.pdffactory.com

1    we would have shown at trial that the defendant met the

2    cooperating witness the first time in December 2010.

3        The defendant met with the undercover employees on

4    April 18 and 19, 2011.

5        During these meetings the defendant told the FBI

6    undercover employees that he had decided to expand his plan,

7    that he had actually identified another target in addition

8    to the Pentagon, that he wanted to fly one plane into the

9    Capitol Building and two planes into the Pentagon, and these

10   were the remote-controlled planes filled with explosives.

11       He assured the undercover employees at this meeting

12   that, quote, this plan was within his ability.  And, quote,

13   very close to completion, that he only needed -- sorry.  He

14   knew how to obtain two of the three components for his plan

15   and that all he needed to do was secure funding.

16       Between April 2011 and August 2011, the defendant

17   requested funding for his attack plan from the undercover

18   employees, who he believed were members of and recruiters

19   for al Qaeda.

20       At a meeting on May 5, 2011, the defendant handed one

21   of the UCEs, the undercover employees, a flash drive, a

22   digital storage device, which the defendant explained

23   contained a report -- the same report that I have provided

24   the Court before the hearing today, your Honor, marked

25   May 5, 2011 -- and he indicated that he had prepared the

1    report based upon his research, and indicated that this

2    report that he had provided, this flash drive he had

3    provided -- contained a narrative of the attack plan, as

4    well as photographs of his targets and launch sites, as well

5    as other information he had downloaded from the Internet.

6    Most notably, it also included printouts and information

7    about the remote-controlled planes he intended to use during

8    his attempt, F-4 remote-controlled planes.

9        At this meeting, the defendant described the flight

10   plans of the three F-4 remote-controlled planes, that one

11   plane he intended to fly would hit the middle of the dome of

12   the Capitol Building, while the second and third planes

13   would hit opposite sides of the Pentagon building.  The

14   defendant indicated that each plane would be filled with 16

15   grenades.

16       Additionally, during this meeting, the defendant

17   described his intentions, the purpose for committing the

18   attack.  He stated that his plan "Ought to terrorize -- it

19   ought to result in the downfall of this entire disgusting

20   place.  That is my goal."

21       Now, as you can see from the plan yourself, your Honor,

22   this is an extremely detailed plan, and, among other things,

23   it contains pictures of the Pentagon and Capitol Building

24   with superimposed arrows to show where the defendant

25   intended to strike his targets.

1          From May 13, 2011, to May 15, 2011, the defendant

2     traveled to Washington, D.C. for the purpose of conducting

3     surveillance.  While in Washington, D.C., the defendant

4     surveilled and photographed the targets, his targets, the

5     Pentagon and Capitol Building.  The defendant also

6     identified and photographed sites at the East Potomac Park,

7     located in Washington, D.C., from which he planned to launch

8     his planes filled with explosives.

9          On June 9, 2011, the defendant provided a second flash

10    drive to the undercover employees containing a detailed

11    report of his Washington, D.C., trip, including the

12    photographs he had taken, and maps and diagrams he had

13    collected while there.  Also on this thumb drive was a copy

14    of a defendant's expanded attack plan.

15         Again, you've been provided a copy of this plan, your

16    Honor, this morning.

17         During the June 9, 2011, meeting, the defendant told

18    the FBI undercover employees that as a result of his

19    extensive surveillance of the Pentagon, he had determined

20    that he needed to expand his attack plan, that he needed to

21    expand his attack plan to include a ground assault on the

22    Pentagon.  The defendant also told the undercover employees

23    at this meeting that he had decided it would be simpler to

24    use homemade explosives, rather than grenades, as the

25    explosive component in his attack planes.

1          I just refer your Honor and direct your attention in

2     the plan that was provided to the undercover employees, in

3     reference to the Pentagon attack on page 4, the defendant

4     wrote, that his "overall goal was to shut down this target

5     by eliminating key entrances and exits and as many

6     individuals as possible."

7          On June 17, 2011, the defendant rented a storage space

8     at a Framingham storage facility under a false name, "Dave

9     Winfield."  The defendant planned to use this space to

10    receive, store, and prepare the components for his attack

11    plan.

12         Between June 2011 and September 2011, the defendant

13    requested that the undercover employees supply him with

14    explosives, grenades, fully automatic weapons, and a

15    silencer to use to carry out his plan.

16         On July, 21, 2011, the defendant placed an order with a

17    Florida distributor for a remote-controlled aircraft, again

18    using the false identity "Dave Winfield."

19         On that same date the defendant told the FBI undercover

20    employees during a meeting that he wanted to maximize the

21    explosive impact of his attack -- of his attack planes, and

22    thus wanted to use -- wanted to get 24 pounds of plastic

23    explosives.  Also during this meeting the defendant informed

24    the undercover employees that 15 pounds of the 24 pounds

25    would be used for the planes themselves, 5 pounds per plane.

1    During a subsequent meeting, less than two weeks later, he

2    increased his request to 25 pounds of plastic explosives.

3        On September 28, 2011, as the defendant had requested

4    and instructed, the undercover employees delivered him C-4

5    explosives, three grenades, and six fully automatic AK-47

6    assault rifles.

7        The defendant inspected these items, and while

8    inspecting the C-4 explosives in his storage unit, the

9    defendant actually took some of the C-4 explosives and

10   placed it into a remote-controlled aircraft that he had

11   ordered and obtained for his attack plan.

12       In addition to attempting to attack the Pentagon and

13   U.S. Capitol Building, the defendant designed, built, and

14   supplied 12 mobile phone detonation devices, and he provided

15   these to the FBI undercover employees.  When he delivered

16   these devices to the FBI undercover employees, he believed

17   that they were members of al Qaeda, and that these

18   detonation devices he constructed would be used to kill U.S.

19   soldiers stationed overseas, specifically in Iraq and

20   Afghanistan.

21       At his May 5, 2011, meeting with one of the FBI

22   undercover employees, the defendant demonstrated a cell

23   phone detonator he had built and indicated that he could

24   instruct others how to put such devices together.

25       On June 9, 2011, the defendant delivered his first

PDF created with pdfFactory trial version www.pdffactory.com

1    mobile phone detonation device to the undercover employees.

2        On June 27, 2011, the defendant gave the FBI undercover

3    employees another mobile phone detonation device, and during

4    this meeting on June 27, 2011, the undercover employees

5    falsely told the defendant that the first phone detonation

6    device had succeeded in killing three U.S. soldiers and

7    injuring four or five others in Iraq.  The defendant was

8    visibly excited by this news and responded "That was exactly

9    what I wanted."

10       He further told the undercover employees at this

11   meeting in reference to this conduct that he felt

12   "Incredible.  We're changing the world."

13       The undercover employees asked the defendant whether he

14   was okay with killing people.  The defendant responded,

15   "yes," and indicated, "I could get two more phones today."

16       Later during the June 27, 2011, meeting, the undercover

17   employees advised defendant that they needed two more phones

18   for the brothers overseas because they wanted to do at least

19   two more roadsides.  In response, the defendant told the

20   undercover employees that he was "100 percent at peace" with

21   the fact that his devices "are killing American soldiers"

22   and was "so happy to hear that and so thankful."

23       After each subsequent delivery to the undercover

24   employees, the defendant was anxious to know how each of the

25   detonation devices he had constructed had worked and how

PDF created with pdfFactory trial version www.pdffactory.com

1    many Americans had been reportedly killed.

2        On August 1, 2011, during a meeting with the two FBI

3    undercover employees, the defendant told the undercover

4    employees that he wanted to increase his production of the

5    mobile phone IED components.  He suggested that he could

6    either send the "brothers overseas" a shipment of "just

7    phones" and "instructions" on how to make the detonation

8    components or "send them" in one box of "50 phones

9    prepackaged and all ready."

10       During this meeting the defendant also stated that he

11    could "write instructions" or make a video for the "brothers

12    overseas" on how to construct the mobile phone detonation

13    devices.

14       Additionally, during this meeting, the defendant

15    advised the undercover employees that he could make 20 to

16    30 -- store 20 or 30 detonation devices in his storage unit

17    per week.  The defendant stated that he wanted to build such

18    devices because "I want to totally destroy and take out the

19    enemy and kill as many kafir" -- that is, nonbelievers --

20    "as possible.  That's why I came up with this phone idea."

21       To accelerate the killings of U.S. soldiers, on

22    September 20, 2011, the defendant made a 20-minute training

23    video, which was recorded by one of the FBI undercover

24    employees.  This video contained instructions on how to

25    build a cell phone detonator.  When he made this video, the

PDF created with pdfFactory trial version www.pdffactory.com

1    defendant intended that this be used to train members of al

2    Qaeda.

3        The defendant began this video by stating, quote,

4    "Today we are going to see how we can make our own cell

5    phone detonators."  He concluded this video by successfully

6    testing the device he had built during the filming and

7    stating, in reference to that device, "now it is ready to be

8    shipped as a detonator."

9        The defendant repeatedly told the undercover employees

10   during their communications, during his meetings with them,

11   that the purpose -- that his purpose in attacking the United

12   States was to terrorize, to terrorize the United States, to

13   decapitate its "military center," and to kill as many

14   "kafirs," non-believers, as possible.

15       During their communications with the defendant, the

16   undercover employees, the FBI undercover employees, told the

17   defendant more than 25 times that he did not have to go

18   through with it, he did not have to go through with his plan

19   to attack the Pentagon and U.S. Capitol Building.  They told

20   the defendant there was no shame in backing out.  He could

21   turn back at any time, and they questioned his willingness

22   to kill people.

23       In response to these inquiries, the defendant

24   repeatedly reaffirmed his commitment to his plan, to his

25   attack plans, and his hope to cause mass destruction and

1    psychological harm to the United States.

2         Additionally, and lastly, your Honor, the government's

3    experts at trial from the FBI's explosives unit in Quantico,

4    Virginia, would have testified that the detonation

5    components the defendant delivered to the FBI undercover

6    employees were capable of being used as the defendant had

7    intended, as an IED triggering mechanism.

8         THE COURT:  All right.

9         That's a lot to digest, Mr. Ferdaus, but to reduce it

10   down to what I think is essential, the government is

11   alleging that in 2010 and 2011 you worked with persons who

12   you mistakenly believed were members of al Qaeda, which is a

13   designated foreign terrorist organization, by developing a

14   plan in an attempt to execute an attack on the Pentagon,

15   particularly, and also, it alleges, the Capitol Building;

16   and that, further, you provided materials, again to persons

17   whom you believed were al Qaeda members, of a material

18   nature, including mobile phones that had been modified to

19   act as switching devices with the intent of killing

20   uniformed American service members.

21        Do you accept responsibility for those allegations?

22        THE DEFENDANT:  Yes, I do.

23        THE COURT:  Are you offering to plead guilty

24   willingly, freely and voluntarily?

25        THE DEFENDANT:  Yes, I am.

1          THE COURT:  Has anyone coerced you in a physical

2     sense into pleading guilty?

3          THE DEFENDANT:  No.

4          THE COURT:  Have any secret promises, that is, any

5     promises other than those that are set out in the plea

6     agreement, been made to induce you to plead guilty?

7          THE DEFENDANT:  No, there are not.

8          THE COURT:  Have any threats been made, other than,

9     of course, the threat of being prosecuted?

10         THE DEFENDANT:  No.

11         THE COURT:  Have you had sufficient time to discuss

12    with your attorneys the charges in the case, your rights,

13    your possible defenses, and the consequences of pleading

14    guilty?

15         THE DEFENDANT:  Yes, I have.

16         THE COURT:  Do you believe that they have acted at

17    all times in your best interest?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Ms. Conrad, your recommendation is that

20    I accept the plea?

21         MS. CONRAD:  Yes, your Honor.

22         THE COURT:  Mr. Ferdaus, have I confused you by any

23    question I asked or anything that I said?

24         THE DEFENDANT:  No.

25         THE COURT:  You are pleading guilty because you are

```
 1    guilty, and, given the government's evidence and the
 2    agreement that you have, you believe it is in your best
 3    interest?
 4              THE DEFENDANT:  Yes.
 5              THE COURT:  Do counsel have any other areas you
 6    would like me to inquire into?
 7              MS. SIEGMANN:  No, your Honor.
 8              THE COURT:  Ms. Conrad?
 9              MS. CONRAD:  No, your Honor.
10              THE COURT:  All right, Mr. Ferdaus, if you would
11    step back to counsel table, please.
12         (Pause in proceedings.)
13              THE COURT:  I find that Mr. Ferdaus is
14    well-oriented.  He is obviously an intelligent and
15    well-educated young man.  His answers have been completely
16    responsive to my questions.
17         I find, as he acknowledges, that he understands the
18    nature of the charges and the potential penalties that he
19    faces.
20         I find he is certainly competent to tender a plea, that
21    he has done so with the full understanding of his rights and
22    the consequences of waiving those rights.
23         I find that there is a sufficient and, indeed, an
24    overwhelming basis in the facts as outlined by the
25    government to warrant a jury in finding guilt on these two
```

1    offenses beyond a reasonable doubt.

2         In sum, I find the plea is tendered voluntarily, with

3    full knowledge of the consequences and after careful

4    consideration by the defendant, with the advice of very

5    experienced counsel, of his own best interest.

6         I will accept the plea, and, of course, as the

7    agreement contemplate, reserve acceptance of the plea

8    agreement until the presentence report is prepared, shared

9    with all parties, and we all have an opportunity then to

10   resolve any disagreements that may or may not arise about

11   the contents of the report.

12        Sentencing will be schedule for Thursday, November 1,

13   2012, at 2 p.m.

14        If counsel have nothing further on this matter today,

15   we will be in recess on this case until November 1.

16             MS. SIEGMANN:  Thank you, your Honor.

17             MS. CONRAD:  Thank you, your Honor.

18             MS. BYRNE:  Thank you, your Honor.

19             THE CLERK:  All rise.

20        Court is in recess.

21        (Proceedings adjourned.)

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

# C E R T I F I C A T E

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons                September 13, 2012

_____
James P. Gibbons

                    JAMES P. GIBBONS, CSR, RPR, RMR
                         Official Court Reporter
                    1 Courthouse Way, Suite 7205
                    Boston, Massachusetts 02210
                        jmsgibbons@yahoo.com